NON-CONFIDENTIAL VERSION

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

EVOLUTIONS FLOORING, INC., *et al.*,

                    Plaintiffs,

          and,

DUNHUA CITY JISEN WOOD INDUSTRY
CO., LTD., *et al.*,

                    Consolidated-Plaintiffs

          v.

UNITED STATES,

                    Defendant,

          and,

AMERICAN MANUFACTURERS OF
MULTILAYERED WOOD FLOORING, *et al.*,

                    Defendant-Intervenors.

Before: Hon. Timothy M. Reif,
          Judge

Consol. Court No. 21-00591

NON-CONFIDENTIAL VERSION

Business Proprietary Information
Removed from Pages: 5-7, 12-15, 18,
25, and 31

## RESPONSE TO MOTION FOR JUDGMENT ON THE AGENCY RECORD

Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
Theodore P. Brackemyre, Esq.
Paul A. Devamithran, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to American Manufacturers
of Multilayered Wood Flooring*

Dated: November 17, 2022

Consol. Ct. No. 21-00591                         NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................................ 1

II.   RULE 56.2 STATEMENT ............................................................................... 2

      A.    Administrative Decision Under Review ...............................................2

      B.    Issues Presented and Summary of Argument ........................................2

III.  STATEMENT OF FACTS ............................................................................... 4

IV.   STANDARD OF REVIEW ........................................................................... 10

V.    ARGUMENT ................................................................................................. 12

      A.    Commerce's Inclusion of Respondents' Backboard Veneer
            Purchases as Part of the Veneers for LTAR Program Is Supported
            by Substantial Evidence and in Accordance with Law ..........................12

      B.    Commerce's Inclusion of UN Comtrade Data in Its Plywood for
            LTAR Benchmark Is Supported by Substantial Evidence and in
            Accordance with Law ..........................................................................16

            1.    Commerce Reasonably Found that Riverside and Baroque
                  Timber Failed to Show that Their Plywood Purchases Were
                  Limited to Specific Grades ........................................................17

            2.    Commerce Reasonably Relied on Comprehensive UN
                  Comtrade Data to Benchmark Riverside's and Baroque
                  Timber's Plywood Purchases ......................................................19

      C.    Commerce's Decision to Apply AFA with Respect to the
            Respondents' Use of the EBC Program Is Supported by Substantial
            Evidence and in Accordance with Law .................................................24

      D.    Commerce's Methodology for Valuing Baroque Timber's Back
            Veneer Purchases Is Supported by Substantial Evidence and in
            Accordance with Law ..........................................................................30

      E.    Commerce's Reliance on the VAT Information Reported by the
            GOC Is Supported by Substantial Evidence and in Accordance with
            Law .....................................................................................................32

VI.   CONCLUSION .............................................................................................. 33

Consol. Ct. No. 21-00591                                    NON-CONFIDENTIAL VERSION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alloy Piping Prods., Inc. v. United States,*
26 CIT 330, 201 F. Supp. 2d 1267 (2002) ................................................................18

*Archer Daniels Midland Co. v. United States,*
968 F. Supp. 2d 1269 (Ct. Int'l Trade 2014) ..........................................................22

*Beijing Tianhai Indus. Co. v. United States,*
52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015) ............................................................22

*Borusan Mannesmann Borus Sanayi ve Ticaret A.S. v. United States,*
61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ............................................................22

*Ceramica Regiomontana, S.A. v. United States,*
810 F.2d 1137 (Fed. Cir. 1987).................................................................................11

*Changzhou Trina Solar Energy Co. v. United States,*
352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ....................................................29, 30

*Consol. Fibers, Inc. v. United States,*
32 CIT 24, 535 F. Supp. 2d 1345 (2008) .................................................................12

*Consolo v. Fed. Mar. Comm'n,*
383 U.S. 607 (1966).................................................................................................10

*Dongtai Peak Honey Indus. Co. v. United States,*
971 F. Supp. 2d 1234 (Ct. Int'l Trade 2014), *aff'd*, 777 F.3d 1343 (Fed. Cir.
2015) ...................................................................................................................10, 11

*Essar Steel Ltd v. United States,*
678 F.3d 1268 (Fed. Cir. 2012).................................................................................28

*Fine Furniture (Shanghai) Ltd. v. United States,*
748 F.3d 1365 (Fed. Cir. 2014).................................................................................29

*Fujian Yinfeng Imp & Exp Trading Co. v. United States,*
No. 21-00088, slip op. 22-107 (Ct. Int'l Trade Sept. 13, 2022) ..................... *passim*

*Fujitsu Gen. Ltd. v. United States,*
88 F.3d 1034 (Fed. Cir. 1996).................................................................10, 11, 12, 19

*Guizhou Tyre Co. v. United States,*
348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) ....................................................29, 30

Consol. Ct. No. 21-00591                              NON-CONFIDENTIAL VERSION

*INS v. Elias-Zacarias*,
  502 U.S. 478 (1992)............................................................................10, 12, 19

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*,
  28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) .....................................................11

*Matsushita Elec. Indus. Co. v United States*,
  750 F.2d 927 (Fed. Cir. 1984).............................................................................10

*Maverick Tube Corp. v. United States*,
  857 F.3d 1353 (Fed. Cir. 2017)...........................................................................29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)...............................................................................................11

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006)...........................................................................12

*Risen Energy Co. v. United States*,
  570 F. Supp. 3d 1369 (Ct. Int'l Trade 2022) ....................................................21

*Timken Co. v. United States*,
  12 CIT 955, 699 F. Supp. 300 (1988) ..................................................11, 12, 19

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951).............................................................................................10

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)....................................................................10, 13

**Regulations**

19 C.F.R. § 351.511(a)(2)(ii) ....................................................................15, 22

**Administrative Materials**

*Cast Iron Soil Pipe Fittings From the People's Republic of China*,
  86 Fed. Reg. 7,852 (Dep't Commerce Feb. 2, 2021)...................................33

*Certain Case Iron Soil Pipe Fitting From the People's Republic of China*,
  83 Fed. Reg. 32,075 (Dep't Commerce July 11, 2018) ...............................32

*Certain Hot-Rolled Carbon Steel Flat Products from India*,
  74 Fed. Reg. 20,923 (Dep't Commerce May 6, 2009) .................................23

*Certain Softwood Lumber Products from Canada*,
  82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017).................................23

Consol. Ct. No. 21-00591                                    NON-CONFIDENTIAL VERSION

*Countervailing Duty of Certain Aluminum Foil From the People's Republic of
    China*, 83 Fed. Reg. 9,274 (Dep't Commerce Mar. 5, 2018) .................................................21

*High Pressure Steel Cylinders From the People's Republic of China*,
    83 Fed. Reg. 63,471 (Dep't Commerce Dec. 10, 2018) ........................................................15

*Multilayered Wood Flooring from the People's Republic of China*,
    85 Fed. Reg. 76,011 (Dep't Commerce Nov. 27, 2020)........................................................20

**Other Authorities**

Uruguay Round Agreements Act, Statement of Administrative Action,
    H.R. Doc. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ......................29

Consol. Ct. No. 21-00591

## I.    **INTRODUCTION**

On behalf of the defendant-intervenor in this action, American Manufacturers of Multilayered Wood Flooring ("AMMWF" or "Defendant-Intervenor"), we hereby submit the following response to the June 24, 2022 motions for judgment on the agency record filed by Plaintiffs Struxtur, Inc. and Evolutions Flooring, Inc. and Consolidated Plaintiffs Dunhua City Jisen Wood Industry Co., Ltd., Dalian Shumaike Floor Manufacturing Co., Ltd., Fine Furniture (Shanghai) Ltd. and Double F Limited (collectively, "Fine Furniture"), Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Senmao"), Zhejiang Dadongwu GreenHome Wood Co., Ltd., Yihua Lifestyle Technology Co., Ltd., Lumber Liquidators Services, LLC, Jiangsu Guyu International Trading Co., Ltd., Kingman Floors Co., Ltd., Huzhou Sunergy World Trade Co., Ltd., Dalian Shengyu Science and Technology Development Co., Ltd., Jiangsu Simba Flooring Co., Ltd., Dongtai Fuan Universal Dynamics, LLC, Zhejiang Fuerjia Wooden Co., Ltd., Baroque Timber Industries (Zhongshan) Co., Ltd. ("Baroque Timber") and Riverside Plywood Corporation ("Riverside") (collectively, "Baroque").

