**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

|  |  |  |
|---|---|---|
| **EVOLUTIONS FLOORING, INC.**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **and** | ) | |
| | ) | |
| **DUNHUA CITY JISEN WOOD INDUSTRY CO., LTD.**, *et al.*, | ) | |
| | ) | |
| **Consolidated Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Consol. Court No. 21-00591** |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING,** | ) | |
| | ) | |
| **Defendant-Intervenors.** | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:
JONZACHARY FORBES
U.S. Department of Commerce
Office of Chief Counsel for
Trade Enforcement and Compliance
1401 Constitution Avenue, NW.
Washington, DC 20230-0001
Telephone: (240) 449-5906
Facsimile: (202) 482-8184
Email: JonZachary.Forbes@trade.gov

November 17, 2022

KELLY M. GEDDES
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 353-0534
Email:  Kelly.Geddes2@usdoj.gov

*Attorneys for Defendant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

STATEMENT PURSUANT TO RULE 56.2 ........................................................................ 2

    I.   Administrative Determination Under Review ............................................................ 2

    II.  Statement Of Issues .................................................................................................. 2

STATEMENT OF FACTS ................................................................................................... 3

SUMMARY OF ARGUMENT ............................................................................................ 7

ARGUMENT ......................................................................................................................... 9

    I.   Standard Of Review .................................................................................................. 9

    II.  Commerce's Calculation Of The Benchmark Price For Plywood Is Supported By Substantial Evidence And Otherwise In Accordance With Law ............................... 11

    III. Commerce's Inclusion Of Respondents' Backboard Purchases In The Veneers For LTAR Program Is Based On Substantial Evidence And In Accordance With Law ... 19

    IV. Commerce's VAT Calculation Is Supported By Substantial Evidence And Otherwise In Accordance With Law .......................................................................................... 21

    V.  Commerce's Finding Based On Adverse Facts Available Of Use Of The EBC Program Was Supported By Substantial Evidence And Otherwise In Accordance With Law ..................................................................................................................... 23

          A.  Legal Framework ............................................................................................ 24

          B.  Commerce Has Fully Justified The Use Of Adverse Facts Available Based On The Government Of China's Failure To Report Requested Information Regarding The EBC Program ............................................................................ 26

               1.   The Government Of China Failed To Provide Requested Information Regarding The EBC Program .......................................................... 26

               2.   The Withheld Information Was Necessary To Verify Non-Use ....... 29

               3.   With Respect To Riverside, No Other Information In The Record Or Accessible By Respondents Could Verify Non-Use Of The EBC Program ............................................................................................ 30

          C.  Commerce Requests A Voluntary Remand To Further Evaluate Its Use Of Adverse Facts Available Regarding Senmao's Use Of The EBC Program.... 35

    VI. Commerce Made An Inadvertent Error In Its Backboard Veneer Calculation And Requests A Voluntary Remand .............................................................................. 36

CONCLUSION ..................................................................................................................... 37

# **TABLE OF AUTHORITIES**

**Cases**

*Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)................................................. 10

*Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1279 (Ct. Int'l Trade 2014) .................................................................................................................... 13

*Changzhou Trina Solar Energy Co., Ltd. v. United States*, 255 F. Supp. 3d 1312, 1324-27 (Ct. Int'l Trade 2017) ........................................................................................... 25, 35, 39

*Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1353 (Ct. Int'l Trade 2019)............. 30, 39

*Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007)................................................. 11

*Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273 (Fed. Cir. 2012) ............................... 12, 13

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1371-73 (Fed. Cir. 2014)....... 28

*Fujian Yinfeng Imp & Exp Trading Co. v. United States*, No. 21-00088, 2022 WL 4180886, at *6 (Ct. Int'l Trade Sept. 13, 2022) ................................................................. 29, 37, 38, 40

*Fujitsu Gen. Ltd. v. United States*, 88 F. 3d 1034, 1038 (Fed. Cir. 1996) ............................. 10, 11

*Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006).......... 11

*Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) .............. 14

*Guizhou Tyre Co., Ltd. v. United States*, 399 F. Supp. 3d 1346, 1349-53 (Ct. Int'l Trade 2019) 39

*Guizhou Tyre Co., Ltd. v. United States*, 523 F.Supp.3d 1312, 1361 (Ct. Int'l Trade May 19, 2021)................................................................................................................. 29, 30

*KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010) ................................................. 28

*Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013).................... 23

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001).............. 10

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003)............................... 28

*OMG, Inc. v. United States*, 972 F.3d 1358, 1363 (Fed. Cir. 2020) ............................................ 23

*Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1379 (Fed. Cir. 2016) ......... 29

*Pierce v. Indseth*, 106 U.S. 546, 551 (1883)................................................................................. 26

*Risen Energy Co. v. United States*, 560 F.Supp.3d 1369 (Ct. Int'l Trade May 12, 2022)...... 15, 21

*SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001)........................................ 41

*Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308 (Fed. Cir. 2020) ...................................... 10

*Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382-83 (Fed. Cir. 2005)........................ 24

*United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009)........................................................ 10

*Yama Ribbons & Bows Co. v. United States*, 865 F. Supp. 2d 1294, 1298 (Ct. Int'l Trade 2012)26

**Statutes**

19 U.S.C. § 1677 .................................................................................................. 11

19 U.S.C. § 1677e ....................................................................................... 5, 24, 35

19 U.S.C. § 1677m .............................................................................................. 22

19 U.S.C. 1516a .................................................................................................... 9

**Regulations**

19 C.F.R. § 351.301 .............................................................................................. 23

19 C.F.R. § 351.307 .............................................................................................. 34

19 C.F.R. § 351.308 .............................................................................................. 24

19 C.F.R. § 351.511 ............................................................................... 11, 12, 13, 14

**Administrative Determinations**

*Carbon and Alloy Steel Threaded Rod from the People's Republic of China: Preliminary Affirmative Countervailing Duty Investigation and Alignment of Final Determination with Final Antidumping Duty Determination*, 84 Fed. Reg. 36,578 (Dep't of Commerce July 29, 2019), and accompanying PDM ............................................................................. 33

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (Sept. 27, 2010) ............................................................................................................. 18

*Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Jan. 2, 2016), and accompanying IDM .................. 17

*Chlorinated Isocyanurates from the People's Republic of China:  Final Affirmative Countervailing Duty Determination; 2012*, 79 Fed. Reg. 56,560 (Dep't of Commerce Sept. 22, 2014) and accompanying IDM ......................................................................... 33

*Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 Fed. Reg. 4,936 (Jan. 28, 2009), and accompanying IDM ........................................................................................... 20

*Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2018*, 86 Fed. Reg. 6,866 (Jan. 25, 2021) and accompanying IDM ........................................................................ 20

*Countervailing Duty Investigation of 1,1,1,2 Tetrafluoroethane from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 79 Fed. Reg. 62,594 (October 20, 2014), and accompanying IDM ...................................................................... 35

*Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9,274 (Mar. 5, 2017), and accompanying IDM ........................................................................................... 19

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016), and accompanying IDM ........................................................................................... 13

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018), and accompanying IDM ...................................... 16

*Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 56,640 (Sept. 28, 2005), and accompanying IDM ...................... 18

*Multilayered Wood Flooring from the People's Republic of China: Amended Antidumping and Countervailing Duty Orders*, 77 Fed. Reg. 5,484 (Dep't of Commerce Feb. 3, 2012) ............. 3

*Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 76,693 (Dep't of Commerce Dec. 8, 2011) ........................................................ 3

*Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 76,011 (Nov. 27, 2020), and accompanying IDM ................................................................................... 19, 22

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| **EVOLUTIONS FLOORING, INC.**, *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| **and** ) | |
| ) | |
| **DUNHUA CITY JISEN WOOD INDUSTRY** ) | |
| **CO., LTD.**, *et al.*, ) | |
| ) | |
| **Consolidated Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Consol. Court No. 21-00591** |
| ) | |
| **UNITED STATES,** ) | **PUBLIC VERSION** |
| ) | |
| **Defendant,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **AMERICAN MANUFACTURERS OF** ) | |
| **MULTILAYERED WOOD FLOORING,** ) | |
| ) | |
| **Defendant-Intervenors.** ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the Court, defendant, the United States, respectfully

responds to the motions for judgment on the agency record filed by plaintiffs and consolidated

plaintiffs challenging the Department of Commerce's final results in the eighth administrative

review of the countervailing duty order covering multilayered wood flooring from the People's

Republic of China.  As explained below, the motions should be denied because the final results

are supported by substantial evidence and are otherwise in accordance with law, except as

concerns two issues:  we respectfully request a voluntary remand to correct a single calculation

issue and to further evaluate the decision to apply adverse facts available to find that respondent

Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. benefited from the government of China's

Export Buyer's Credit program.

