# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

|  |  |
|---|---|
| EVOLUTIONS FLOORING, INC., *et al.*, | ) |
| Plaintiffs, | ) |
| and | ) |
| DUNHUA CITY JISEN WOOD INDUSTRY CO., LTD., *et al.*, | ) |
| Consolidated Plaintiffs, | ) |
| v. | )  Consol. Court No. 21-00591 |
| UNITED STATES, | ) |
| Defendant, and | ) |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) |
| Defendant-Intervenor. | ) |

## CONSOLIDATED PLAINTIFFS BAROQUE TIMBER & RIVERSIDE PLYWOODS' REPLY BRIEF

Francis J. Sailer
Andrew T. Schutz
Michael S. Holton
GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

Dated: January 6, 2023

# TABLE OF CONTENTS

**INTRODUCTION** ...................................................................................................................**1**

**ARGUMENT** ........................................................................................................................**1**

**I.**     **ITTO BENCHMARK DATA ARE SPECIFIC TO THE PLYWOOD BAROQUE PURCHASED; UNCOMTRADE DATA ARE NOT AND ARE DISTORIVE** .......**1**

**II.**    **AFA SHOULD NOT HAVE BEEN APPLIED TO EXPORT BUYER'S CREDIT PROGRAM USAGE** .................................................................................**8**

     **A.**    THE MISSING INFORMATION IS NOT NECESSARY TO DETERMINE USAGE ......**9**

     **B.**    COMMERCE SHOULD HAVE ACCEPTED STATEMENTS OF NON-USE IN THE QUESTIONNAIRE RESPONSE ...............................................................**11**

**III.**   **COMMERCE'S TIER 2 VAT RATE IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE** .................................................................................................**15**

**CONCLUSION** ....................................................................................................................**18**

# TABLE OF AUTHORITIES

## CASES

*Clearon Corp. v. United States*, 359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) .........................10

*Cooper (Kunshan) Tire Co., Ltd. et. al v. United States*, Slip Op. 22-137 (Dec. 8, 2022) ........14

*Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) ............10

*Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344 (Ct. Int'l Trade 2018) .................16

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ......................................15

*Risen Energy Co. v. United States*, 560 F.Supp.3d 1369 (Ct. Int'l Trade May 12, 2022) ........6,7

*Saha Thai Steel Pipe Pub. Co. v. United States*, 2022 WL 17369301 (Ct. Int'l Trade Dec. 2, 2022) ....................................................................................................................................14

*Sigma Corp. v. United States*, 841 F. Supp. 1255, 1267 (CIT 1993) ........................................14

## ADMINSTRATIVE DECISIONS

*Alloy and Certain Carbon Steel Threaded Rod from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value,* 85 Fed. Reg. 8,821 (Feb. 18, 2020) ..................................................................................................................................17

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 57,809 (Oct. 19, 2021) ..............................................................................................................................11

*Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 86 Fed. Reg. 14,071 (Mar. 12, 2021) ...............................................................................10

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016) ....................................................................................................................................2

*Light-walled Rectangular Pipe and Tube from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing*

*Duty Determination with Final Antidumping Duty Determination*, 72 Fed. Reg. 67,703, 67,709 (Nov. 30, 2007) ................................................................................................16

*Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 76,011 (Nov. 27, 2020) ..........................................................................................................3

## STATUTES & REGULATIONS

19 U.S.C. § 1677(5)(E)(IV) ...............................................................................................2,5,9

19 C.F.R. § 351.511 ..................................................................................................... passim

**INTRODUCTION**

Consolidated Plaintiffs, Baroque Timber Industries (Zhongshan) Co., Ltd. ("Baroque Timber") and Riverside Plywood Corporation ("Riverside Plywood") (collectively "Baroque") submit this Reply Brief in response to the Response Briefs filed on November 17, 2022, by Defendant the United States (the "Government") and Defendant-Intervenor the American Manufacturers of Multilayered Wood Flooring ("Petitioner") (referred to as "Gov. Br." and "Pet. Br.," respectively). For the reasons outlined below, and in Baroque's Memorandum of Law in Support of its 56.2 Motion ("Baroque Br."), the Court should reject Defendant's and Defendant-Intervenor's arguments in full.