For the reasons discussed in this brief, in conjunction with the arguments presented by Defendant United States, Defendant-Intervenor respectfully requests that this Court reject the arguments raised by Plaintiffs and Consolidated Plaintiffs and affirm the Final Results of the U.S. Department of Commerce ("Commerce") in the 2018 administrative review of the countervailing duty ("CVD") order on *Multilayered Wood Flooring from the People's Republic of China* ("*MLWF from China*").

Consol. Ct. No. 21-00591                                          NON-CONFIDENTIAL VERSION

## II.     RULE 56.2 STATEMENT

### A.     Administrative Decision Under Review

The administrative determination challenged in this appeal is Commerce's Final Results in the 2018 administrative review of the CVD order on *MLWF from China*. *Multilayered Wood Flooring From the People's Republic of China*, 86 Fed. Reg. 59,362 (Dep't Commerce Oct. 27, 2021) (final results and partial rescission of countervailing duty admin. rev.; 2018), P.R. 402 ("Final Results") and accompanying Issues and Decision Memorandum, P.R. 393 ("Final I&D Memo").[1]

### B.     Issues Presented and Summary of Argument

#### 1.     Whether Commerce's Inclusion of Respondents' Backboard Veneer Purchases as Part of the Veneers for LTAR Program Is Supported by Substantial Evidence and in Accordance with Law?

Yes.  Commerce properly determined that Riverside's and Baroque Timber's backboard purchases were covered by the veneers for less-than-adequate remuneration ("LTAR") program. Commerce possesses broad discretion to make factual determinations such as these, and it appropriately exercised that discretion here.  The information on the administrative record, including the scope of the underlying CVD order, clearly defines what constitutes a veneer for the purposes of this program.  Commerce reasonably found that the inputs purchased by Riverside and Baroque Timber, which they identified as "backboards," meet that definition.  Fine Furniture's arguments to the contrary lack merit and should be rejected by the Court.

---

[1]     Documents on the public record of the underlying administrative review are identified here as "P.R.," followed by the number assigned to the relevant document in the administrative record index filed with the Court on January 31, 2022, ECF No. 28.  Documents in the confidential administrative record are identified by name, followed by "C.R." and the corresponding record number.

### 2. Whether Commerce's Inclusion of UN Comtrade Data in Its Plywood for LTAR Benchmark Is Supported by Substantial Evidence and in Accordance with Law?

Yes.  Commerce properly included UN Comtrade export data in its plywood for LTAR benchmark calculations.  Given the deference afforded Commerce in making factual decisions, after considering the entire record, the agency reasonably concluded that Riverside and Baroque Timber failed to show that their plywood purchases were limited to specific grades.  Moreover, since the UN Comtrade data relied on by Commerce are comprehensive and cover all grades of plywood, the agency reasonably included these data in the final benchmarks regardless of what grades of plywood the respondents purchased.  Baroque's arguments to the contrary are erroneous and should be rejected by the Court.

### 3. Whether Commerce's Decision to Apply AFA with Respect to the Respondents' Use of the EBC Program Is Supported by Substantial Evidence and in Accordance with Law?

Yes.  Commerce appropriately applied adverse facts available ("AFA") in finding that respondents used the Export Buyer's Credit program ("EBC program").  As it has in many other cases, the Government of the People's Republic of China ("GOC") repeatedly failed to provide complete information regarding the operations of this program, including critical information concerning changes made to the program and the partner and correspondent banks used to disburse program funds.  This made it impossible for Commerce to verify the extent to which Chinese respondents used the EBC program during the period of review ("POR").  In contrast to other cases identified by Plaintiffs, Commerce provided an even more detailed and thorough explanation of why missing information from the GOC left the agency unable to fully verify non-use in this proceeding.  As such, Commerce properly applied AFA, and its decision to do so should be sustained by this Court.

> **4.    Whether Commerce's Methodology for Valuing Baroque Timber's Back Veneer Purchases Is Supported by Substantial Evidence and in Accordance with Law?**

Yes.  Based on the information on the record, Commerce reasonably valued Baroque Timber's back veneer purchases in its final veneers for LTAR benchmark calculations.  To the extent there are any errors in the data, they stem entirely from how Riverside and Baroque Timber reported this data, not from Commerce's final calculations.  Commerce relied on the information as reported by the respondent and even followed the argument made by Riverside in its administrative case brief.  Baroque fails to show that Commerce's calculation methodology was unreasonable or that Baroque's preferred methodology would lead to a more accurate benchmark calculation.  Thus, Baroque unfounded arguments should be rejected by the Court.

> **5.    Whether Commerce's Reliance on the VAT Information Reported by the GOC Is Supported by Substantial Evidence and in Accordance with Law?**

Yes.  Commerce appropriately relied on the value-added tax ("VAT") information reported by the GOC in adding a 17 percent VAT to its benchmark calculations for each month of the POR.  Contrary to Baroque's arguments, Commerce fully considered and properly rejected the arguments raised by the respondents.  Commerce's use of the VAT rate as reported by the GOC is consistent with its practice in other recent determinations.  As such, Commerce reasonably relied on the same information from the GOC here, and its decision to do so should be upheld by the Court.

## III.   STATEMENT OF FACTS

Commerce initiated an administrative review of the CVD order on *MLWF from China* on February 6, 2020 for a POR covering the calendar year 2018.  *Multilayered Wood Flooring From the People's Republic of China*, 86 Fed. Reg. 21,693 (Dep't Commerce Apr. 23, 2021) (prelim. results of countervailing duty admin. rev., and intent to rescind rev. in part; 2018), P.R. 351 and

**BUSINESS PROPRIETARY INFORMATION**
**HAS BEEN DELETED**

accompanying Preliminary Decision Memorandum, P.R. 340 at 2 ("Prelim Decision Memo"). Commerce selected Riverside and Senmao as mandatory respondents on April 22, 2020.[2] Prelim Decision Memo at 2.

Riverside, Senmao, and the GOC submitted initial questionnaire responses between May 28, 2020 and July 16, 2020.  *See id.* at 3-4.  Throughout their initial responses, the GOC and the respondents failed to provide to complete information regarding the EBC program.  *See* Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Multilayered Wood Flooring from the People's Republic of China: GOC Section II Questionnaire Response* (July 16, 2020), P.R. 107-127, C.R. 51-70 at 7-11 ("GOC IQR"); Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP to Sec'y Commerce, re: *Riverside Plywood Initial Questionnaire Response: Seventh Administrative Review of the Countervailing Duty Order on Multilayered Wood Flooring from China (C-570-971) (POR: 2018)* (July 13, 2020), P.R. 106, C.R. 27-50 at 22, [          ] ("Riverside IQR"); Letter from Husch Blackwell LLP to Sec'y Commerce, re: *Multilayered Wood Flooring from the People's Republic of China: Section III Questionnaire Response* (July 6, 2020), P.R. 103, C.R. 15-25 at 12-13, [          ] ("Senmao IQR").  Of note, the GOC chose not to submit information regarding 2013 amendments to the administrative measures and implementing rules of the EBC program, which appears to have eliminated an important USD $2 million minimum contract threshold that was in place for this program.  *See* GOC IQR at 9, Exhibits EXPORT-1 – EXPORT-3.  Likewise, the GOC refused to provide information regarding the partner and correspondent banks involved in the disbursement of funds under the EBC program, deeming it "not applicable" to Commerce's analysis.  *Id.* at 9.

---

[2]    Baroque Timber is a cross-owned affiliate of Riverside, as well as a producer of subject flooring, that submitted information regarding its input purchases throughout the underlying review.  *See* Prelim Decision Memo at 10.

Riverside, Senmao, and the GOC submitted supplemental questionnaire responses between July 10, 2020 and March 10, 2021. *See* Prelim Decision Memo at 3-4. Despite being asked to provide additional information concerning the EBC program, in its supplemental response, the GOC failed to provide any information regarding the program's amendments, the minimum contract threshold, or the partner and correspondent banks involved in the disbursement of funds. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Multilayered Wood Flooring from the People's Republic of China: GOC Supplemental Questionnaire Response* (Sept. 8, 2020), P.R. 155-156, C.R. 81-82 at 4-6 ("GOC 1st SQR"); *see also* GOC IQR at 9.