**STATEMENT PURSUANT TO RULE 56.2**

**I.      Administrative Determination Under Review**

The administrative determination under review is *Multilayered Wood Flooring From the*

*People's Republic of China:  Final Results and Partial Rescission of Countervailing Duty*

*Administrative Review; 2018*, 86 Fed. Reg. 59,362 (Dep't of Commerce Oct. 27, 2021) (*Final*

*Results*) (P.R. 402), and accompanying Issues and Decisions Memorandum (IDM) (P.R. 393),

amended by *Multilayered Wood Flooring from the People's Republic of China:  Notice of*

*Amended Final Results of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg.

68,219 (Dep't of Commerce Dec. 1, 2021) (P.R. 414).  The period of review is January 1, 2018,

through December 31, 2018.

**II.     Statement Of Issues**

1.      Whether Commerce's calculation of the benchmark for plywood is supported by

substantial evidence and otherwise in accordance with law.

2.      Whether Commerce's inclusion of respondents' backboard purchases in the

veneers for less than adequate remuneration (LTAR) program is based on substantial evidence

and in accordance with law.

3.      Whether Commerce's value-added tax (VAT) calculation is supported by

substantial evidence and otherwise in accordance with law.

4. Whether Commerce's application of adverse facts available (AFA) to find that respondents used the Export Buyer's Credit (EBC) Program is supported by substantial evidence and otherwise in accordance with law.

5. Whether Commerce erred in its back veneer calculation.

## STATEMENT OF FACTS

The Department of Commerce published a countervailing duty (CVD) order on multilayered wood flooring from the People's Republic of China on December 8, 2011.  *See Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 76,693 (Dep't of Commerce Dec. 8, 2011) (CVD Order); *see also Multilayered Wood Flooring from the People's Republic of China: Amended Antidumping and Countervailing Duty Orders*, 77 Fed. Reg. 5,484 (Dep't of Commerce Feb. 3, 2012).  On December 6, 2019, Commerce issued a notice that interested parties could request an administrative review of the order.  *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 84 Fed. Reg. 66,880 (Dep't of Commerce Dec. 6, 2019) (P.R. 33).  Following timely requests, Commerce initiated the administrative review.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 6,896 (Dep't of Commerce Feb. 6, 2020) (P.R. 34).

Commerce selected Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. (Senmao) and Riverside Plywood Corp. (Riverside) as mandatory respondents, as they were the two companies that accounted for the largest volume of subject merchandise imports during the period of review based on an analysis of Customs and Border Protection data and certified quantity and value information that was timely submitted.  *See* Countervailing Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China:  Respondent Selection (Apr. 22, 2020) (P.R. 74, C.R. 8).

On May 14, 2020, Commerce issued its initial countervailing duty questionnaire to Riverside, Senmao, and the government of the People's Republic of China.  *See* 2018 Countervailing Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China:  Countervailing Duty Questionnaire (May 14, 2020) (P.R. 77).  Commerce subsequently issued new subsidy allegation and supplemental questionnaires to the respondents and the government of China.  *See* PDM at 3 (P.R. 340).  In their initial questionnaire responses, Riverside and Senmao claimed that they had not benefitted from the Export Buyer's Credit (EBC) program, a governmental program through which China's government-owned Export-Import Bank (Ex-Im Bank) offers loans to customers of Chinese exporters at reduced rates.  *Id.* at 19.  To support this claim, Senmao submitted non-use certifications for all its reported U.S. customers.  *Id.* (citing Senmao Initial Questionnaire Response (July 6, 2020) at 12-13 (P.R. 103, C.R. 15)).  Riverside submitted non-use certifications from some of its listed U.S. customers, but most of them did not provide such certificates.  *Id.* (citing Riverside Initial Questionnaire Response (July 13, 2020) at 22 (P.R. 106, C.R. 27)).  The government of China submitted its initial questionnaire response on July 16, 2020, similarly asserting that respondents had not used the EBC program.  Multilayered Wood Flooring from the People's Republic of China:  Gov. China Section II Questionnaire Response (July 16, 2020) (Gov. China IQR) (P.R. 107-108, C.R. 51-70).  However, as further explained in the argument below, the government of China refused to provide requested information Commerce could have used to verify the claimed non-use of the EBC program, including identities of the banks that were involved in the program and sample loan documentation.

On April 23, 2021, Commerce published its preliminary results.  Commerce found that during the period of review, the government of China was providing countervailable subsidies to

producers and exporters of multilayered wood flooring, including by providing veneers and plywood for less than adequate renumeration (LTAR) and through the EBC program. *See* PDM at 36-47. Commerce further determined that the necessary information to allow Commerce to verify non-use of the EBC program was missing from the record, and that the government of China had failed to provide that information despite Commerce's request to do so. *Id.* at 19-24. Accordingly, Commerce explained that it had applied facts otherwise available and adverse inferences pursuant to 19 U.S.C. § 1677e(a) and (b) because the government of China failed to cooperate by not acting to the best of its ability to provide the requisite information. *Id.* at 8-9. Commerce assigned countervailable subsidy rates of 9.36 percent for Riverside and its cross-owned affiliates and 5.19 percent for Senmao. *See Multilayered Wood Flooring From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Intent To Rescind Review, in Part; 2018*, 86 Fed. Reg. 21,693, 21,694 (Dep't of Commerce Apr. 23, 2021) (P.R. 351). Commerce assigned a countervailable subsidy rate of 8.12 percent to the non-selected companies under review. *Id.* Commerce calculated this subsidy rate based on the weighted average of the subsidy rates calculated for Senmao and Riverside using publicly-ranged sales data submitted by those two respondents. *Id.*

Following publication of the preliminary results, the petitioner, the government of China, Riverside, and Senmao submitted timely administrative case briefs. *See* IDM at 2-3. Additionally, Commerce received various case briefs from other interested parties, including Fine Furniture (Shanghai) Limited and Double F Limited (collectively, Fine Furniture) and Lumber Liquidators Services, LLC (Lumber Liquidators). *Id.* at 3.

On October 27, 2021, Commerce published its final results, making certain changes to the calculations for various LTAR programs and continuing to apply adverse facts available

(AFA) to find that the respondents used the EBC Program. *See Final Results*; *see also* IDM at 7, 19-33. Commerce calculated a final subsidy rate of 9.18 percent for Riverside and its cross-owned affiliates, 5.81 percent for Senmao, and 8.12 percent for the non-selected companies. *Final Results*, 86 Fed. Reg. at 21,694.

Plaintiffs Evolutions Flooring, Inc. and Struxtur, Inc. (collectively Evolutions) initiated this action on November 23, 2021. *See* ECF No. 1. On February 11, 2022, it was consolidated with three other cases challenging the same final results. *See* ECF No. 29. Plaintiffs have filed seven motions for judgment on the administrative record. ECF Nos. 43-45, 48-51. Consolidated plaintiffs Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation (cross-owned affiliates who we will refer to collectively as Riverside) argue that Commerce erred in its calculation of the benchmark price for plywood and its determination of the applicable value-added tax (VAT) rate. ECF No. 51 at 12-21. Plaintiff Fine Furniture (Shanghai) Limited and plaintiff-intervenor Double F Limited (collectively Fine Furniture) argue that Commerce erred by including of backboard as "veneers" within the scope of the countervailing duty order. ECF No. 46 at 6-9. Riverside and Fine Furniture also argue, along with plaintiff-intervenors Dunhua City Jisen Wood Industry Co., Ltd. and Dalian Shumaike Floor Manufacturing Co., Ltd (collectively Dunhua) and plaintiffs Yihua Lifestyle Technology Co., Ltd., *et al.* (collectively Yihua), that Commerce erred by applying adverse facts available to find that respondents benefitted from the EBC program. ECF No. 51 at 21-31; ECF No. 46 at 9-13; ECF No. 49 at 4-9; ECF No. 50 at 2-11. In addition, various plaintiffs and plaintiff-intervenors have incorporated each other's arguments into their own motions. *See* ECF No. 43 (Senmao); ECF No. 44 (Consolidated Plaintiff Zhejiang Dadongwu GreenHome Wood Co., Ltd.); ECF No. 46 at 13-14 (Fine Furniture); ECF No. 48 (Evolutions); ECF No. 49 at 4 (Yihua);

ECF No. 50 at 11 (Dunhua).  Finally, Riverside also raises a calculation error that Commerce intends to address through a voluntary remand.