**ARGUMENT**

**I.     ITTO BENCHMARK DATA ARE SPECIFIC TO THE PLYWOOD BAROQUE PURCHASED; UNCOMTRADE DATA ARE NOT AND ARE DISTORIVE**

Commerce failed to provide a reasoned explanation based on substantial evidence for including UN Comtrade data in the Tier 2 plywood benchmark (1) that are not grade specific, (2) where indisputable evidence exists that different plywood grades have *significantly* different prices, and (3) where there is no record evidence that the UN Comtrade data include comparable grades of plywood to that used by Baroque. The Government's and Petitioner's briefs provide insufficient justification for Commerce's position.

First what is not in dispute. The Government and Petitioner does not dispute that Commerce found the UN Comtrade data and International Tropical Timber Organization (ITTO) data both to be "sufficiently reliable and representative" of a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question. Gov. Br. at 12. Commerce made this determination by averaging the two sources together based on 19 C.F.R. § 351.511(a)(2)(ii), which requires Commerce to "average all

1

commercially available world market prices to arrive at the benchmark figure." *Id.* at 12 (quoting *Essar Steel*, 721 F. Supp. at 1293 (citing 19 C.F.R. § 351.511(a)(2)(ii))). In other words, Commerce determined that the UN Comtrade data and the ITTO data were both individually and independently reliable and representative of a world market price; as a consequence, Commerce averaged the commercially available world market prices.

What is in dispute is whether the non grade-specific UN Comtrade plywood data satisfy the "prevailing market conditions" criteria outlined in 19 U.S.C. § 1677(5)(E)(iv), permitting Commerce to use this source as a tier 2 benchmark in the first place. As discussed in detail in Baroque's brief, record evidence shows that no subject merchandise producer in China would use plywood grades higher than those reported by the ITTO data. Baroque Br. at 13-20. Narrowing the benchmark data to only the ITTO data and excluding the UN Comtrade data that includes higher grade plywoods, ensures that the benchmark selected is sufficiently comparable to the input subject to the less than adequate remuneration program.

Indeed, the Government in its brief affirms Baroque's argument. Quoting *Solar Cells 2013*, the Government first explains that when determining appropriate benchmarks, Commerce considers "the facts surrounding the data/information placed on **the record of a proceeding** … {which} must be evaluated on a case-by-case basis." Gov. Br. at 12 (emphasis added) (quoting *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016), and accompanying IDM at comment 6). We agree. The Government then goes on to explain that "Commerce's practice is to consider whether a dataset represents comparable commercially available world market prices, and if so, to include it in the calculation of the weight-averaged benchmark, **narrowing it to a more relevant subset if appropriate**." Gov. Br. at 13 (emphasis

added).  Again, we agree.

Importantly, the Government emphasizes that Commerce utilized this practice in this review by excluding certain UN Comtrade HTS subheadings from the plywood benchmark because those subheadings covered plywood of certain wood species (*e.g.*, tropical wood) that was not actually purchased by Baroque during the POR. *See* Gov. Br. at 13; *Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 76,011 (Nov. 27, 2020), and accompanying IDM at Cmt. 6 (removing the HTS provisions covering tropical wood and stating that "Commerce's practice is normally to rely on data reflecting the narrowest category of products encompassing the input product") (**PR 393**).  We also agree that this was the correct practice; where we diverge, however, is that Commerce should have applied that same practice with regard to grade.  Narrowing the plywood benchmark data based on grade is no different than narrowing the benchmark based on species. Here, the record indicates that Baroque did not purchase *or* use plywood grades greater than those reported by ITTO.  Nor would any MLWF producer given that high quality face veneer is always placed on top of the plywood core obscuring any scars or "defects" in the plywood.  *See* Second Benchmark Data Submission at Exhibit S-3 and S-4 (Jan. 26, 2021) (PR 231-235).