In its supplemental responses, *inter alia*, Riverside provided information concerning Riverside's and Baroque Timber's backboard veneer and plywood purchases. *See* Prelim Decision Memo at 10, 38. With [                    ], Riverside's questionnaire responses described these inputs as "very thin piece{s} of wood," and its own documentation [

                              ]. Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP to Sec'y Commerce, re: *Riverside Plywood Response to Supplemental Questionnaire: Administrative Review of the Countervailing Duty Order on Multilayered Wood Flooring from China (C-570-971) (POR: 2018)* (Sept. 8, 2020), P.R. 158, C.R. 87-89 at Exhibit SD-2 ("Riverside 1st SQR"); Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP to Sec'y Commerce, re: *Riverside Plywood Second Supplemental Response: Seventh Administrative Review of the Countervailing Duty Order on Multilayered Wood Flooring from China (C-570-971) (POR: 2018)* (Oct. 2, 2020), P.R. 173, C.R. 92-94 at 1 ("Riverside 2nd SQR"). Riverside also provided revised volume and value information for Baroque Timber's [         ] purchases. Riverside 2nd SQR at [          ].

Regarding plywood, Riverside submitted purchase orders, [

] reports, purporting to show that Riverside and Baroque Timber [

]. *See* Riverside 1st SQR at Exhibits SD-11a and SD-13; Letter from

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP to Sec'y Commerce, re: *Riverside*

*Plywood Third Supplemental Response: 2018 Administrative Review of the Countervailing Duty*

*Order on Multilayered Wood Flooring from China (C-570-971) (POR: 2018)* (Mar. 10, 2021),

P.R. 332-334, C.R. 126-129 at 1-2, Exhibits TS-2 – TS-4 ("Riverside 3rd SQR").   These

documents showed that [                                                                    ] but did

not demonstrate that [                                                                    ].

AMMWF filed new subsidy allegations on August 5, 2020, alleging the provision of wood

glues and adhesives for LTAR and paint, primer, and stain for LTAR.  Prelim Decision Memo

at 3.  Commerce initiated investigations of these programs on September 15, 2020, and the agency

issued new subsidy allegation questionnaires to which the GOC and respondents submitted

responses between October 16, 2020 and November 30, 2020.  *See id.* at 3-4.

Parties filed benchmark submissions with information for Commerce to consider using as

benchmarks in the agency's LTAR program calculations between December 7, 2020 and

December 17, 2020.  *See id.* at 4, 33-36.  As part of these filings, AMMWF, Riverside, and Senmao

each submitted export data from UN Comtrade to value various inputs purchased by the

respondents.  *Id.* at 33-34.  In particular, AMMWF and Senmao provided comprehensive UN

Comtrade data to benchmark respondents' purchases of plywood for LTAR.  *Id.* at 4, 33-34.

Riverside also submitted a second benchmark filing on January 26, 2021.  Letter from Grunfeld,

Desiderio, Lebowitz, Silverman & Klestadt, LLP to Sec'y Commerce, re: *Second Benchmark Data*

*Submission: 2018 Administrative Review of the Countervailing Duty Order on Multilayered Wood*

*Flooring from the People's Republic of China (C-570-971)* (Jan. 26, 2021), P.R. 231-235 ("Riverside 2nd Benchmark Submission").

Commerce published its Preliminary Results on April 23, 2021. Preliminary Results. Commerce preliminarily included Riverside's and Baroque Timber's backboard purchases as part of the veneers for LTAR program, finding a "veneer" to be defined as "a thin slice of wood" and that all veneers, regardless of whether they are "used as an outer or inner layer," are covered by the program. Prelim Decision Memo at 38. Commerce measured the benefit for the respondents' veneer purchases based on the information reported by the respondents. *See id.* In its preliminary plywood benchmark calculations, Commerce relied on both UN Comtrade export data submitted by AMMWF and Senmao as well as International Tropical Timber Organization ("ITTO") data submitted by Riverside. *Id.* at 34-35. Commerce also added to its preliminary benchmarks the applicable VAT rate, as reported by the GOC, for LTAR inputs purchased by respondents. *Id.* at 36. Due to the failure of the GOC to provide the information requested by the agency, Commerce applied AFA with respect to the EBC program in the Preliminary Results. *Id.* at 19-25.

Following the Preliminary Results, parties filed affirmative and rebuttal case briefs on June 1, 2021 and June 15, 2021, respectively. Final I&D Memo at 2-4. AMMWF filed an affirmative brief, arguing that Commerce should (i) revise its benchmark calculations to properly value multiple sources of data, (ii) revise its benchmark calculations to properly value respondents' inland freight costs, and (iii) apply partial AFA to Riverside and Baroque Timber for failing to fully report their veneer purchases. *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Multilayered Wood Flooring from the People's Republic of China: Case Brief* (June 1, 2021), P.R. 372, C.R. 142 at 1-3, 11-14, 33, 35-37 ("AMMWF Case Br."). Chinese respondents also filed affirmative briefs, raising many of the issues now on appeal in this action. Final I&D Memo at 2-3;

*see also* Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP to Sec'y Commerce, re: *Administrative Case Brief: 2018 Administrative Review of the Countervailing Duty Order on Multilayered Wood Flooring from China (C-570-971)* (June 2, 2021), P.R. 370, C.R. 139-140 at 1-3, 17-18 ("Riverside Case Br."); Letter from Mowry & Grimson, PLLC to Sec'y Commerce, re: *Administrative Review of the Countervailing Duty Order on Multilayered Wood Flooring from the Peoples Republic of China: Case Brief* (June 1, 2021), P.R. 371, C.R. 141 at 1-2.

AMMWF filed a rebuttal case brief, responding to the arguments made by Chinese respondents in their affirmative briefs, which included many of the same issues now on appeal. *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Multilayered Wood Flooring from the People's Republic of China: Rebuttal Brief* (June 15, 2021), P.R. 384, C.R. 144 at 1-5. Chinese respondents, including Riverside and Senmao, also filed rebuttal briefs on the same day. Final I&D Memo at 3-4.

Commerce held a hearing on September 9, 2021, during which parties presented on issues raised in case and rebuttal briefs. *See* Letter from Kathleen Marksberry, Program Manager, AD/CVD Operations, Off. VIII, Enf't & Compliance to All Interested Parties, re: *Multilayered Wood Flooring from the People's Republic of China—8th Administrative Review: Scheduling of Public Hearing* (Sept. 1, 2021) P.R. 388.

Commerce published its Final Results on October 27, 2021. Final Results. Commerce made changes to its cut timber, fiberboard, plywood, veneers, and paint for LTAR benchmark calculations. Final I&D Memo at 7, 19-33, 56-57, 63-64, 66-67, 73-77, 79-81, and 85-86; *see also* Memorandum from Dennis McClure, Int'l Trade Compliance Analyst, AD/CVD Operations, Off. VIII through Katie Marksberry, Program Manager, AD/CVD Operations, Off. VIII to The File, re: *Countervailing Duty Investigation on Multilayered Wood Flooring from the People's*

Consol. Ct. No. 21-00591                                    NON-CONFIDENTIAL VERSION

*Republic of China: Final Results Calculations for Riverside Plywood Corporation* (Oct. 20, 2021), P.R. 396-397, C.R. 147-148 at 2-3, Attachment 2 (tab, Baroque Back Veneer and Conversions) ("Riverside Final Calc Memo").  Commerce published its Amended Final Results on December 1, 2021, in which it corrected, among others, ministerial errors raised by AMMWF and Senmao concerning Senmao's plywood and fiberboard benchmark calculations.  *Multilayered Wood Flooring From the People's Republic of China*, 86 Fed. Reg. 68,219 (Dep't Commerce Dec. 1, 2021) (notice of amended final results of countervailing duty admin. rev.; 2018), P.R. 414 and accompanying Ministerial Error Decision Memorandum, P.R. 409 at 2-3.

## IV.    **STANDARD OF REVIEW**

This Court reviews Commerce's decisions in CVD proceedings to determine whether those decisions are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *see also Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (citation and quotation marks omitted).  It is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *see also Dongtai Peak Honey Indus. Co. v. United States*, 971 F. Supp. 2d 1234, 1238 (Ct. Int'l Trade 2014), *aff'd*, 777 F.3d 1343, 1349 (Fed. Cir. 2015).