## SUMMARY OF ARGUMENT

Commerce's determination to weight-average record UN Comtrade and International Tropical Timber Organization (ITTO) data for purposes of calculating a tier 2 plywood benchmark price for Riverside was supported by substantial evidence and in accordance with law, as Riverside did not provide sufficient evidence to warrant Commerce's exclusion of the broad world market price data provided in the UN Comtrade data.  As required by regulation, Commerce identified the available world market prices for plywood and then narrowed the available data to more closely match the type of plywood used by Riverside.  Specifically, Commerce utilized both UN Comtrade's robust global dataset of prices, and the more limited dataset available from ITTO.  Commerce removed certain Harmonized Tarif Schedule (HTS) subheadings from the UN Comtrade data where Riverside showed that the subheadings did not represent their actual input purchases of plywood.  However, the subheadings were not grade-specific, so Commerce ultimately used data that included various grades of plywood.  Riverside argues that Commerce should have instead ignored the broad and robust UN Comtrade data entirely and used only a narrow set of ITTO data from two specific geographical regions, in order to limit the data to the specific grade of plywood that Riverside claims to have used. However, to do so would be inconsistent with the applicable regulation and would result in an unreasonably narrow, and likely inaccurate, subset of data.  In addition, Riverside did not present sufficient evidence to demonstrate that its input purchases were limited to specific grades or that only such grades could be used in the manufacture of subject merchandise.

Commerce's inclusion of backboard purchases in its calculations for veneers for LTAR program was supported by substantial evidence and in accordance with law.  The plain language

of the CVD order provides an unambiguous definition for "veneers."  Riverside's record information clearly indicates that its backboard purchases meet this definition.  Consolidated-Plaintiffs do not present any evidence beyond certain pricing information and industry use information to support its claims that backboard should be excluded.  This type of information as a matter of law is not sufficient for Commerce to disregard the plain language of the scope of the CVD order.

Commerce's determination to apply a 17 percent VAT rate in its benefit calculations was supported by substantial evidence.  In multiple certified responses, the government of China confirmed that the applicable VAT rate for 2018 (the period of review) was 17 percent. Riverside relies entirely on its company-specific information showing that it paid a 16 percent VAT rate for part of the period of review.  However, Commerce reasonably relied on the government of China's responses, as it is the authority that sets the applicable VAT rate. Riverside had the opportunity to submit any relevant information to the record indicating an official change in law or rebut the government of China's certified responses, but it did not do so.  Commerce must make determinations based on record information and it reasonably determined that based on record information provided by the government of China that the applicable VAT rate for the period of review was 17 percent.

Commerce's determination to apply AFA based on the government of China's failure to provide requested information regarding the EBC program was supported by substantial evidence and in accordance with law.  Commerce provided a thorough explanation identifying what information was missing from the record that the government of China failed to provide, why this information was necessary for Commerce to verify claims of non-use and better understand the EBC program, and why no other sources of information would be sufficient to

verify non-use in light of the identified critical nature of the missing information from the government of China.  Nonetheless, because this Court has directed Commerce in other decisions to reconsider whether any available information provided by respondents may sufficiently fill the gap caused by the government of China's refusal to provide necessary information, Commerce respectfully requests a remand with respect to Senmao, which provided non-use certifications from all its U.S. customers.  However, Commerce has reasonably determined that any further attempt to verify non-use by Riverside's customers would be insufficient, as a majority of its customers did not provide such certifications.

Finally, Commerce made an inadvertent calculation error in its veneer for LTAR program.  Riverside identified in its administrative case brief before Commerce certain issues with Commerce's calculations that Commerce agreed with in its final results but inadvertently did not correct in the calculations.  As such, Commerce respectfully requests a remand on this issue.

**ARGUMENT**

## I.    <u>Standard Of Review</u>

Commerce's determinations, findings, or conclusions in a countervailing duty proceeding are upheld unless "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. 1516a(b)(1)(B)(i); *see also Fujitsu Gen. Ltd. v. United States*, 88 F. 3d 1034, 1038 (Fed. Cir. 1996).  "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  A party challenging a determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001).

Substantial evidence is "more than a mere scintilla" and is evidence that "a reasonable mind might" accept as adequate. *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308 (Fed. Cir. 2020) (citation omitted). The agency's findings may be supported by substantial evidence even if the possibility of drawing two inconsistent conclusions exists. *Id.* at 1308-09. The Court must sustain the determination if it is "reasonable and supported by the record as a whole, even if some evidence detracts from {Commerce's} conclusion." *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004).

Moreover, "{t}his Court has recognized that the antidumping statute 'reveals tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law." *Fujitsu*, 88 F.3d at 1039 (quoting *Smith–Corona Group v. United States*, 713 F.2d 1568, 1571, 1582 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984)). "This deference is both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when Commerce exercises its technical expertise to select and apply methodologies to implement the dictates of the trade statute. *Id.* at 1039. The Court may not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007), and the Court will not substitute its judgment for that of Commerce in choosing between two fairly conflicting views, even though it could justifiably have made a different choice had the matter been before it de novo. *See Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006); *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (Court will not "weigh the adequate quality or quantity of the evidence for sufficiency").

## II.    Commerce's Calculation Of The Benchmark Price For Plywood Is Supported By Substantial Evidence And Otherwise In Accordance With Law

In its final results, Commerce weight-averaged record UN Comtrade and International Tropical Timber Organization (ITTO) data for purposes of calculating a plywood benchmark price to compare to the price of plywood purchased by respondents during the period of review. IDM at 63-64.  Riverside argues that Commerce's calculation of the benchmark price was unreasonable because it was not limited to data for C/CC grade plywood, and that Commerce should have therefore relied exclusively on a narrow ITTO dataset of prices for C/CC grade plywood from the European Union and Peru.  Riverside Br. at 6-21.  However, in accordance with its regulations, Commerce instead included the UN Comtrade's far more robust dataset of global prices, which it narrowed to the extent practicable to fit the type of plywood used by Riverside.  This decision was reasonable and in accordance with the law.

Under the countervailing duty statute, a benefit is conferred where "goods. . . are provided. . . for less than adequate remuneration" (LTAR).  19 U.S.C. § 1677(5)(E)(iv).  In determining whether government-subsidized goods have been provided for LTAR, Commerce must identify a benchmark price (market price) to compare with the price of the goods receiving a government subsidy.  *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273 (Fed. Cir. 2012) (*CAFC Essar*).  Commerce "will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good. . . resulting from actual transactions."  19 C.F.R. § 351.511(a)(2)(i).  This is known as a "tier 1" benchmark.  *See CAFC Essar*, 678 F.3d at 1273.  When using a tier 1 benchmark, the goal is to identify actual transactions within the relevant market, and to define that market as specifically as possible.

However, when data for actual transactions within the relevant market are not available, 19 C.F.R. § 351.511(a)(2)(ii) establishes Commerce's practice in relying on a "tier 2" benchmark:

> If there is no useable market-determined price with which to make the comparison under paragraph (a)(2)(i) of this section, {Commerce} will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question. Where there is more than one commercially available world market price, {Commerce} will average such prices to the extent practicable, making due allowance for factors affecting comparability.

In other words, where actual data from the market at issue is not available, Commerce draws on broad, worldwide data and takes the average of that data, in order to reasonably approximate the market price.  When calculating a tier 2 benchmark price, Commerce is not required to use benchmark prices that are nearly identical to reported purchases.  *See Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1279 (Ct. Int'l Trade 2014).  The regulation requires only that that the benchmark be a comparable market-determined price to the price that would be available to the purchasers in the country at issue.  *CAFC Essar*, 678 F. 3d at 1273-74.  If Commerce determines that multiple datasets are sufficiently reliable and representative, "Commerce must average all commercially available world market prices to arrive at the benchmark figure."  *See Essar Steel*, 721 F. Supp. at 1293 (citing 19 C.F.R. § 351.511(a)(2)(ii)).