After explaining that Commerce's practice is to narrow the datasets where the record and data allow, the Government then attempts to rationalize why Commerce included non grade-specific UN Comtrade HTS subheadings in the benchmark:

> A tier 2 benchmark, however, is calculated when real transactions from the relevant market are not available, such that they are necessarily drawn from other markets that may have different prices. Accordingly, rather than finding a narrowly **tailored dataset** that may differ from the actual prices in the relevant market for any of number reasons, Commerce draws on global datasets and takes the average, as required by 19 C.F.R. §

3

> 351.511(a)(2)(ii), **in order to approximate a reasonable benchmark price. Commerce tailors those global datasets to the extent possible by using <u>only the subheadings</u> of the data that match the product at issue**.

Gov. Br. at 14 (emphases added). The Government's explanation is not reasonable. The Government essentially argues that it only narrows the benchmark data where the HTS subheadings are specific enough to "match the product at issue." *Id.* The Government's explanation concedes that the UN Comtrade data "could not be filtered by grade" and, thus, do not match Baroque's plywood. Def. Br. at 16. In other words, Commerce concedes that the UN Comtrade data plywood subheading do not match the product at issue because these headings do not specfify grade (and therefore include all grades). It makes little sense for Commerce to only exclude HTS subheadings that are made up exclusively of products not similar to the input being valued on the one hand but to knowingly include basket subheadings that definitively include non-similar, and distortive products on the other. This is inconsistent with the myriad cases outlined in Baroque brief at pages 7-11. And, when prices are used for grade A plywood, the benefit being calculated for the subsidy is a result of grade differences and not a result of the countervailable subsidy being received.[1]

      Commerce attempts to rationalize this inherent contradiction in its position by arguing (1) the non grade-specific UN Comtrade data represent more "robust" data, and (2) the ITTO data are too narrow. *See* Def. Br. at 16. These characteristics, however, are not among the selection criteria outlined in the statute or regulations and cannot trump these criteria. The overarching statutory criterion is to take into consideration "prevailing market conditions," which include

---

[1] Grade A plywood can be as much as $10.25/kg while Grade D can be as low as $2.14/kg, a difference of nearly 500%. Second Benchmark Data Submission at Exhibit S-2d (Jan. 26, 2021) (**PR 231-235**).

"price, quality, availability, marketability, transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E)(iv). The regulations echo this criterion by requiring that it be reasonable to conclude that the world market price would be available to purchasers in the country in question; and where there is more than one world market price, Commerce makes due allowance for factors affecting comparability. *See* 19 C.F.R. § 351.511(a)(2)(ii). Commerce's desire to have a more "robust" dataset cannot disregard the clear statutory mandate and focus on comparability.

In this case, Commerce determined that both the UN Comtrade data and the ITTO data were world market prices that would be available to purchasers in the country in question. We do not dispute this finding. As discussed above, the issue before this Court is not whether the ITTO data are narrow or the UN Comtrade data are robust, but whether the inclusion of the UN Comtrade data **match the product at issue based on the record of the case.** If there is no match, Commerce is not assessing whether the adequacy of remuneration is caused by a countervailable subsidy but rather is assessing the impact of product differences. Both the Government and Defendant-Intervenors imply that the non grade-specific UN Comtrade data are comparable (or more "robust") than the grade-specific ITTO data simply because UN Comtrade data include all grades that *could* be purchased by the respondents. *See*, *e.g.*, Gov. Br. at 16-19; Pet. Br. at 19-23. This robustness is exactly what makes the UNComtrade data non-comparable. It is overinclusive of plywoods of different grades that Baroque did not purchase or use, making it distortive. Baroque presented a significant amount of evidence showing that:

> Plywood is produced in a variety of different grades and these grades significantly impact price (grade A plywood can be nearly 500% more costly than grade D);

> Plywood used for subject merchandise is Grades C or D, generally, since a high-

quality face veneer is placed on top of the plywood obscuring scars and defects in the plywood;

The plywood that Baroque Timber uses in its production is Grade C/D; and

The HTS provisions used for plywood do not distinguish grade and therefore include all grades of plywood.

*See* Baroque Br. at 13-17.

Similar to Commerce's "narrowing" of the data based on the species of wood, the question that should be asked in this case, given the significant record evidence submitted by Baroque, is: If the UN Comtrade data had been broken out by grade-specific subheadings similar to the species breakout (which Commerce excluded), would Commerce include the dissimilar grades in the average of the benchmark? The answer to this question is clearly "*no*" based on Commerce's own statements in this case. Thus, there is no basis, where significant record evidence indicates that Baroque purchased and used specific grades, to use UNComtrade data that include much more costly, grade A plywood.