A plaintiff cannot ask the Court to re-weigh the evidence on the record and decide the case for Commerce.  *See Matsushita Elec. Indus. Co. v United States*, 750 F.2d 927, 936 (Fed. Cir. 1984).  Factual findings by Commerce are afforded considerable deference.  *See INS v. Elias-*

*Zacarias*, 502 U.S. 478, 483-84 (1992) (stating that in fact-intensive situations, agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion). Indeed, Commerce is afforded "tremendous deference," which is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when Commerce exercises its "technical expertise in identifying, selecting, and applying the methodologies to implement the dictates set forth in the governing statute." *Fujitsu Gen. Ltd.*, 88 F.3d at 1039. Particularly regarding technical matters, it is not the role of the Court to "weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988). In addition, the Court "uphold{s} a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp. Inc. v. Ark. Best Freight Sys.*, 419 U.S. 281, 286 (1974)); *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987). As such, Commerce need only "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle*, 463 U.S. at 43 (citation omitted).

Moreover, in determining whether Commerce's decisions in CVD proceedings are "unsupported by substantial evidence on the record, or otherwise not in accordance with the law," this Court reviews the agency's conduct under the abuse of discretion standard. *See Dongtai Peak*, 971 F. Supp. 2d at 1239; *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F. Supp. 3d 1317, 1323 (Ct. Int'l Trade 2014). Accordingly, the Court has recognized that it "(1) must consider whether {Commerce's} decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists

between {Commerce's} factfindings and its ultimate action." *Consol. Fibers, Inc. v. United States*,

32 CIT 24, 35-36, 535 F. Supp. 2d 1345, 1354 (2008).

## V.      ARGUMENT

### A.      Commerce's Inclusion of Respondents' Backboard Veneer Purchases as Part of the Veneers for LTAR Program Is Supported by Substantial Evidence and in Accordance with Law

Commerce properly determined that Riverside's and Baroque Timber's backboard

purchases were covered by the veneers for LTAR program.  Based on the scope language, the

respondents' own [                                    ], and the evidence on the record, these "very thin

piece{s}" of wood [                                                                    ].  *See*

Final I&D Memo at 75-76; Riverside 2nd SQR at 1.  Fine Furniture's arguments to the contrary

lack merit and should be rejected by the Court.  *See* Mem. of P. & A. in Supp. of Rule 56.2 Mot.

for J. upon the Agency R. of Consol. Pls. and Pl.-Intervenors Fine Furniture (Shanghai) Ltd. and

Double F Ltd. at 6-9 (June 24, 2022), ECF No. 46 ("Fine Furniture Br.").

As highlighted in the preceding section, factual findings made by Commerce are afforded

considerable deference.  *See INS*, 502 U.S. at 483-84; *Fujitsu Gen. Ltd.*, 88 F.3d at 1039; *Timken

Co.*, 12 CIT at 962, 699 F. Supp. at 306; *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352

(Fed. Cir. 2006) (describing the substantial evidence standard as "a high barrier to reversal").  Put

simply, as this Court recently averred: "it isn't the court's job to micromanage the Commerce

Department." *Fujian Yinfeng Imp & Exp Trading Co. v. United States*, No. 21-00088, slip op. 22-

107 at 21 (Ct. Int'l Trade Sept. 13, 2022).  As such, the Court should decline Fine Furniture's

invitation to take on the role of factfinder, especially as Commerce's determination was reasonable

and rationally connected to record evidence showing that backboards are in fact wood veneers that

should be covered under the veneers for LTAR program.  In arguing otherwise, Fine Furniture

fails to grapple with the broad discretion provided Commerce in making factual findings or point to any relevant record information that the agency ignored in reaching its determination or that undermines its conclusions. *See* Fine Furniture Br. at 6-9; 19 U.S.C. § 1516a(b)(1)(B)(i). Rather, Commerce fully addressed the arguments raised by Fine Furniture in the underlying review and thoroughly explained why, on the whole, the record evidence supported its determination. *See* Final I&D Memo at 75-76. Thus, there is simply no basis to Fine Furniture's claims.

In the Final Results, Commerce correctly found that "{b}ackboards are a type of veneer used in the production of subject merchandise." *Id.* at 75. In reaching that determination, Commerce relied on the information on the record, including evidence provided by Riverside. Commerce noted that the scope of the CVD order makes clear that "{m}ultilayered wood flooring is composed of an assembly of two or more layers of plies of wood veneer(s) in combination with a core." *Id.* The scope language further clarifies that a "'veneer' is a thin slice of wood, rotary cut, sliced or sawed from a log, bolt or flitch." *Id.* The four-digit Harmonized Tariff Schedule ("HTS") category for wood veneer (HTS 4408) also covers "{s}heets for veneering (including those obtained by slicing laminated wood), for plywood or for similar laminated wood and other wood, sawn lengthwise, sliced or peeled, whether or not planed, sanded, spliced or end-jointed, of a thickness not exceeding 6 mm." AMMWF Case Br. at 33; Final I&D Memo at 74. While there may be minor differences between face, core, and back veneers used in the production of subject flooring, they are all veneers. *See* Final I&D Memo at 75.

Commerce also pointed to Riverside's own description of its backboard veneers, which it describes as being "used in the production of wood flooring as 'one solid piece of wood, which is generally used as the bottom layer.'" *Id.*; Riverside 2nd SQR at 1. Riverside's questionnaire responses [                                    ] as "very thin piece{s} of wood," and its own

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**

documentation [                                                              ].  Riverside

2nd SQR at 1; AMMWF Case Br. at 35-36; Riverside 1st SQR at Exhibit SD-2.  Furthermore, as

Commerce explained, "Riverside has not provided any information which would indicate that its

backboards do not meet the definition of a veneer used in this proceeding."  Final I&D Memo at

75.  Therefore, after considering the information on the record, Commerce reasonably found that

Riverside's backboard purchases are covered by the veneers for LTAR program.[3]

In challenging Commerce's determination, Fine Furniture first argues that, because

AMMWF never filed a new subsidy allegation specific to backboards, it was unlawful for

Commerce to countervail Riverside's backboard purchases.  Fine Furniture Br. at 7.  No such

allegation was necessary as backboards are covered by the previously alleged and countervailed

veneers for LTAR program.  As explained above, Commerce examined the information on the

record and concluded that the inputs Riverside described as "backboards" constituted veneers.

Thus, Commerce correctly and reasonably found that "it is neither appropriate nor necessary for

the petitioner to file a separate {new subsidy allegation} because backboard is a type of veneer

and we have previously determined that all veneers are included in the veneer for LTAR program."

Final I&D Memo at 75.  Put simply, there is no requirement or need to separately allege the

provision of backboards for LTAR because backboards are veneers and thus are covered by the

veneers subsidy program.

---

[3]      Notably, in their administrative case briefs, Riverside and Baroque Timber did not
challenge Commerce's inclusion of their backboard purchases in the veneers for LTAR program
nor do they contest that determination here.  *See* AMMWF Case Br. at 37; Riverside Case Br. at
1-3.  Indeed, Fine Furniture—another Chinese producer and exporter of subject flooring—is the
only party to dispute Commerce's treatment of Riverside's and Baroque Timber's backboard
purchases as veneers.  *See* Fine Furniture Br. at 6-9.

**BUSINESS PROPRIETARY INFORMATION**
**HAS BEEN DELETED**

Fine Furniture next contends that differences in the [          ] between Riverside's and Baroque Timber's backboard purchases and their other veneer purchases show that Commerce improperly classified backboards as veneers.  Fine Furniture Br. at 8.  This is a results-driven argument that ignores the reality of the veneers program and the basic framework of LTAR programs.  Fine Furniture fails to point to any information regarding the [          ] of respondents' backboard purchases that Commerce failed to address or provide any explanation as to why the agency's ultimate determination was unreasonable.  *See id.*  Instead, Fine Furniture merely wishes that Commerce had weighed the record evidence differently.

Based on the information on the record, Commerce's determination was reasonable.  Necessarily, certain input purchases are [          ] than others, due to a variety of factors, and the corresponding benefits are calculated accordingly.  This is why Commerce uses broad averages to calculate benchmarks, because respondents can always point to minor differences in products.  *See* 19 C.F.R. § 351.511(a)(2)(ii); Issues and Decision Memorandum accompanying *High Pressure Steel Cylinders From the People's Republic of China*, 83 Fed. Reg. 63,471 (Dep't Commerce Dec. 10, 2018) (final results of countervailing duty admin. rev.; 2016) at 16-17.  Neither the statute, the regulations, nor agency practice require that Commerce exclude or split benchmarks based on the individual species, types, grades, sizes, or prices of a product.  In fact, if Commerce were to do so, it would open the agency's benchmark calculations up to significant gamesmanship.  Accordingly, Commerce properly rejected this line of argument.  *See* Final I&D Memo at 75.