"The factors relied upon by {Commerce} when determining appropriate benchmark(s) for valuing an input depend on the facts surrounding the data/information placed on the record of a proceeding and therefore must be evaluated on a case-by-case basis."  *See e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016), and accompanying IDM at

comment 6.  "The court's role is not to assess whether the benchmark data Commerce used was the 'best available,' but rather whether Commerce's choice was reasonable."  *Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) (citing *Peer Bearing Company-Changshan v. United States*, 298 F. Supp. 2d 1328, 1336 (Ct. Int'l Trade 2003)).

Commerce's practice is to consider whether a dataset represents comparable commercially available world market prices, and if so, to include it in the calculation of the weight-averaged benchmark, narrowing it to a more relevant subset if appropriate.  Here, Commerce reasonably determined that the UN Comtrade data, although not differentiated by grade, was usable as a world market price in its tier 2 benchmark.  Commerce adjusted the data to exclude Harmonized Trade Tariff (HTS) subheadings that were not as comparable to the type of plywood purchased by Riverside.  Specifically, in its preliminary results, based on purchase orders, supplier certifications, and inventory in-slips demonstrating that the plywood purchased by Riverside was made from specific wood species, Commerce excluded the UN Comtrade HTS subheadings that do not represent the specific species in question.  PDM at 36.  In the final results, Commerce weight-averaged this more targeted subset of the UN Comtrade data with the ITTO data.  IDM at 63-64.  In this manner, it fulfilled its obligation to "average {world market prices} to the extent practicable, making due allowance for factors affecting comparability."  19 C.F.R. § 351.511(a)(2)(ii).

Riverside argues that the price data Commerce used was still too broad because it was not limited to data for grade C/CC plywood.  Riverside cites various cases that, it argues, show that Commerce must only use "the most product-specific benchmark possible for use in LTAR calculations."  Riverside Br. at 7-11.  According to Riverside, these cases indicate that Commerce acted unreasonably in this instance by including UN Comtrade data at all, even when

that data was limited to exclude all subheadings that were not applicable.  Instead, Riverside asserts that the only reasonable choice was to reject the UN Comtrade data and rely on a narrow subset of ITTO data from only the European Union and Peru.

Riverside's argument confuses the standard for calculating tier 2 benchmarks with the standard for calculating tier 1 benchmarks.  As explained above, a tier 1 benchmark draws on actual transactions from the actual relevant market, and it is therefore beneficial to choose transactions that are as similar to the product at issue as possible.  A tier 2 benchmark, however, is calculated when real transactions from the relevant market are not available, such that they are necessarily drawn from other markets that may have different prices.  Accordingly, rather than finding a narrowly tailored dataset that may differ from the actual prices in the relevant market for any of number reasons, Commerce draws on global datasets and takes the average, as required by 19 C.F.R. § 351.511(a)(2)(ii), in order to approximate a reasonable benchmark price.  Commerce tailors those global datasets to the extent possible by using only the subheadings of the data that match the product at issue.  However, Riverside asks Commerce to throw out the robust global datasets entirely and rely only on narrow datasets from two limited geographic regions, because, according to Riverside, Commerce must use the "most product-specific data in calculating benchmarks."  Riverside Br. at 12.  Riverside's proposed method, however, is entirely inconsistent with § 351.511(a)(2)(ii).

Riverside's characterization more accurately describes the tier 1 approach and completely ignores the importance in a tier 2 calculation of drawing on a broad global dataset.  A closer look at the cases Riverside relies on makes this distinction clear.  First, Riverside cites *Risen Energy Co. v. United States*, 560 F.Supp.3d 1369 (Ct. Int'l Trade May 12, 2022), and claims that *Risen* demonstrates Commerce's obligation to use "the most accurate data available."  Riverside Br. at

7.  However, in *Risen*, the Court *rejected* precisely what Riverside is now asking Commerce to do: rely on a narrow, geographically limited dataset in a tier 2 benchmark calculation.  The Court in *Risen* explained that Commerce, rather than finding an actual "world market price" as required by the regulation, instead focused on finding prices that would actually be available to plaintiffs, and therefore relied on a dataset of transactions between the United States and China.  *Id.* at 1378.  The Court reasoned that this dataset was "sourced from limited samples," and that including it in the calculation risked "overvaluing the United States to China route data."  *Id.* at 1379.  The same result would occur here if Commerce discarded the global UN Comtrade dataset and relied only on a narrow subset of ITTO data from two regions.  Accordingly, while it is true that the Court in *Risen* emphasized the importance of using data that contributed to the "accuracy" of the benchmark price, it was concerned with finding "a more accurate world market price" by including *broader* datasets; it was not concerned with finding a more narrowly tailored dataset.

Riverside then cites decision memoranda from several past CVD reviews to argue that Commerce selects "the most product-specific benchmark possible for use in LTAR calculations." However, the cases it cites are perfectly consistent with Commerce's calculation in this case. For instance, Riverside cites *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018), and accompanying IDM at Cmt. 3.  In that case, Commerce found two datasets it could use for a tier 2 calculation: Comtrade data that was less product-specific (including various sorts of aluminum products), but that had the advantage of being reported on a monthly basis, and more narrowly tailored HIS Markit data that more accurately represented the specific product in question (aluminum frames).

*Id.* Commerce averaged both datasets to arrive at its benchmark price. Here, Commerce did the same, averaging the more robust Comtrade data with the more narrowly tailored ITTO data. There is no basis to think that Commerce's reasoning in *Crystalline Silicon Photovoltaic Cells* suggests that a global dataset should be thrown out entirely in favor of a narrower dataset that is limited to two specific geographical regions.

Next, Riverside cites *Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Jan. 2, 2016), and accompanying IDM at 3. There, Commerce explained that it used the HTS categories that represented the grades of paper used by the respondent, explaining that Commerce will "deriv{e} benchmark prices by grade *when such data are available*." *Id.* Here, Commerce took the exact same approach, narrowing the UN Comtrade data by using only the HTS subheadings applicable to Riverside.

However, plywood is an entirely different input than paper, and in this case the HTS subheadings were not grade-specific. Accordingly, Commerce followed its usual practice by narrowing the data to the extent practicable, based on what was available. But it was not required to discard the global dataset entirely because that data could not be filtered by grade. As already explained, this would go too far and require Commerce to rely exclusively on a limited dataset from certain geographical regions, rather than relying on robust global data. Riverside also cites another case where Commerce relied on a dataset limited to the specific species of timber used by the respondent. Riverside Br. at 8 (citing *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (Sept. 27, 2010)). As

explained above, Commerce in this case *did* narrow the UN Comtrade data to the subheadings for the relevant species, such that this case supports Commerce's calculation here.

Riverside then cites a case where Commerce was calculating a tier 5 benchmark price by finding an appropriate "surrogate" market.  Riverside Br. at 8-9 (citing *Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 56,640 (Sept. 28, 2005), and accompanying IDM at Cmt. 1).  Calculating surrogate values is an entirely distinct process from calculating average world market prices for a tier 2 benchmark.  *See id.* at Cmt. 9.  This standard is simply irrelevant to the calculation Riverside is challenging here.

Riverside next argues that Commerce has "reject{ed} non-product specific HTS categories in favor of more product-specific benchmarks."  Riverside Br. at 9.  It cites various cases including *Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9,274 (Mar. 5, 2017), and accompanying IDM at comment 16 (*Aluminum Foil from China*)), as well as past reviews of the CVD order being challenged in this case.  Riverside Br. at 9-10 (citing *Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 76,011 (Nov. 27, 2020), and accompanying IDM at comment 6.)  However, these cases do not undermine Commerce's decision, but rather support it, because Commerce did the exact same thing here:  Commerce looked at record evidence submitted by Riverside and relied on that evidence to exclude less comparable HTS subheadings such that the benchmark calculation would be based on only more comparable subheadings.  PDM at 36.  Again, these cases merely suggest Commerce should

narrow a global dataset to the extent possible, not that Commerce should discard the dataset entirely if it is not identical to the product at issue.