The Government also attempts to address the several cases cited by Baroque supporting the proposition that Commerce's practice is to narrow and tailor global datasets to the extent possible based on the record evidence to match the product at issue. Specifically, the Government argues that *Risen Energy Co. v. United States*, 560 F.Supp.3d 1369 (Ct. Int'l Trade May 12, 2022), supports Commerce's position to include non grade-specific UN Comtrade data, because the "Court reasoned that this dataset was 'sourced from limited samples' and that including it in the calculation risked 'overvaluing the United States to China route data.'" Gov. Br. at 15 (citing *Risen Energy Co.* at 1378). Unfortunately, the Government's analysis misses the mark of the court's reasoning in *Risen Energy Co.* Based on the facts of that case, the court

determined that the "narrow" Descartes ocean freight dataset was less accurate than the "broader" Xeneta ocean freight dataset for valuing ocean freight in the benchmarks. But this was not only because the Descartes data were limited or narrow. Rather, the court found that the Department did not address the "flaws" in the Descartes data (*i.e.*, (1) the data were from one company, and thus may not constitute a world price, (2) some of the data included less than a container load shipment rate, and (3) the data included inland freight "which would incur additional fees **not associated** with ocean freight or found in the Xeneta data"). *Id.* at 1379. In other words, similar to this case, the evidence in *Risen* showed that Descartes data were not specific to the input or services being valued, and the inclusion of the data skewed or did not add to the accuracy of the benchmark. *Id.* While the specific facts are not the same, the dicta of *Risen* is the same as the Government's statement in its brief here: "Commerce's practice is to consider whether a dataset represents comparable commercially available world market prices, and if so, to include it in the calculation of the weight-averaged benchmark**, narrowing it to a <u>more relevant</u> subset if appropriate**."  Gov. Br. 13 (emphasis added).

This is no different than the other cases the Government tries to distinguish. There is no dispute that the specific facts are not the same as this case. However, all the cases stand for the idea and practice that "**in order to approximate a reasonable benchmark price . . . Commerce tailors those global datasets to the extent possible by using <u>only the subheadings of the data that match the product at issue</u>**" (emphasis added). Def. Br. at 14. In this case, none of the UN Comtrade subheadings match the product at issue. Consequently, the inclusion of the non grade-specific UN Comtrade data do not add to the accuracy of the benchmark, but rather cause the benchmark to be skewed by including prices **not associated** with Baroque's purchases in the benchmark calculation.

Finally, Defendant-Intervenors address Commerce's original finding that "Riverside did not provide any official company documentation to demonstrate that its plywood input is limited to a particular grade." Pet. Br. at 17-19 (citing Final I&D Memo at 63). It is notable that the Government abandons this argument in its Response Brief before this Court. Moreover, Baroque cites copious amounts of record evidence in its Memorandum of Law to support its Rule 56.2 Motion for Judgment on the Agency Record. *See* Baroque Br. at 18-21. Defendant-Intervenors now attempt to refute this record evidence through speculation and *post-hoc* reasoning, but fail altogether to cite to any record evidence that rebuts or refutes the information that Baroque provided.

Consistent with its practice, Commerce is required to select the most product-specific data utilizing record evidence. Defendant and Defendant-Intervenors' arguments concerning the "robust" nature of the non-specific data are not reasoned or supported by substantial evidence. Moreover, Defendant's arguments concerning the narrower ITTO data are irrelevant given the fact that Commerce already determined that the ITTO data individually and independently was reliable and representative of a world market price. Based on the record evidence, the Court should direct the Commerce to recalculate the benchmark consistent with these arguments.