Lastly, Fine Furniture wrongly claims that Commerce's determination "expanded the definition of veneers far beyond its use in the industry and created a dangerous precedent" by "plac{ing} any type of thin wood product within the scope of the veneers for LTAR program."

Fine Furniture Br. at 9.  This is not correct.  Commerce has clearly defined what constitutes a *veneer* for the purposes of the veneers for LTAR program.  Final I&D Memo at 75.  This definition is not overexpansive but rather is consistent with the definition provided in the scope of the CVD order.  *Id.*  Further, Fine Furniture provides no evidence or explanation as to how veneers are defined in the industry or why Commerce's definition would contradict that definition.  *See* Fine Furniture Br. at 8-9.  In this regard, Fine Furniture's claims are speculative and entirely unsubstantiated.  Policy interests also favor a comprehensive and clear definition of veneer, as relied on by Commerce in this proceeding.  If Commerce adopted a narrower and more ambiguous definition, or allowed the types of end use carve-outs suggested by Fine Furniture, it would encourage gamesmanship and, ultimately, not properly account for the full extent of countervailable subsidies being received by Chinese respondents.  *See id.* at 6-9.

In short, Commerce appropriately countervailed Riverside's and Baroque Timber's backboard purchases under the veneers for LTAR program.  Commerce possesses broad discretion to make factual determinations such as these, and it properly exercised that discretion in this instance.  The information on the administrative record, including the scope of the underlying CVD order, clearly defines what constitutes a veneer for the purposes of this program.  The inputs purchased by Riverside and Baroque Timber, which they identified as "backboards," meet that definition, and Fine Furniture's arguments to the contrary should be rejected by the Court.

**B.**     **Commerce's Inclusion of UN Comtrade Data in Its Plywood for LTAR Benchmark Is Supported by Substantial Evidence and in Accordance with Law**

Commerce properly included UN Comtrade export data in its plywood for LTAR benchmark calculations.  Baroque's arguments to the contrary are erroneous and should be rejected.  Consol. Pls.' Mot. for J. on the Agency R. at 6-21 (June 24, 2022), ECF No. 51 ("Baroque

Br."). Based on the record evidence and considering the agency's wide discretion to make factual determinations such as these, Commerce reasonably found that Riverside and Baroque Timber failed to show that their plywood purchases were limited to specific grades. Even so, because the UN Comtrade data relied on by Commerce are comprehensive and cover all grades of plywood, the agency reasonably included these data in the final benchmarks, regardless of what grades of plywood the respondents purchased. *See* Final I&D Memo at 63.

Baroque's arguments fail on two grounds. First, Commerce reasonably determined that Riverside and Baroque Timber failed to demonstrate that their plywood purchases were limited to specific grades. Second, Baroque fails to show that Commerce was unreasonable in relying on comprehensive UN Comtrade data to benchmark the respondents' plywood purchases for the agency's final determination. Even under the legal standard articulated by Baroque, Commerce reasonably included UN Comtrade data, which are inclusive of the specific grades of plywood that Riverside and Baroque Timber claim to purchase, in its plywood for LTAR benchmarks.

### 1. Commerce Reasonably Found that Riverside's and Baroque Timber's Plywood Purchases Were Not Limited to Specific Grades

Baroque argues that Riverside and Baroque Timber only purchased grades C and D plywood during the POR and that, as a result, Commerce should have limited its plywood benchmark to ITTO price data covering grade C/CC, thereby excluding the UN Comtrade export data that covered all plywood grades. Baroque Br. at 6-21. However, Commerce reasonably determined that the respondents did not demonstrate that they only purchased grades C and D plywood during the POR. *See* Final I&D Memo at 63. Commerce found that "Riverside did not provide any official company documentation to demonstrate that its plywood input is limited to a particular grade." *Id.* Commerce further reasoned that, while Riverside "provide{d} witness statements, which may be reflective of the industry as a whole," they "do not represent dispositive

evidence of the type of input used by Riverside in particular" and they "do not tie to any of Riverside's documentation in this review." *Id.*

Commerce reasonably reached these determinations after a full consideration of the record evidence and nothing in Baroque's brief suggests otherwise. *See id.*; Baroque Br. at 13-21. Baroque points to various documents, [                          ], [

                  ], but none of this documentation shows that Riverside and Baroque Timber [                                          ]. *See* Baroque Br. at 18-21; Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP to Sec'y Commerce, re: *Riverside Plywood Response to Petitioner's Pre-Preliminary Comments: 2018 Administrative Review of the Countervailing Duty Order on Multilayered Wood Flooring from China (C-570-971) (POR: 2018)* (Apr. 12, 2021), P.R. 339, C.R. 131 at 2-3; Riverside 3rd SQR at 1-2, Exhibits TS-2 – TS-4; Riverside 2nd Benchmark Submission at Exhibits S-1 – S-4; Riverside 1st SQR at Exhibits SD-11a and SD-13.  At most, these documents demonstrate that [

            ].  They say nothing, though, of the [

      ], let alone [                    ] Riverside's and Baroque Timber's plywood purchases. *See* Baroque Br. at 18-21.  Commerce recognized this in reaching its Final Results, noting that there is no "official company documentation to demonstrate that {Riverside's} plywood input is limited to a particular grade."  Final I&D Memo at 63.  As such, based on this information, it was reasonable for Commerce to reject the contention that Riverside and Baroque Timber only purchased grades C and D plywood during the POR.

Moreover, respondents bear the burden of building an adequate administrative record, and based on the information provided, Commerce reasonably concluded that Riverside's and Baroque Timber's plywood purchases were not necessarily limited to grades C and D.  *Alloy Piping Prods.,*

*Inc. v. United States*, 26 CIT 330, 348, 201 F. Supp. 2d 1267, 1284 (2002) ("The general rule" is

that "the respondent bears the burden and responsibility of creating an accurate record within the

statutory timeline."). Further, Commerce is afforded considerable deference when making factual

determinations such as these. *See INS*, 502 U.S. at 483-84; *Fujitsu Gen. Ltd.*, 88 F.3d at 1039;

*Timken Co.*, 12 CIT at 962, 699 F. Supp. at 306; *Fujian Yinfeng*, slip op. 22-107 at 21. Baroque

fails to identify any record evidence that contradicts Commerce's conclusion or show that it was

somehow unreasonable. *See* Baroque Br. at 13-21.

Accordingly, even if there was information to support Commerce reaching a different

conclusion, the agency was well within the bounds of its broad discretion in reaching its decision.

That is, in finding that "Riverside did not provide any official company documentation to

demonstrate that its plywood input is limited to a particular grade" and that the respondent "only

provides witness statements . . . which do not represent dispositive evidence of the type of input

used by Riverside . . . and which do not tie to any of Riverside's documentation in this review,"

Commerce did not ignore any record information or make a determination in clear contrast to the

weight of record evidence. Final I&D Memo at 63. Rather, it simply reached a conclusion that

Baroque does not like. That is not a basis to overturn the agency's determination. And so, the

Court should find Commerce's use of UN Comtrade data in its plywood benchmark calculations

to be supported by substantial evidence and in accordance with law.

> **2.     Commerce Reasonably Relied on Comprehensive UN Comtrade Data
> to Benchmark Riverside's and Baroque Timber's Plywood Purchases**

Even if Commerce did incorrectly find that Riverside's and Baroque Timber's plywood

purchases were not limited to grades C and D, the agency still reasonably relied on UN Comtrade

export data in its plywood benchmark calculations. In arguing otherwise, Baroque makes a straw

man argument, claiming that Commerce's determination was inconsistent with law, while

mischaracterizing the decision that the agency actually made.  *See* Baroque Br. at 6-11.  Baroque cites repeatedly to inapplicable case law to support its claim that Commerce contravened established law and practice by including UN Comtrade data in its plywood benchmarks.  *See id.* at 8-11.  These references imply that Commerce used UN Comtrade data that are wholly irrelevant to Riverside's and Baroque Timber's plywood purchases.  But, that is incorrect.  Since the UN Comtrade plywood data are not grade specific, they cover all grades, including those purchased by the respondents.  *See id.* at 17-18.