Riverside cites two instances where Commerce narrowed price datasets by grade to calculate tier 1 benchmarks, but these cases are inapposite. *See* Riverside Br. at 10-11 (citing *Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2018*, 86 Fed. Reg. 6,866 (Jan. 25, 2021) and accompanying IDM at comment 1 (*CWP from Turkey*); *Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 Fed. Reg. 4,936 (Jan. 28, 2009), and accompanying IDM at 21 (*Pressure Pipe from China*)). As explained above, Commerce calculates a tier 1 benchmark by finding the most representative transactions in the actual relevant market, which is entirely different than the tier 2 process of averaging global data and involves more narrow tailoring to the specific product at tissue. In addition, Commerce explains once again in *CWP From Turkey* that even in a tier 1 calculation, it delineates by grade only "when such data are available." *CWP From Turkey* IDM at comment 1. In this case, the UN Comtrade data was not differentiated by grade, such that Commerce could only tailor the data by grade if it discarded the global dataset entirely. Finally, part of the reason Commerce distinguished by grade in *Pressure Pipe from China* was that it found certain grades "incompatible with the production process used to produce {subject merchandise}." *Pressure Pipe from China* IDM at 21. Commerce found here, however, that "there is nothing on the record that demonstrates that different grades of plywood cannot be used to produce subject merchandise" and therefore the UN Comtrade data was still a usable world average data set. IDM at 63.

In sum, Riverside's argument relies on a mischaracterization of the legal standard for a tier 2 benchmark calculation. In such a calculation, Commerce's goal is not to narrow the data as much as possible to most precisely reflect the product at issue, but rather to find robust data from worldwide markets and then to narrow that data to the extent it is able to do so to reflect the appropriate product. Here, Commerce used a robust global dataset from UN Comtrade and then narrowed it using the available subheadings. But to discard that global dataset entirely in favor a far more limited dataset from only two geographical regions, simply because that dataset is, according to Riverside, more product-specific, would turn the tier 2 process on its head and result in the same error the Court identified in *Risen*: giving undue weight to a specific regional dataset rather than calculating an average world market price, as required by the regulation.

## III.  Commerce's Inclusion Of Respondents' Backboard Purchases In The Veneers For LTAR Program Is Based On Substantial Evidence And In Accordance With Law

Fine Furniture challenges Commerce's determination that Riverside's backboard purchases during the period of review are veneers for purposes of calculating benefit under the veneers for LTAR program. However, this inclusion was supported by substantial evidence and by the scope language of the order, and is otherwise in accordance with law.

In determining whether the reported backboards were veneers within the meaning of the CV order, Commerce first looked at the scope of the order, which states:

> All multilayered wood flooring is included within the definition of subject merchandise, without regard to: dimension (overall thickness, thickness of face ply, thickness of back ply, thickness of core, and thickness of inner plies; width; and length); wood species used for the face, back and inner veneers; core composition; and face grade.

IDM at 75 (quoting CVD Order, 76 Fed. Reg. at 76,694). Further, the scope language states, "Multilayered wood flooring is composed of an assembly of two or more layers or plies of wood veneer(s) in combination with a core" with a clarifying footnote that explains that a "'veneer' is a

*thin slice of wood, rotary cut*, sliced or sawed from a log, bolt or flitch.  Veneer is referred to as a ply when assembled."  *Id.*

Throughout this proceeding, in accordance with the clear scope language above, Commerce has consistently treated all layers of wood used in the manufacture of subject merchandise as veneers/plies, regardless of where they are placed in the assembly (e.g., face veneers, center or "core" plies, or backboards).  IDM at 75 (citing *Multilayered Wood Flooring from the People's Republic of China:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020), and accompanying IDM at Comment 3).  Riverside describes its backboard used in the production of wood flooring as "one solid piece of wood, which is generally used as the bottom layer. It is a very thin piece of wood made of rapid growing wood. . ."  *Id.* (quoting Riverside Second Supplemental Questionnaire Response (Oct. 2, 2020) at 1).

Fine Furniture argues that Commerce ignored evidence indicating that backboard is an entirely different product from veneer.  Fine Furniture Br. at 7-9.  Fine Furniture points to evidence submitted by Riverside that suggests that backboards and "veneers" are distinct products in terms of physical characteristics, end-use price and terminology used in the industry.  *Id.* at 8.  Fine Furniture concludes that by expanding the definition of veneers beyond its understanding in the industry, Commerce "created a dangerous precedent."  *Id.* at 9.

Here, however, the plain language of the CVD order is unambiguous, specifically the provisions providing that "'veneer' is a thin slice of wood" and that multilayered wood flooring is subject merchandise "without regard to . . . wood species used for the face, *back* and inner veneers."  CVD Order, 76 Fed. Reg. at 76,694 (emphasis added).  The Federal Circuit has clarified in numerous instances that the order's unambiguous language governs the scope of the

order.  *See OMG, Inc. v. United States*, 972 F.3d 1358, 1363 (Fed. Cir. 2020); *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013); *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382-83 (Fed. Cir. 2005).  ("{T}he scope of the order can be clarified but it cannot be changed by the interpretive process.").  Fine Furniture asks the Court to direct Commerce to overlook the plain language of the scope of the order based on certain pricing information and purported industry use, which would truly create dangerous precedent. Most tellingly, during the review, Fine Furniture did not present to Commerce any information from sources from the initial investigation, such as the petition, original Commerce determination, or original International Trade Commission injury determination to support its claim that there was an intention or understanding to not effectuate the plain language of the order as Fine Furniture contends, and it does not present any such information here.

> For these reasons, Commerce's application of the plain language of the order to conclude that the reported backboard purchases are veneers for purposes of this proceeding is supported by substantial evidence and in accordance with law.

## IV. Commerce's VAT Calculation Is Supported By Substantial Evidence And Otherwise In Accordance With Law

In its final results, Commerce constructed the benchmarks for purchases of veneers, plywood, fiberboard, glue, and paint by adding a 17 percent VAT rate, a rate based on the submissions of the government of China.  IDM at 81-82.  Riverside argues that it should have applied a 16 percent rate for a portion of the period of review.  However, Commerce's determination is supported by substantial evidence and in accordance with law.

In its Initial Questionnaire Response, the government of China reported that the effective VAT rate for 2018 was 17 percent for the various benchmark inputs.  *See* Gov. China IQR at Exhibit GEN-3 (P.R. 107).  The government of China further confirmed that a 17 percent VAT

rate was applicable in its New Subsidy Allegation Questionnaire Response. *See* Gov. China

NSA QR at 5, 15 (P.R. 176). Riverside contends that Commerce acted unreasonably by not

considering record information specific to Riverside that showed that it actually paid a 16

percent VAT rate from May 2018 onward, and not making a requisite adjustment. *See* Riverside

Br. at 33. However, in the context of a CVD proceeding where the government authority

responsible for setting the applicable VAT rate certifies in multiple responses that the applicable

VAT rate was 17 percent for the year 2018, it is not unreasonable for Commerce to determine

that that rate is accurate. IDM at 82. Further, Riverside's focus on its own VAT rate is

misplaced when Commerce is considering the VAT rate adjustment for purposes of its

benchmark calculation. This Court has upheld Commerce's determination that when making a

VAT adjustment to a tier 2 benchmark, it should look to what "a hypothetical Chinese firm

would pay VAT on the inputs in question." *See Changzhou Trina Solar Energy Co., Ltd. v.

United States*, 255 F. Supp. 3d 1312, 1324-27 (Ct. Int'l Trade 2017). The government of China's

responses in multiple instances about the effective rate are the most authoritative information on

the record for determining what "a hypothetical Chinese firm would pay."

Riverside argues that Commerce was obligated to alert it to any deficiency in its reporting

pursuant to 19 U.S.C. § 1677m(d). Riverside Br. at 34. This argument misunderstands

Commerce's conclusions on record information. Commerce stated that, when it required

information on the applicable VAT, it looked to the government of China's reporting as it was

the government authority responsible for determining the effective VAT rate for Chinese firms.

IDM at 82. Commerce did not conclude that Riverside's submissions were deficient within the

meaning of 19 U.S.C. § 1677m(d), because it did not look to such submissions to establish the

effective VAT rate. Indeed, if Riverside felt that the government of China had misreported the

applicable VAT rate in its Initial Questionnaire Response and New Subsidy Allegation

Questionnaire Response, then it could have provided rebuttal factual information pursuant to 19

C.F.R. § 351.301(c)(1)(v).