## II.      AFA SHOULD NOT HAVE BEEN APPLIED TO EXPORT BUYER'S CREDIT PROGRAM USAGE

In their briefs, the Government and Petitioner argue that Commerce properly applied AFA to the Export Buyer's Credit Program ("EBCP"), and to Baroque's customers' usage of this program, in particular, because the company failed to provide non-use certifications for all of its U.S. customers.   Def. Br. at 30; Pet. Br. at 25.  Given Commerce's on-going practice that this program can be verified at the U.S. customers, statements of non-use in the questionnaire response to Commerce's EBCP usage question are just as sufficient as a customer non-use

certification. We note that Commerce never requested such certifications in this proceeding. Thus, Commerce's finding that Baroque did not provide sufficient information to demonstrate non-use is not supported by substantial evidence.

### A. THE MISSING INFORMATION IS NOT NECESSARY TO DETERMINE USAGE

As Baroque discussed in detail in its brief, in making an AFA finding, the statute requires the Department to (1) identify a gap in the record, (2) demonstrate that the interested party failed to cooperate by not acting to the best of its ability; and (3) ensure that its overall determination is supported by substantial evidence. *See* Baroque Br. at 29, *citing* 19 U.S.C. § 1677e. In addition, in investigating the countervailability of a subsidy, it must be (a) "specific," and (b) provide a financial contribution from (c) a government authority that results in (d) a benefit conferred. Put another way, Commerce's investigation of the countervailability of any alleged subsidy program essentially involves two separate prongs: (1) to determine how the program operates so as to determine countervailability; and (2) to determine whether the respondent received a benefit from the program so as to establish usage. These are separate and independent inquiries. With regard to the EBCP, in the application of AFA, any "gap" identified with respect to the countervailability of the program under prong (1) cannot be automatically applied to prong (2).

Notwithstanding this premise, the Government and Petitioner repeat arguments that Commerce adequately identified a gap in the record because the GOC did not provide it with (1) the 2013 Administrative Measures revisions to the EBCP; and (2) a list of all partner/ correspondent banks involved in the disbursement of funds under the EBCP, and that this information is critical to its understanding of the program, without which it is not able to verify the completely independent inquiry regarding use or non-use. Gov. Br. at 26-30, Pet. Br. at 26.

As multiple decisions by this Court have now held, any gap resulting from the absence of the missing documents relates solely to an **understanding** of the operation of the program and not to establishing **usage** of this program. *See, e.g., Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261, 1270-71 (Ct. Int'l Trade 2018) ("While the Department did note that information as to the functioning of the Program was missing, this finding was rendered immaterial by responses from both Guizhou and the GOC as to the Program's use. This defect proves fatal to Commerce's imposition of AFA"). *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1360 (Ct. Int'l Trade 2019) ("While Commerce is, no doubt, curious as to all of the inner workings of many Chinese programs, mere curiosity is not enough. Commerce must either provide an adequate answer as to why the information it seeks 'to fully understand the operation of the program' is necessary to fill a gap as to {respondent}'s products and their sale, or rely on the information it has on the record").

The conclusion that these two pieces of information are not necessary to find usage are not limited to the courts. Notwithstanding the Government's protestations, Commerce itself has determined that these missing pieces of information are in fact not "necessary" to establish non-usage of the EBCP. In many cases now, Commerce has been faced with the same missing information from the GOC and finds non-usage based on information provided by the respondents. In *Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 86 Fed. Reg. 14,071 (Mar. 12, 2021), and accompanying IDM ("*VSEs*"), the Department actually accepted a respondent's submission of a U.S. customer's underlying loan documents and loan reconciliation as sufficient evidence of non-use. Commerce noted that a loan "reconciliation" demonstrated the purpose of each financing instrument and "lending agreements

. . . show the purpose of each of {the} debt instruments and the parties involved in the financing' of loans." *Id.* at Cmt. 2. The finding in *VSEs* demonstrates that Commerce can indeed review a U.S. customer's information to establish non-use and, thus, declarations of non-use are in fact verifiable. Thus, there is no basis for Commerce's claims that the "missing" information requested regarding the operation of the program is necessary to the verification of use.

Commerce followed this practice in *Mobile Access Equipment from China*, where Commerce conducted a non-use verification at the respondent's U.S. customers, despite the same missing information from the GOC as this case, and found that the customer did not use the program. *Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 57,809 (Oct. 19, 2021), and accompanying IDM at Cmt. 5.