In selecting plywood benchmark data, Commerce relied on comprehensive information that was inclusive of all types of plywood purchased by Riverside and Baroque Timber.  *See* Final I&D Memo at 63.  The cases relied on by Baroque follow a different pattern and thus are not applicable here.  *See* Baroque Br. at 8-11; *see also, e.g.*, Issues and Decision Memorandum accompanying *Multilayered Wood Flooring from the People's Republic of China*, 85 Fed. Reg. 76,011 (Dep't Commerce Nov. 27, 2020) (final results and partial recission of countervailing duty admin. rev; 2017) at 38 ("MLWF China CVD AR 17 Final I&D Memo").  Most commonly in these cases, Commerce removed certain data from its benchmarks after it was shown that (1) the respondent did not purchase a particular type, grade, or size of an input, and (2) the removed data was specific to types, grades, or sizes that the respondent did not purchase.  The opposite fact pattern exists in the current proceeding.  Even if Riverside and Baroque Timber only purchased grades C and D plywood, the UN Comtrade data cover all grades and thus were not limited to non-purchased grades.  Rather, the UN Comtrade data contain information describing the very purchases that Riverside and Baroque Timber claim to have made.

To illustrate, Baroque analogizes to Commerce's final determination in the CVD investigation of *Certain Aluminum Foil from the People's Republic of China*.  Baroque Br. at 9.

There, the benchmark for primary aluminum included data for unalloyed aluminum ingot (HTS 7601.10) and alloyed ingot (HTS 7601.20), so when the respondent showed that it only produced unalloyed ingots, Commerce removed the data for alloyed ingots.  Issues and Decision Memorandum accompanying *Countervailing Duty of Certain Aluminum Foil From the People's Republic of China*, 83 Fed. Reg. 9,274 (Dep't Commerce Mar. 5, 2018) (final affirmative deter.) at 47.  Here, under the same logic, there is no data to remove, as the UN Comtrade data cover all grades and there are no data that are specific to the inputs Baroque claims it did not purchase.  This is critically distinct from cases where the data in question only covered inputs that were proven not to be purchased.

Baroque also points to the Court's recent decision in *Risen Energy Co. v. United States*, 570 F. Supp. 3d 1369 (Ct. Int'l Trade 2022);  Baroque Br. at 7.  However, the Court's remand order to Commerce to reconsider its choice of ocean freight data in *Risen* is not applicable here.  *See Risen*, 570 F. Supp. 3d at 1379.  In that case, the Court found that Commerce failed to consider certain flaws in the ocean freight data used in its benchmark analysis.  *Id.*  But, there are no such flaws in the current proceeding.  The only concern that Baroque raises with the UN Comtrade data is that it covers all grades of plywood.  *See* Baroque Br. at 6-21.

Additionally, as Commerce recognized, there is no information on the record that subject flooring cannot be produced using other grades of plywood.  *See* Final I&D Memo at 63.  In fact, Baroque acknowledges that grade C or D plywood is used by Riverside, Baroque Timber, and other subject producers to manufacture subject flooring, yet the ITTO data only covers grade C/CC.  *See* Baroque Br. at 17.  Therefore, without the UN Comtrade data, the plywood benchmarks would contain no data pertinent to Riverside's and Baroque Timber's grade D plywood purchases.

For this reason alone, it was not only reasonable but necessary for Commerce to continue to use comprehensive UN Comtrade to construct its plywood benchmarks.

Moreover, Commerce's regulations for tier-two benchmarks do not require that benchmark data be identical to the input in question for the data to appropriately represent the world market price. *See* 19 C.F.R. § 351.511(a)(2)(ii). Further to that point, Commerce's use of UN Comtrade data, which necessarily cover the grades of plywood purchased by the respondents, is consistent with court precedent. *See, e.g., Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1369 (Ct. Int'l Trade 2015) ("{T}here is nothing that requires that it use prices for merchandise that are *identical* to a respondent's purchases"); *Borusan Mannesmann Borus Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1341 (Ct. Int'l Trade 2015) ("An import benchmark's 'comparability' means it must bear a reasonably realistic resemblance to the importing market's reality or it will not be in accordance with the statute"); *Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1278 (Ct. Int'l Trade 2014) ("Commerce, though, is required only to select benchmarks that are comparable, not identical."). Thus, there is no legal standard requiring Commerce to exclude the UN Comtrade data. The agency simply made a factual determination regarding what best constituted comparable merchandise for the purpose of the benchmark based on its broad discretion to do so.

In this regard, it is also consistent with Commerce's established practice to use a comprehensive plywood benchmark, inclusive of all data on the record that describe the input in question. For example, in the 2007 administrative review of the CVD order on *Certain Hot-Rolled Carbon Steel Flat Products from India*, Commerce found that there "is no requirement that the benchmark used in the Department's LTAR analysis be identical to the good sold by the foreign government," and that "the imposition of such a requirement would likely disqualify most, if not

all, potential benchmarks under consideration in a LTAR analysis." Issues and Decision Memorandum accompanying *Certain Hot-Rolled Carbon Steel Flat Products from India*, 74 Fed. Reg. 20,923 (Dep't Commerce May 6, 2009) (final results and partial rescission of countervailing duty admin. rev.) at cmt. 12. Similarly, in its final determination in the CVD investigation of *Certain Softwood Lumber Products from Canada*, Commerce noted that "the legal requirements governing the Department's selection of benchmarks do not require perfection." Issues and Decision Memorandum accompanying *Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017) (final affirm. countervailing duty deter., and final neg. deter. of critical circumstances) at 110. Indeed, this framework is consistent with the legal standard proffered by Baroque, as Commerce is not required to exclude relevant data but rather it has established a practice of including all relevant data. *See* Baroque Br. at 6-17.

Effectively, Baroque's argument boils down to the fact that it disagrees with Commerce's decision to not only rely on ITTO grade C/CC prices but, instead, to also use UN Comtrade data covering all grades of plywood. *See id.* at 18-21. Baroque fails to identify any legal principle that would require Commerce to only use what it claims is the "most specific" ITTO data and exclude relevant UN Comtrade data. *See id.* at 6-21. That is, Baroque does not dispute that the UN Comtrade data encapsulate the grades of plywood the Riverside and Baroque Timber purport to purchase. *See id.* at 12. Baroque simply prefers for Commerce to have disregarded that data in favor of the ITTO pricing information. However, reasonable minds may differ, and Commerce's decision to use UN Comtrade data was entirely reasonable, supported by the record, and in accordance with the law. In fact, there are several reasons for Commerce to have relied on UN Comtrade data that Baroque fails to acknowledge in its brief. *See id.* at 6-21. Most notably, the ITTO pricing data on the record is limited to grade C/CC plywood. *See id.* at 17-18. Thus, even

if Riverside and Baroque Timber only purchased grades C and D plywood, at the very least, it would be unreasonable to throw out otherwise probative UN Comtrade data that could be used to benchmark grade D purchases.

In conclusion, Commerce properly included UN Comtrade data in its final plywood benchmark calculations. Commerce possesses broad discretion to make factual decisions, and in considering the entire record, the agency reasonably concluded both that Riverside and Baroque Timber failed to demonstrate that their plywood purchases were limited to specific grades and that comprehensive UN Comtrade was appropriate to include in the plywood benchmarks. Baroque's arguments to the contrary are not persuasive. Baroque fails to show why Commerce was required to exclude the UN Comtrade data and, instead, the record evidence demonstrates that the agency had every reason to rely on that information in its final determination.

### C.  Commerce's Decision to Apply AFA with Respect to the Respondents' Use of the EBC Program Is Supported by Substantial Evidence and in Accordance with Law

Consolidated Plaintiffs argue that Commerce erred in applying AFA regarding respondent companies' use of the EBC program. *See* Consol. Pls.' Rule 56.2 Mot. for J. on the Agency R. at 4-9 (June 24, 2022), ECF No. 49 ("Guyu Br."); Pl.-Intervenors' Mot. for J. on the Agency R. at 2-11 (June 24, 2022), ECF No. 50 ("Dunhua City Br."); Fine Furniture Br. at 9-13; Baroque Br. at 21-31. However, as Commerce explained, the record of the underlying administrative review does not contain complete information regarding the EBC program and does not adequately demonstrate that respondents did not use the program during the POR. *See* Final I&D Memo at 19-33. This Court recently recognized the deference afforded Commerce in upholding the agency's decision to apply AFA as to the use of this program in nearly identical circumstances and pursuant to the same reasoning as in this review. *See Fujian Yinfeng*, slip op. 22-107. In contrast,

the case law referenced by Consolidated Plaintiffs is distinguishable. *See* Guyu Br. at 4-9; Dunhua City Br. at 2-11; Fine Furniture Br. at 9-13; Baroque Br. at 21-31. Accordingly, Commerce appropriately applied AFA and its decision to do so should be sustained by this Court.