Further, Riverside's contention that there had been a change in Chinese regulation is not

supported by the record of this proceeding.  Foreign law is a fact which is to be proved, and the

general rule as to the proof of foreign laws is that the law, if written, must be proved by a copy

properly authenticated.  *See Pierce v. Indseth*, 106 U.S. 546, 551 (1883).  Riverside's contention

that Commerce must consider the record of separate proceedings to reconsider its decision here

violates the principle that Commerce makes its determinations solely on the record of the

proceeding before it.  *See, e.g.*, *Yama Ribbons & Bows Co. v. United States*, 865 F. Supp. 2d

1294, 1298 (Ct. Int'l Trade 2012) ("Commerce must base its decisions on the record before it in

each individual investigation.").  As explained above, Riverside had the opportunity to submit

the factual information on the record of the proceeding for Commerce's consideration, but it did

not.

For these reasons, Commerce's determination to make a benchmark adjustment of 17

percent based on certified responses from the government of China was supported by substantial

evidence and otherwise in accordance with law.

## V.     Commerce's Finding Based On Adverse Facts Available Of Use Of The EBC Program Was Supported By Substantial Evidence And Otherwise In Accordance With Law

Commerce lawfully determined, through the application of an adverse inference in

selecting from among the facts otherwise available, that respondents used the Export Buyer's

Credit Program.  Plaintiffs claim that Commerce's determination is unsupported by substantial

evidence and unlawful.  The record, however, demonstrates that Commerce repeatedly requested

information necessary for the investigation from the government of China.  IDM at 20-33.

Commerce could not obtain this information from any other source. *Id.* But instead of cooperating, the government of China unequivocally refused to provide the requested information. *Id.* As a result, Commerce had no verifiable understanding of the Export Buyer's Credit Program, and thus could not determine whether plaintiffs or their U.S. customers benefited from the Program. *Id.* Commerce explained in detail the information missing from the record, the necessity of the information, and how lack of that information affects Commerce's ability to verify non-use of the Program. Accordingly, substantial evidence supports Commerce's application of adverse facts available.

A.    Legal Framework

Commerce applies facts otherwise available to fill gaps in the record if "necessary information is not available on the record," 19 U.S.C. § 1677e(a)(1), or if an interested party: (a) withholds information requested by Commerce; (b) fails to provide the information in the form or in the manner requested; (c) significantly impedes the proceedings; or (d) provides information that cannot be verified. 19 U.S.C. § 1677e(a)(2)(A)-(D). During a countervailing duty proceeding, Commerce may select a rate with which to countervail a subsidy program by applying an adverse inference from among the facts otherwise available when Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b). When applying an adverse inference, Commerce may rely on information derived from any stage of the proceeding, including the petition, a final determination in the investigation, any previous review, or any other information placed on the record. 19 U.S.C. § 1677e(b); *see also* 19 C.F.R. § 351.308(c).

Commerce may lawfully apply an adverse inference based upon the government of China's failure to provide requested information, even where the respondents cooperate. *See, e.g.*, *KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010) (finding that a collateral

impact on a cooperating party does not render the application of adverse inferences in a countervailing duty investigation improper); *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1371-73 (Fed. Cir. 2014) (affirming Commerce's application of adverse inferences when China did not provide requested information despite the respondents' cooperation).

An interested party fails to act to the best of its ability when it does not exert "*maximum effort* to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (emphasis added). To avoid the application of adverse facts available, respondents "conduct prompt, careful and comprehensive investigations of all relevant records that refer or relate to the imports in question." *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1379 (Fed. Cir. 2016) (citing *Nippon Steel*, 337 F.3d at 1382).

The Court has had opportunity to address the EBC Program in the past, and to explain when Commerce has satisfied the requirements to apply an adverse inference that respondents benefited from that program. Recently, after surveying its decisions concerning the EBC Program, the Court summarized the applicable standard:

> {T}he Court has determined that to apply an adverse inference to find that a cooperating party benefitted from the {EBC Program} based on the {government of China's} failure to cooperate, "Commerce must (1) define the gap in the record explaining exactly what information is missing from the record necessary to verify non-use; (2) establish how the withheld information creates this gap by explaining why the information the {government of China} refused to give was necessary to verify claims of non-use; and (3) show that only the withheld information can fill the gap by explaining why other information, on the record or accessible by respondents, is insufficient or impossible to verify."

*Guizhou Tyre Co., Ltd. v. United States*, 523 F. Supp. 3d 1312, 1361 (Ct. Int'l Trade May 19,

2021) (quoting *Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, 405 F. Supp. 3d

1317, 1333 (Ct. Int'l Trade 2019)).  Where Commerce provides a "thorough explanation of

exactly why the missing information was necessary to verify EBCP non-use," that explanation

"distinguishes {the} case from other cases where this court has held that Commerce failed to

properly explain the need for the absent information."  *Fujian Yinfeng Imp & Exp Trading Co. v.*

*United States*, No. 21-00088, 2022 WL 4180886, at *6 (Ct. Int'l Trade Sept. 13, 2022) (citing, as

an example, *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1353 (Ct. Int'l Trade 2019)).

Commerce met that standard here, as we explain below.

> B.    Commerce Has Fully Justified The Use Of Adverse Facts Available Based On
>        The Government Of China's Failure To Report Requested Information Regarding
>        The EBC Program

In past cases, the Court concluded that Commerce failed to make the requisite showing to

justify its use of adverse facts available concerning use of the EBC Program.  *See Guizhou Tyre*,

523 F. Supp. 3d at 1359-61.  However, we respectfully submit that Commerce has provided a

thorough and reasoned explanation of its determination in this review that addresses the concerns

raised in prior decisions of this Court.

> 1.    The Government Of China Failed To Provide Requested Information
>        Regarding The EBC Program

Commerce fully explained in the IDM exactly which information is missing from the

record.  In its initial questionnaire to the government of China, Commerce requested that the

government of China provide the original and translated copies of laws, regulations or other

governing documents for the EBC program; a list of all partner/correspondent banks involved in

disbursement of funds under the program; and if the government of China claims that no

customer respondent used the buyer credits, to explain in detail the steps it took to determine that

the program was not used and to identify the documents, databases, accounts, etc., that were examined to determine there was no use.  IDM at 24-25 (citing 2018 Countervailing Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Questionnaire (May 14, 2020) (P.R. 77) at II-1, II-5, and II-6).

In response, the government of China provided the Ex-Im Bank's 2000 Administrative Measures governing the EBC program, as well as detailed implementation rules governing that program issued in 1995.  *Id.* at 25 (citing PDM at 19-20 (citing Gov. China IQR at Exhibits Export-2 and Export-3 (P.R. 119)).  It maintained that the Rules demonstrate that if there is an EBC loan provided by the Ex-Im Bank, the Chinese exporter and the U.S. importer are involved and can verify usage.  *Id.*; *see also* Gov. China IQR (P.R. 107) at 8-11, Exhibits Export-2 and Export-3 (P.R. 119).  Specifically, the government of China stated that in accordance with the Rules, the Ex-Im Bank must investigate and verify the performance capability of the Chinese exporters in its loan evaluation and approval proceeding.  IDM at 25-26; Gov. China IQR at 10. Further, the government of China represented that the Ex-Im Bank makes disbursements for the EBC program by debiting the buyer's account and crediting the funds to the exporters, after it receives the shipping documents from the exporter.  *Id.*  It also stated that the Ex-Im Bank must notify the buyer of this disbursement on the day it occurs.  *Id.*  Thus, according to the government of China, the exporter receives the money directly from the Ex-Im Bank and would therefore be aware of receiving the benefits of the EBC Program.