These cases demonstrate that the Government's claim that "the withheld information prevented {Commerce} from verifying non-use of the EBC program" is without merit. Gov. Br. at 29. Commerce can and has verified the usage of this program without the list of partner/corresponding banks and the revised 2013 administrative measures and, therefore, the absence of these documents cannot be the basis for Commerce's claim that it cannot verify the program.

### B.    COMMERCE SHOULD HAVE ACCEPTED STATEMENTS OF NON-USE IN THE QUESTIONNAIRE RESPONSE

In its brief, the Government states that

> Commerce notes that Riverside did not provide non-use declarations for all of its reported U.S. customers, instead only providing a minority. *See* PDM at 19 n. 99. Therefore, consistent with Commerce's practice, we do not seek a remand to further evaluate its position with respect to Riverside. In order for Commerce to determine use (or non-use) of the EBC program, all of the respondent's U.S. customers must be willing to participate in the review because any benefit calculation for this program would need to take all reported U.S. customers into account. Therefore, given that the

11

> majority of Riverside's U.S. customers did not provide such certifications, Commerce reasonably determines that any further evaluation would be insufficient for purposes of verifying non-use.

Gov. Br. at 36.   There are several errors with regard to this position.

First, the Government (and Commerce) fail to explain why statements of non-use within the response are not sufficient to establish non-use.  That is, why are Riverside Plywood's and Baroque Timber's statements that they contacted <u>each</u> customer and <u>each</u> customer confirmed that they did not use the program not sufficient; why are non-requested declarations/certifications necessary?  In CVD cases, Commerce's initial questionnaire asks each mandatory respondent whether it used the program alleged.  If the respondent does not use the program, the respondent states so in the response.   An example from this case is provided below:

A.   <u>Government Provision of Goods or Services for LTAR</u>
  1) Provision of Formaldehyde for LTAR
  2) Provision of Urea for LTAR
  3) Provision of Standing Timber

   a.  Using the attached Microsoft Excel template "Input Purchases," please report all of your purchases during the POR.  Submit this information in electronic format using Microsoft Excel, and include a printout of the electronic file in your response.

   As the template specifies, please report each purchase of the input during the POR.  By each purchase, we are referring to each line item on a VAT invoice that corresponds to a unique price and/or quantity.  For an example, <u>see</u> the attached reporting template.

   Report all purchases with invoice dates that reflect actual deliveries during the POR.  If another reporting basis that your company records in its accounting system more accurately reflects the establishment of the material terms of purchase dates that reflect actual deliveries during the POR, then report your purchases on this basis.  Please explain why this basis is more accurate and clearly identify how it is recorded in your accounting system.

   You should report this purchase information regardless of whether your company used the input to produce the subject merchandise during the POR.

<u>Response:</u>

<u>Baroque Timber:</u> Baroque Timber did not purchase any of the alleged inputs between the POR, so these questions are not applicable to Baroque Timber.

<u>Riverside Plywood:</u> Riverside did not purchase any of the alleged inputs between the POR, so these questions are not applicable to Riverside Plywood.

Riverside IQR at 30 (PR 106; CR 27-50).  Commerce did not require more evidence of the

accuracy of this statement for these programs and did not issue any supplemental questions on

this issue.   Further, Baroque was not required to provide more information on its own "to build

the record" showing this statement was true.  Had Commerce verified Baroque (Commerce

elected not to conduct verifications in this review), it could have reviewed Baroque's purchase

accounts and confirmed that none of these inputs were purchased.   In other words, because

Commerce knows how to verify the program, simply stating "no" regarding usage in the

response is sufficient without more, just as it is with regard to most other programs.

In this case in questions related to the EBCP, Commerce's questionnaire does not ask for

customer certifications and does not ask for any documentation establishing non-use.  Instead, if

the customers did not use the program, the question simply asks the respondent to "explain in

detail the steps you took to determine that no customer used the Buyer Credit Facility":