As an initial matter, in its recent decision in *Fujian Yinfeng*, this Court upheld Commerce's determination to apply AFA as to the use of the EBC program under a similar fact pattern. *See Fujian Yinfeng*, slip op. 22-107 at 11-15. There, the Court found that "Commerce explained at length why the missing information was necessary" to "confirm non-use of the {EBC program}." *Id.* at 13. Specifically, as is the case here, the Court found that Commerce's "thorough explanation of exactly why the missing information was necessary to verify {EBC program} non-use distinguishes this case from other cases where this court has held that Commerce failed to properly explain the need for the absent information." *Id.* at 15. Further, like in *Fujian Yinfeng*, Commerce thoroughly explained here why the GOC's refusal to provide requested information concerning the EBC program's USD $2 million contract minimum, the correspondent and partner banks of the EBC program, and other elements of this subsidy program have made it impossible for Commerce to fully verify whether respondents did in fact use this program. *See* Final I&D Memo at 28-29; *see also Fujian Yinfeng*, slip op. 22-107 at 13-14.

Commerce explained in extensive detail its application of AFA as to the use of the EBC program throughout this proceeding. *See* Final I&D Memo at 13-33; *Fujian Yinfeng*, slip op. 22-107 at 11-15. Here, the GOC and the respondents have continued to not provide the necessary information about the EBC program. *See* GOC IQR at 7-11; GOC 1st SQR at 4-6; Riverside IQR at 22, [          ]; Senmao IQR at 12-13, [              ]; Prelim Decision Memo at 23-26. In reaching its final determination, the agency described the evolution of its analysis on this issue, which informs its decision to continue to apply AFA when the GOC fails to provide the requested

information.  *See* Final I&D Memo at 19-24.  In particular, Commerce explained the history behind

its reasoning as to why information regarding changes to the EBC program is necessary for the

agency to evaluate respondents' use of the program.  *See id.* at 23-24.  Then, Commerce applied

its analysis to the facts of this proceeding, continuing to find that based on the GOC's failure to

provide requested information concerning revisions made to the EBC program and the partner and

correspondent banks involved in the disbursement of program funds, it was not possible for the

agency to fully understand how the program operates and, thus, it could not determine the extent

to which respondents used the program during the POR.  *See id.* at 24-33.

   For instance, the GOC provided copies of administrative measures and implementing rules

regarding this program, dating to 2000 and 1995, respectively.  GOC IQR at 9, Exhibits

EXPORT-2, EXPORT-3.  However, the program was amended in 2013.  *Id.* at Exhibit

EXPORT-1.  And, it appears that the 2013 revisions eliminated an important USD $2 million

minimum contract threshold that was in place for this program.  *Id.*  Despite being asked

specifically about these changes in the program, the GOC repeatedly failed to provide any

information regarding the program's amendments or whether the minimum contract threshold had

been eliminated.  GOC 1st SQR at 4-6.  As Commerce explained, without necessary information

about this USD $2 million contract minimum, Commerce would have to examine all loans received

by Senmao, Riverside, and Baroque Timber's customers, substantially impeding its ability to

analyze respondents' use of this program.  *See* Final I&D Memo at 29; *Fujian Yinfeng*, slip op.

22-107 at 13.

   Similarly, the GOC repeatedly refused to provide information regarding the partner and

correspondent banks involved in the disbursement of funds under the EBC program.  GOC IQR

at 9; GOC 1st SQR at 4-6.  This is essential information about the internal administration of the

program, yet the GOC deemed it "not applicable" on the presumptive basis that none of the respondents' U.S. customers used the EBC program.   GOC IQR at 9.   In the previous administrative review of the same CVD order, in no uncertain terms, Commerce stated that it "cannot verify non-use of the EBC Program without a complete set of administrative measures on the record that would provide necessary guidance to Commerce in querying the records and electronic databases of the China Ex-Im Bank."   MLWF China CVD AR 17 Final I&D Memo at 60 n.358.   Without current versions of these documents, Commerce cannot determine the mechanisms through which assistance is provided.  Even if respondents' customers claim non-use, Commerce cannot know that respondents and respondents' customers are the appropriate parties to make that assessment, unless and until the GOC provides all original and translated copies of all the current laws, regulations, and other government documents for this program.  This is all information that the GOC possesses yet has failed to provide.  *See* Final I&D Memo at 29.

The GOC also chose not to submit a "complete list of correspondent/partner/intermediate banks."  *Id.* at 30.  Once again, without knowing how or through which entities funds are disbursed for the EBC program, it is not possible for Commerce to determine whether respondents used the program.  As Commerce explained, "there will not necessarily be an account in the name 'China Ex-Im Bank' in the books and records . . . of the U.S. customers."  *Id.* at 27; *see also Fujian Yifeng*, slip op. 22-107 at 14.  Nor could Commerce "narrow down the company's lending to a subset of loans likely to be the export buyer's credits (*i.e.*, loans from correspondent banks)."  Final I&D Memo at 28; *see also Fujian Yifeng*, slip op. 22-107 at 14.  Put simply, without this information, the flow of funding—and, thus, the ultimate users of the program—remains unknown. As such, without this critical information, Commerce reasonably determined (and thoroughly explained why) it was unable to verify whether respondents did in fact use this program.

In challenging this determination, Consolidated Plaintiffs cannot and do not argue that the GOC has not repeatedly failed to provide information requested by Commerce.  *See* Guyu Br. at 4-9; Dunhua City Br. at 2-11; Fine Furniture Br. at 9-13; Baroque Br. at 21-31.  Rather, they argue that the information was simply not "necessary," *see* Guyu Br. at 7-8; Dunhua City Br. at 3-5; Fine Furniture Br. at 10; Baroque Br. at 23-25, or that there was no "gap" in the record such that AFA was required, *see* Guyu Br. at 5; Dunhua City Br. at 5-8; Fine Furniture Br. at 11-13; Baroque Br. at 23-25.  In effect, Chinese respondents have taken it upon themselves to decide what information is required for Commerce to make a determination as to the use of the EBC program. This is of course inappropriate.  As the finder of fact, it is Commerce's role to decide what information is necessary to assess the extent to which a subsidy program is used.  As discussed above, Commerce fully explained why necessary information was missing from the record and how this deficiency in the record supported the application of AFA.  As such, Consolidated Plaintiffs' claims that the missing information was unnecessary are unpersuasive.

Consolidated Plaintiffs also argue that Commerce has no reason to thoroughly understand how a subsidy program operates prior to determining whether that program was used by respondents.  *See, e.g.*, Guyu Br. at 7.  This line of argument is without merit.  As the agency charged with administering the CVD laws, Commerce has an obligation to thoroughly investigate potentially countervailable subsidies and, in doing so, Commerce has the authority to request information from respondent parties, including foreign governments, concerning such programs. A respondent's repeated failure to cooperate without consequence will only serve to undermine Commerce's authority and its ability to conduct fair proceedings.  As Commerce lacks subpoena power over foreign respondents, *Essar Steel Ltd v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012), the ability to utilize the facts available portion of the statute and apply adverse inferences

is critical to effectively administering the antidumping and countervailing duty laws, *see, e.g.*, Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 868 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4197.  As the U.S. Court of Appeals for the Federal Circuit ("CAFC") has recognized, "the purpose of the adverse facts statute is 'to provide respondents with an incentive to cooperate' with Commerce's investigation."  *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1360 (Fed. Cir. 2017) (quoting *F.lli De Cecco Di Filippo Fara S. Martin S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).  Indeed, the CAFC previously affirmed Commerce's authority to respond to a foreign government's failures, even when such action negatively impacts foreign company respondents because such action "has the potential to encourage the {GOC} to cooperate so as not to hurt its overall industry."  *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014).