However, the government of China refused to provide Commerce with further requested information that Commerce could have used to verify its assertions.  First, despite Commerce's request that the government of China provide all "governing documents for the EBC program," the government of China did not include a copy of 2013 revisions to the Ex-Im Bank's

Administrative Measures.  *See* IDM at 26; Gov. China IQR at Exhibit Export-1, PDF p.11 (P.R. 119).  In the *Countervailing Duty Investigation of Certain Amorphous Silica Fabric from the People's Republic of China*, 82 Fed. Reg. 8,405 (Dep't of Commerce Jan. 25, 2017) (*Silica Fabric from China*), Commerce asked the government of China about certain changes to the EBC program, including changes in 2013 that may have eliminated a requirement limiting EBC loans to business contracts exceeding USD 2 million.  IDM at 23.  This was prompted by information obtained during *Citric Acid and Certain Citrate Salts Final Results of Countervailing Duty Administrative Review; 2012*, 79 Fed. Reg. 78,799 (Dep't of Commerce Dec. 31, 2014).  *Id.*

In its initial questionnaire response, the government of China provided the prior supplemental response from *Silica Fabric from China*, indicating that there had been certain internal guidelines of the China Ex-Im Bank adopted in 2013.  *See* Gov. China IQR at Exhibit Export-1, PDF p.11 (P.R. 119).  In a supplemental questionnaire, Commerce included the following question regarding these internal guidelines:

> In Exhibit EXPORT-1 of the GOC's IQR, you provided the GOC's 7th Supplemental Response in the Countervailing Duty Investigation of Certain Amorphous Silica Fabric from the People's Republic of China. The information in this exhibit references "certain internal guidelines" that were adopted by the Export-Import Bank in 2013. Please provide an English and Chinese version of these internal guidelines.

Gov. China Supplemental Questionnaire Response (Sept. 8, 2020) at 4 (P.R. 155).  The government of China responded by stating, "As has been explained in detailed steps in the IQR, the GOC has confirmed that none of the respondents or its cross-owned affiliation has applied or received benefits under this program. Thus, the GOC believes this question is not applicable."  *Id.*

It further stated that Commerce's request for a list of all partner/correspondent banks involved in disbursement of funds under the EBC program is not applicable since none of the mandatory respondents' customers obtained EBCs during the period of review.  IDM at 26; Gov. China IQR at 9 (P.R. 107).  It similarly refused to provide a sample buyer's credit application establishing the terms of the program or the interests rate for loans provided through the program.  IDM at 19-20; Gov. China IQR at 9 (P.R. 107).

        2.      The Withheld Information Was Necessary To Verify Non-Use

Commerce also offered a thorough explanation of why the withheld information prevented it from verifying non-use of the EBC program.  As explained in the IDM, in prior investigations, based on Commerce's understanding of the program at that time, verification of non-use appeared to be possible through examining the financial statements and books and records of U.S. customers for evidence of loans provided directly from the China Ex-Im Bank to the U.S. customers.  IDM at 27 (citing *Chlorinated Isocyanurates from the People's Republic of China:  Final Affirmative Countervailing Duty Determination; 2012*, 79 Fed. Reg. 56,560 (Dep't of Commerce Sept. 22, 2014) and accompanying IDM at 15).

However, as Commerce explained in its preliminary results, Commerce then obtained information in another CVD proceeding alerting it to the Ex-Im Bank's revisions to its Administrative Measures regarding this program in 2013.  PDM at 19 (citing *Carbon and Alloy Steel Threaded Rod from the People's Republic of China: Preliminary Affirmative Countervailing Duty Investigation and Alignment of Final Determination with Final Antidumping Duty Determination*, 84 Fed. Reg. 36,578 (Dep't of Commerce July 29, 2019), and accompanying PDM at 9).  This information provides that the China Ex-Im Bank may now disburse EBCs directly or through third-party partner and/or correspondent banks.  *Id.* at 20.  As part of this review, the government of China provided a copy of their response in *Silica Fabric*

*from China*, which contains this information.  Gov. China IQR at Exhibit Export-1 at PDF p.12-

13 (P.R. 119) ("According to the Ex-Im Bank, in order to make a disbursement, the Ex-Im Bank

lending contract requires the buyer (importer) and seller (exporter) to open accounts with either

the Ex-Im Bank or one of its partner banks.  While these accounts are typically opened at the Ex-

Im Bank, *sometimes a customer prefers another bank (e.g., the Bank of China) which is more*

*accessible than an account with the Ex-Im Bank.*") (emphasis added).  Accordingly, the available

record evidence indicates that under the EBC program, credits are not direct transactions from

the China Ex-Im Bank to the U.S. customers of the respondent exporters; rather, there can be

intermediary banks involved.  IDM at 27.

As a result, performing the verification steps to make a determination of whether the

"manufacture, production, or export" of the company respondents' merchandise has been

subsidized would require knowing the names of the intermediary banks; it would be their names,

not the name "China Ex-Im Bank," that would appear in the subledgers of the U.S. customers if

they received the credits.  *Id.*  Accordingly, the government of China's refusal to provide the

names of intermediary banks, or sample EBC documents that would help it identify EBC

transactions, prevented Commerce from reviewing financial documents from respondents'

customers to verify non-use.

   3. With Respect To Riverside, No Other Information In The Record Or
     Accessible By Respondents Could Verify Non-Use Of The EBC
     Program

Finally, Commerce gave a detailed explanation as to why there is no feasible way that

Commerce could verify non-use of the EBC program without receiving the names of

intermediary banks from the Government of China, especially with respect to Riverside, which

did not submit non-use certificates from all of its U.S. customers.  This necessary information is

missing from the record because such disbursement information is only known by the originating

bank, the China Ex-Im Bank, which is a government-controlled bank.  IDM at 30 (citing

*Countervailing Duty Investigation of 1,1,1,2 Tetrafluoroethane from the People's Republic of*

*China: Final Affirmative Countervailing Duty Determination*, 79 Fed. Reg. 62,594 (October 20,

2014), and accompanying IDM at 31 (confirming that the government of China solely owns the

China Ex-Im Bank)).  Without cooperation from the China Ex-Im Bank and/or the government

of China, Commerce cannot reasonably be expected to know the banks that could have disbursed

EBCs to the company respondent's customers.  *Id.*  Therefore, as this Court has previously

acknowledged, "only the government of China, and in particular the {China} Ex-Im {Bank},

could provide and verify the information needed to determine whether a benefit was conferred to

Respondents during the {period of review} from the EBC Program."  *Trina Solar*, 195 F. Supp.

3d at 1355.

There was no reasonable way for Commerce to verify non-use relying only on other

record evidence or information accessible by respondents.  In its typical non-use verification

procedure, Commerce examines a company's subledgers for references to any party that might

have made it a loan through the EBC program.  IDM at 28.  Without knowing the identities of

the correspondent banks who make such loans, this would be extremely onerous, if not

impossible.  Commerce would be required to comb through the business activities of

respondents' customers without any guidance as to how to identify loans or banks that might be

related to the EBC program and should therefore be subject to scrutiny.  IDM at 27.  Because it

could identify such loans or banks, Commerce would be required to view the underlying

documentation for all entries from the subledger to attempt to confirm the origin of each loan.

*Id.*

Furthermore, even if Commerce attempted to scrutinize specific entries from customers'
subledgers, it is not clear if it could confirm whether those entries were connected to the EBC
program.  IDM at 28.  Commerce could request to see underlying documentation, such as
applications and loan agreements, but there is no basis to believe those documents would reveal
whether the banks involved were participating in the EBC program.  *Id.*  This is especially true
given the government of China's refusal to provide a sample application or other documents
making up the "paper trail" of a direct or indirect export credit from the China Ex-Im Bank.  *Id.*
Commerce would simply not know what to look for behind each loan in attempting to identify a
loan provided by the China Ex-Im Bank via a correspondent bank.  Even if Commerce identified
that particular transactions did involve the China Ex-Im Bank, Commerce still might not
recognize whether the transactions were specifically related to the EBC program without having
any specific criteria to guide it.  *Id.*

The government of China's refusal to provide the 2013 revisions to the Ex-Im Bank's
Administrative Measures further prevented Commerce from identifying relevant transactions.
*See* IDM at 28-29.  As explained, the 2000 Administrative Measures provided that EBC loans
were limited to business contracts exceeding USD 2 million, which could help Commerce
identify transactions that might be related to the EBC program.  *Id.* at 23; Gov. China IQR at
Exhibit Export-2, PDF p.17 (P.R. 119).  However, it is not clear that this rule remains in effect
after the 2013 revisions, *see* IDM at 23, which "increases the difficulty of verifying loans
without any such parameters."  *Fujian Yinfeng*, 2022 WL 4180886, at *5.  Without those
revisions, Commerce does not have a complete understanding of the program, which requires a
roadmap for the verifiers by which they can conduct an effective verification of usage.  IDM at
28-29.  Thus, as the IDM concluded, "Commerce could not accurately and effectively verify

usage at the company respondent's customers, even were it to attempt the unreasonably onerous examination of each of the customers' loans." *Id.* at 29. In short, as was the case in *Fujian Yinfeng*, Commerce in this case "reasonably explained that absent EBCP information it requested from the Chinese government, the Department's attempt to verify whether {respondent's} U.S. customers were EBCP recipients (and thus the beneficiaries of subsidies) amounted to 'looking for a needle in a haystack with the added uncertainty that Commerce might not even be able to identify the needle when it was found.'" *Fujian Yinfeng*, 2022 WL 4180886, at *6 (quoting IDM); *see also* IDM at 29 (providing same explanation here).