> 2.  Please discuss in detail the role your company plays in assisting your customers in
>     obtaining buyer credits.  Please provide a separate discussion for each type of
>     assistance provided to your customers during the POR.  Provide complete copies
>     of documentation you provided to the China Ex-Im in order to assist your
>     customers in obtaining buyer credits (provide this documentation for one sample
>     transaction for each type of assistance provided to your customers during the
>     POR).
>
> If you claim that none of your customers used buyer credits during the POR, please explain in
> detail the steps you took to determine that no customer used the Buyer Credit Facility.
>
> Response: Neither Riverside Plywood's nor Baroque Timber's customers used this program
> and the companies have never been in contact with China Ex-Im regarding this program.
> Because Riverside Plywood's and Baroque Timber's export customers could not obtain Export
> Buyer's Credits from China ExIm bank, or any other partner bank, without Riverside Plywood
> and Baroque Timber's direct cooperation and involvement. Since neither Riverside Plywood
> nor Baroque Timber have ever been approached by their customers or by China ExIm bank
> regarding the Export Buyer's Credit, they have direct knowledge that their export customers
> have not used this program. Nevertheless, the companies also contacted their U.S. customers
> and confirmed that they did not use the program. Please see Exhibit 11c.

Riverside IQR at 22 (PR 106; CR 27-50).  In this response, Baroque Timber and Riverside

Plywood indicated that they contacted all of their U.S. customers and confirmed non-use.  Since

Baroque Timber and Riverside Plywood actually contacted their customers and confirmed non-

usage (but only obtained certifications for some customers), this case is distinguishable from *Cooper (Kunshan) Tire Co., Ltd. et. al v. United States*, where the court noted that "Commerce reiterated, and the court agrees that, because the respondents did not provide any customer certifications of non-use, it is unclear 'whether any communication ever took place between the respondents and their customers or whether the non-use statements are based solely on assumptions about how the program currently operates.'" Slip Op. 22-137 at 62 (Dec. 8, 2022).

Just as with the non-use of the input programs, clear statements of non-use in a response subject to verification should be accepted as sufficient evidence of non-use. This is consistent with Commerce's general CVD practice  Had Commerce decided to verify this program, it could have specifically requested and reviewed customer information, just as it did in *MAE*. Commerce, however, does not necessarily need such information before verification. In the case of verifying the non-use of a particular program, Commerce is *always* reviewing information and data it has not seen before. Moreover, to the extent the statement Baroque Timber and Riverside Plywood made in their response was not clear, or if Commerce required more information regarding third parties (such as certifications), Commerce should have requested this information. "The law requires respondents to be diligent, not clairvoyant." *Saha Thai Steel Pipe Pub. Co. v. United States*, 2022 WL 17369301, at *11 (Ct. Int'l Trade Dec. 2, 2022); *see also Sigma Corp. v. United States*, 841 F. Supp. 1255, 1267 (CIT 1993) ("Commerce cannot expect a respondent to be a mind-reader").

The Government now claims that Commerce can only determine non-use, or attempt to determine non-use, if the respondent provides certifications for *all* of its U.S. customers. As noted above, Commerce never expressly requested these certifications in its questionnaires; instead, Commerce's question states only that non-use must be "explained." Further, the

Government claims that the failure to provide these unrequested certifications demonstrates a U.S. customer's unwillingness to cooperate in the proceeding, making further inquiry futile. There is no reasonable or logical basis for this conclusion. Punishing respondents for not convincing their customers to provide an unrequested certification for filing with the U.S government is unduly punitive. If Commerce believes this documentation is required to establish non-use, then it should request this information in the questionnaire. In spite of the years and overwhelming number of cases involving this issue, Commerce has never even attempted to make this simple adjustment. The Court should remand this issue to Commerce to explain why the statements of non-use in the questionnaire are insufficient evidence of non-use, particularly since such in-questionnaire statements are accepted as evidence of non-use for other programs.

III. **COMMERCE'S TIER 2 VAT RATE IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE**

In its brief, the Government argues that Commerce's decision to rely solely on the GOC's questionnaire response statement as to the applicable VAT rate for the relevant inputs was supported by substantial evidence. Gov. Br. at 21; Pet. Br. at 32. This position is without merit. In evaluating the substantiality of evidence, the Court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003). Here, evidence on the record not only fairly detracts from Commerce's position that 17 percent was the applicable VAT rate during the entire POI for the inputs, such that 17 percent would be applied to the tier 2 benchmark, but evidence exists that render that conclusion entirely unreasonable and unsupported by substantial evidence

In supporting Commerce's decision, the Government makes two arguments. First, the Government argues that "The government of China's responses in multiple instances about the

effective rate are the most authoritative information on the record for determining what "a hypothetical Chinese firm would pay." Gov. Br. 22. Second, the Government argues that since the record does not contain the actual foreign laws supporting the alleged change in VAT regulation, that other evidence on the record is insufficient to support such a change. *Id*. at 23. There are a number of errors in these claims.