Additionally, prior opinions of this Court do not dictate the outcome here.  Commerce provided a fulsome explanation as to why the GOC's refusal to provide specific information regarding the EBC program has made it impossible for the agency to fully verify non-use of the program, and that more detailed explanation distinguishes the current proceeding from previous cases.  *See, e.g.*, *Fujian Yinfeng*, slip op. 22-107 at 15.  For instance, Consolidated Plaintiffs attempt to analogize this case to *Guizhou Tyre Co. v. United States* and *Changzhou Trina Solar Energy Co. v. United States*.  *See* Guyu Br. at 7-8; Dunhua City Br. at 7; Fine Furniture Br. at 12; Baroque Br. at 26-29; *see also Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018); *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018).  In *Guizhou Tyre*, this Court ordered Commerce to reconsider its decision to apply AFA as to the EBC program and to consider the evidence of non-use that was on the record of that proceeding.  *Guizhou Tyre*, 348 F. Supp. 3d at 1281.  Critically, despite Consolidated Plaintiffs'

rhetoric, this Court has not found that Commerce cannot apply AFA to the EBC program under circumstances such as those present in this proceeding. Rather, this Court held in *Guizhou Tyre*, 348 F. Supp. 3d at 1281, as well as in *Trina Solar*, 352 F. Supp. 3d at 1327-28, that Commerce needed only to explain in sufficient detail its reasoning behind its application of AFA. Indeed, the Court in *Trina Solar* found that Commerce simply "did not explain how an adverse inference regarding the operation of the {EBC program} leads to a finding that respondents used the program." *Trina Solar*, 352 F. Supp. 3d at 1326. And so, the Court remanded the matter to Commerce so that the agency could further explain its reasoning. *Id.* at 1326-27.

The other cases relied on by Consolidated Plaintiffs likewise largely consist of proceedings in which the Court remanded Commerce's determination so that the agency could adequately explain its reasoning for apply AFA for the EBC program. *See* Guyu Br. at 4-7; Dunhua City Br. at 6-11; Fine Furniture Br. at 9-13; Baroque Br. at 22-27. In this regard, these cases are factually distinguishable from the current proceeding, as Commerce has provided a more fulsome explanation of its determination here. As such, the fact that the Court may have remanded Commerce's application of AFA with respect to the EBC program in other proceedings, based on different explanations from the agency, does not require the same outcome here.

In sum, Commerce reasonably concluded that necessary information was missing from the record for the agency to determine the extent to which Chinese respondents used the EBC program. Therefore, Commerce's application of AFA in this respect was supported by substantial evidence, in accordance with law, and should be sustained by this Court.

### D.   Commerce's Methodology for Valuing Baroque Timber's Back Veneer Purchases Is Supported by Substantial Evidence and in Accordance with Law

Based on the information provided by the respondent, Commerce reasonably valued Baroque Timber's back veneer purchasers in its final veneers for LTAR benchmark calculations.

*See* Final I&D Memo at 79-80; Riverside Final Calc Memo at 2-3, Attachment 2 (tab, Baroque Back Veneer). Baroque asserts that Commerce erred by inaccurately allocating and converting volumes and values of Baroque Timber's back veneer purchases. Baroque Br. at 31-33. However, there are no errors to correct as Commerce's benchmark calculations are based directly on the density data and the line item volume and value information reported by Baroque Timber regarding its back veneer purchases. *See* Riverside Final Calc Memo at Attachment 2 (tab, Baroque Back Veneer); Riverside 2nd SQR at [          ]. Commerce converted Baroque Timber's reported purchases from cubic meters to kilograms and, in doing so, calculated the benefit received for each purchase based on the information reported by the respondent. *See* Riverside Final Calc Memo at Attachment 2 (tab, Baroque Back Veneer). Baroque's arguments to the contrary are unfounded, especially as Baroque fails to show that its preferred calculation methodology would result in a more accurate benchmark. *See* Baroque Br. at 31-33.

To the extent there are any inaccuracies in the data, they stem entirely from how Riverside and Baroque Timber reported this data, not from Commerce's final calculations. Commerce largely followed the argument made by Riverside in its case brief and did so by using the purchase data as reported by the respondent. *See* Riverside Case Br. at 17-18; Riverside 2nd SQR at [

]; Riverside Final Calc Memo at Attachment 2 (tab, Baroque Back Veneer). Even if certain values in the back veneers purchase data reported for Baroque Timber were not properly allocated, there is no way for Commerce to determine what the correct purchase values or volumes should be or to verify that aggregating them would result in an accurate per-purchase calculation. In fact, aggregating Baroque Timber's back veneer purchases and calculating benefits at the aggregated level is distortive and inconsistent with Commerce's established practice, especially when not necessary for conversion purposes. *See, e.g.*, Issues and Decision Memorandum accompanying

Consol. Ct. No. 21-00591                                    NON-CONFIDENTIAL VERSION

*Certain Case Iron Soil Pipe Fitting From the People's Republic of China*, 83 Fed. Reg. 32,075 (Dep't Commerce July 11, 2018) (final affirm. countervailing duty deter.) at 20 ("{A} benefit is either conferred or not conferred, and a positive benefit from certain transactions cannot be masked by negative benefits from other transactions").  In other words, there is simply no basis to make such an adjustment, as Baroque suggests.  *See* Baroque Br. at 31-33.

Accordingly, it was entirely reasonable, and consistent with the record evidence, for Commerce to have calculated the benefits received from Baroque Timber's back veneer purchases in the way it did.  Commerce relied on the information as reported by the respondent.  Baroque's mistaken arguments lack merit, and no adjustment to Commerce's final calculations is necessary.

### E.  Commerce's Reliance on the VAT Information Reported by the GOC Is Supported by Substantial Evidence and in Accordance with Law

Commerce reasonably relied on the VAT information reported by the GOC in adding a 17 percent VAT to its benchmark calculations for each month of the POR.  *See* Final I&D Memo at 81-82.  Baroque argues that Commerce improperly ignored information showing that the relevant VAT rate was lowered to 16 percent from May 2018 through the end of the POR.  Baroque Br. at 33-35.  Contrary to this claim, as Commerce detailed in its final decision memorandum, the agency fully considered and properly rejected the arguments raised by the respondent.  *See* Final I&D Memo at 81-82.  Commerce noted that while Riverside reported a VAT rate of 16 percent for certain months, the GOC reported a 17 percent rate for the entire POR.  *Id.*  Commerce also determined that the GOC is "the authority responsible for setting the VAT rate" and that it "certified the accuracy of its response."  *Id.* at 82.  Thus, Commerce was reasonable in relying exclusively on the VAT information submitted by the GOC.  What is more, Commerce found that "Riverside provided no explanation as to why the VAT rate for certain purchases during the POR differed from the VAT rate provided in the GOC's response."  *Id.*

In this regard, Commerce's use of the VAT rate as reported by the GOC is consistent with the Commerce's determination in the 2017-2018 administrative review of the CVD order on *Cast Iron Soil Pipe Fittings from the People's Republic of China*. There, Commerce continued to use the VAT rate reported by the GOC absent an explanation from the respondent for the difference and where the GOC was the authority for setting the VAT rate and submitted a certification to its accuracy. Issues and Decision Memorandum accompanying *Cast Iron Soil Pipe Fittings From the People's Republic of China*, 86 Fed. Reg. 7,852 (Dep't Commerce Feb. 2, 2021) (final results of countervailing duty admin. rev.; 2017-2018) at 8. Commerce properly relied on the same information from the GOC under similar circumstances in this proceeding. And thus, Commerce appropriately used a 17 percent VAT in its benchmark calculations for the entire POR.

## VI.   CONCLUSION

For the reasons detailed above, Defendant-Intervenor respectfully requests that the Court reject the arguments raised by Plaintiffs and Consolidated Plaintiffs and affirm Commerce's Final Results in the 2018 administrative review of the CVD order on *MLWF from China*.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
Theodore P. Brackemyre, Esq.
Paul A. Devamithran, Esq.

**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
(202) 719-7000

*Counsel to American Manufacturers of
Multilayered Wood Flooring*

Dated: November 17, 2022

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(l), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Response to Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 10,346 words.

<u>/s/ Timothy C. Brightbill</u>
(Signature of Attorney)

<u>Timothy C. Brightbill</u>
(Name of Attorney)

<u>American Manufacturers of Multilayered Wood Flooring</u>
(Representative Of)

<u>November 17, 2022</u>
(Date)