Finally, Commerce "understandably doesn't take the Chinese government's representations on faith" when it makes unverified assertions that respondents did not benefit from the EBC program. *Fujian Yinfeng*, 2022 WL 4180886, at *6 n.5. The government of China states that it "determined" that respondents' customers did not use receive EBC loans "through a process in which the mandatory respondents provided their U.S. customer lists to the {government of China}." Gov. China IQR at 9 (P.R. 107). It also asserts that the Ex-Im Bank "searched it records" to confirm non-use. *Id.* However, the government of China failed to provide any documentation to support these claims or to explain the process behind these determinations. Gov. China IQR at 9-10 (P.R. 107); *see also Fujian Yinfeng*, 2022 WL 4180886, at *6 ("this representation by the Chinese government failed to provide any documentation to show on what basis the purported search was conducted—or even if it really was"). It ignored Commerce's request for information including "documents, databases, accounts, etc. that were examined to determine there was no use." *Id.* Accordingly, Commerce has no way of verifying its statements. Similarly, respondents claimed in their initial questionnaire responses that they had not benefitted from the EBC program but offered no evidence other than assertions of non-

use from customers.  *See* PDM at 19.  In Riverside's case, only a minority of its customers provided such declarations.  IDM at 25 (citing Riverside's IQR at Exhibit 11C).  Commerce is not obligated to simply accept these statements as fact, but rather is entitled to "verify factual information" that it relies on in a countervailing duty investigation.  19 C.F.R. § 351.307; *see also Fujian Yinfeng*, 2022 WL 4180886, at*4, *6 (upholding Commerce's application of AFA "even though Yinfeng reported no receipt of EBCP benefits and submitted certifications of non-use from its customers").  Commerce attempted to verify the non-use certificates by requesting various information that would enable it to identify transactions related to the EBC program, but the government of China refused to comply.

In sum, Commerce fully explained what information the government of China failed to provide, why that information was necessary to verify non-use, and why no other available information could fill that gap.  This case is distinct from those where this Court set aside Commerce's determination because the respondent had in fact provided the necessary information, or where Commerce failed to detail why the information would be necessary. *See, e.g.*, *Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287, 1291-93 (Ct. Int'l Trade 2020) (sustaining on remand determination that respondents did not use program where Commerce did not ask any questions to attempt verification); *Clearon Corp. v. United States*, 474 F. Supp. 3d 1339, 1353 (Ct. Int'l Trade 2020) (holding on remand that substantial evidence did not support applying adverse facts available where Commerce did not analyze whether the missing information actually impacted its ability to verify); *Guizhou Tyre Co., Ltd. v. United States*, 399 F. Supp. 3d 1346, 1349-53 (Ct. Int'l Trade 2019) (holding application of adverse facts available to determine use and benefit was unsupported by substantial evidence where Commerce failed to explain why information was necessary); *Guizhou Tyre Co., Ltd. v.*

*United States*, 348 F. Supp. 3d 1261, 1270 (Ct. Int'l Trade 2018) (finding lack of substantial evidence where Commerce failed to make initial finding that claimed missing information would be necessary). Contrary to these cases, here Commerce did in fact detail what information it needed, in particular the revised administrative measures, names of participating banks, and examples of loan documentation. Importantly, there is no binding precedent from the United States Court of Appeals for the Federal Circuit on this issue.

Thus, Commerce reasonably found that the government of China withheld necessary information that was requested of it which resulted in necessary information not being available on the record of this review, and that the government of China significantly impeded the proceeding.  IDM at 32.  Accordingly, Commerce must rely on facts otherwise available in issuing the final results, pursuant to 19 U.S.C. 1677e(a)(1), (a)(2)(A), and (a)(2)(C).  *Id.*  In addition, for the reasons explained, Commerce lawfully found that an adverse inference is warranted in the application of facts available, pursuant to 19 U.S.C. 1677e(b), because the government of China did not act to the best of its ability in providing the necessary information to Commerce.  Commerce's use of an adverse inference to determine that it is unable to verify non-usage of the EBC program is therefore reasonable and supported by substantial evidence on the record.

C.    Commerce Requests A Voluntary Remand To Further Evaluate Its Use Of Adverse Facts Available Regarding Senmao's Use Of The EBC Program

With respect to Senmao, Commerce continues to find that the government of China is the only party that can answer questions about the internal administration of this program and that non-use certificates cannot replace the cooperation of the government of China.  As noted above, this reasonable finding was sustained in *Fujian Yinfeng*, 2022 WL 4180886, at *6.  Nonetheless, we recognize that the Court has directed Commerce in other decisions to consider whether any

available information provided by respondents may be sufficient to fill the gap of missing record information in considering claims of non-use for the EBC program.  *See, e.g.*, *Guizhou Tyre Co. v. United States*, 399 F. Supp. 3d 1346 (Ct. Int'l Trade 2019).  In this review, Senmao provided non-use declarations for all its reported U.S. customers.  *See* PDM at 19 n. 101.  Therefore, we respectfully request that the Court remand this case to Commerce to further evaluate whether there is sufficient information available or that could be requested that may be sufficient to fill the gap of missing record information to verify claims of non-use on behalf of Senmao.  *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001) ("When an agency action is reviewed by the courts, . . . the agency may request a remand, without confessing error, to reconsider its previous position.").

Commerce notes that Riverside did not provide non-use declarations for all of its reported U.S. customers, instead only providing a minority.  *See* PDM at 19 n. 99.  Therefore, consistent with Commerce's practice, we do not seek a remand to further evaluate its position with respect to Riverside.  In order for Commerce to determine use (or non-use) of the EBC program, all of the respondent's U.S. customers must be willing to participate in the review because any benefit calculation for this program would need to take all reported U.S. customers into account.  Therefore, given that the majority of Riverside's U.S. customers did not provide such certifications, Commerce reasonably determines that any further evaluation would be insufficient for purposes of verifying non-use.

## VI.   Commerce Made An Inadvertent Error In Its Backboard Veneer Calculation And Requests A Voluntary Remand

Riverside submitted comments in its administrative case brief regarding errors in the calculation of average unit values (AUVs) for Baroque Timber's (Riverside's cross-owned affiliate) reported purchases of fiberboard and veneer (including backboard veneer), which are

used to calculate the received benefit under the fiberboard and veneer for LTAR programs.  *See* Riverside's Administrative Br. (June 2, 2021) at 15-18.  Commerce agreed with Riverside and made corrections to the benefit calculations for fiberboard and veneer in the final results. Commerce, however, inadvertently did not correct a separate set of data for backboard veneer which is considered a type of veneer.  IDM at 79-80.  Therefore, we respectfully request that the Court remand this issue to allow Commerce to correct the inadvertent error in line with Commerce's determination in the final results.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' motions for judgment on the agency record and sustain Commerce's final results in their entirety, with the exception of the backboard veneer calculation issue and the issue of whether to use adverse facts available to find that Senmao benefited from the EBC program, for which we respectfully request a remand.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

37

OF COUNSEL:                          /s/ Kelly M. Geddes
JONZACHARY FORBES                    KELLY M. GEDDES
U.S. Department of Commerce          Trial Attorney
Office of Chief Counsel for          U.S. Department of Justice
Trade Enforcement and Compliance     Civil Division
1401 Constitution Avenue, NW.        Commercial Litigation Branch
Washington, DC 20230-0001            P.O. Box 480, Ben Franklin Station
Telephone: (240) 449-5906            Washington, DC 20044
Facsimile: (202) 482-8184            Telephone: (202) 353-0534
Email: JonZachary.Forbes@trade.gov   Email:  Kelly.Geddes2@usdoj.gov

November 17, 2022                    *Attorneys for Defendant*