First, it must be acknowledged that Commerce is extremely familiar with China's VAT regime. Respondents report VAT on their input purchases in every China CVD case; and in virtually every China CVD case Commerce uses a Tier 2 benchmark and adds VAT to the benchmark. Commerce is therefore well aware that all purchases of a particular input, whether imported or purchased directly, have the same VAT rate. *See Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1373 (Ct. Int'l Trade 2018) (discussing Commerce's treatment of China's VAT regime in the AD context); *Light-walled Rectangular Pipe and Tube from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination*, 72 Fed. Reg. 67,703, 67,709 (Nov. 30, 2007) (finding that the difference between China's VAT rate on inputs and VAT refund on exports is not countervailable) (unchanged in Final).

Second, given the make-up of the VAT regime in China that the same VAT percentage is applied to an input purchase in all circumstances, statements from the GOC are not the sole authority on the applicable VAT rate for inputs. Instead, this information can also come from the respondents, who actually pay the VAT on their inputs. In this and every China CVD case involving an input for LTAR program, each respondent reports the VAT percentage and amount paid on all relevant input purchases. Here, Baroque Timber and Riverside Plywood reported

paying a VAT of 16 percent on all inputs (plywood, veneer, etc.), rather than 17 percent, beginning in May of the POR. Baroque's Supplemental Questionnaire Response (Sept. 8, 2020) at SD-13 and SD-14 (PR 158; CR 87-89). This clearly suggests that the GOC's statement that the applicable rate was 17 percent for the entire POR was a clerical error in its reporting, failing to note the inter-review change in the VAT rate.

Third, Commerce's own review of the China VAT regulations in another China CVD case with the same period of investigation and Commerce's finding that the VAT rate changed, is authoritative evidence of the validity of Baroque's claim.[2] *See Alloy and Certain Carbon Steel Threaded Rod from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value,* 85 Fed. Reg. 8,821 (Feb. 18, 2020), and accompanying IDM at Cmt. 15

Finally, we note the irony of the Government's argument here. For this issue, the Government argues that the GOC's statement in its response (without any unrequested documentary support) **is the sole basis** on which the VAT rate can be established and that third-party evidence of the VAT rate change cannot be used. In contrast, with the EBCP issue, the Government argues that the respondents' statement in their response (without any unrequested documentary support) **cannot be the sole basis** to establish non-use and third party information is **required**. These contrasting (and contradictory) positions cannot be justified.

In sum, record evidence of actual input purchases clearly establishes that the VAT rate changed for the inputs in question during the POR. Commerce should not have applied a 17 percent VAT rate to the Tier 2 benchmark for the input for LTAR programs while at the same time accepting the 16 percent VAT rate actually paid by Baroque Timber and Riverside Plywood

---

[2] We also note that this VAT rate change in China was big news, generally. https://www.china-briefing.com/news/chinas-new-vat-rates-prepare-may-1-transition/

for their input purchases.  This resulted in a comparison of purchase prices to the benchmark that did not yield the necessary applies-to-apples comparison, requiring a remand.

## <u>CONCLUSION</u>

For the reasons discussed above, Baroque requests that this Court hold that Commerce's Final Results are unsupported by substantial evidence and otherwise not in accordance with law, and remand the Final Results with instructions to issue a new determination that is consistent with the Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Francis J. Sailer
Andrew T. Schutz
Kavita Mohan

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

Dated:  January 6, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Baroque Timber Industries (Zhongshan) Co., Ltd.'s and Riverside Plywood Corporation's Reply Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 5,311 words, less than the 7,000 word limit.

*/s/ Andrew T. Schutz*
Andrew T. Schutz

*Consolidated Plaintiffs, Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation*

Dated: January 6, 2023