Slip Op. 25-33

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **EVOLUTIONS FLOORING, INC. AND STRUXTUR, INC.,** | |
| Plaintiffs, | |
| and | |
| **DUNHUA CITY JISEN WOOD INDUSTRY CO., LTD. ET AL.,** | |
| Consolidated-Plaintiffs, | **Before: Timothy M. Reif, Judge** |
| v. | **Consol. Court No. 21-00591** |
| **UNITED STATES,** | |
| Defendant, | |
| and | |
| **AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING,** | |
| Defendant-Intervenor. | |

## OPINION AND ORDER

[Sustaining in part and remanding in part Commerce's final results in the eighth administrative review of the countervailing duty order covering multilayered wood flooring from the People's Republic of China.]

Dated:   March 27, 2025

Thomas J. Trendl, Steptoe & Johnson LLP, of Washington, D.C., argued for plaintiffs Evolutions Flooring, Inc. and Struxtur, Inc.  With him on the briefs was Gregory S. McCue.

Sarah M. Wyss, Mowry & Grimson, PLLC, of Washington D.C., argued for consolidated plaintiffs Fine Furniture (Shanghai) Ltd. and Double F Limited.  With her on the briefs was Kristin H. Mowry.

Stephen W. Brophy and Jeffrey S. Neeley, Husch Blackwell LLP, of Washington D.C., argued for consolidated plaintiffs Jiangsu Senmao Bamboo Wood Industry Co., Ltd.

Adams C. Lee, Harris Bricken McVay Sliwoski LLP, of Seattle, WA, argued for consolidated plaintiff Zhejiang Dadongwu GreenHome Wood Co., Ltd.

Kelsey Christensen, Clark Hill PLC, of Washington, D.C., argued for consolidated plaintiffs Yihua Lifestyle Technology Co., Ltd.; Lumber Liquidators Services, LLC; Jiangsu Guyu International Trading Co., Ltd.; Kingman Floors Co., Ltd.; Huzhou Sunergy World Trade Co., Ltd.; Dalian Shengyu Science and Technology Development Co., Ltd.; Jiangsu Simba Flooring Co., Ltd.; Dongtai Fuan Universal Dynamics, LLC; Zhejiang Fuerjia Wooden Co., Ltd.; and Kemian Wood Industry (Kunshan) Co., Ltd. With her on the briefs were Mark Ludwikowski and William Sjoberg.

Andrew T. Schutz, Grunfeld Desiderio Lebowitz Silverman & Klestadt LLP, of Washington D.C., argued for consolidated plaintiffs Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation.  With him on the briefs were Francis J. Sailer and Michael S. Holton.

Kelly M. Geddes, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., and JonZachary Forbes, Of Counsel, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C., argued for defendant United States.  With them on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K. Hogan, Assistant Director.

Theodore P. Brackemyre and Timothy C. Brightbill, Wiley Rein LLP, of Washington D.C., argued for defendant-intervenor American Manufacturers of Multilayered Wood Flooring.  With them on the brief were Stephanie M. Bell and Paul A. Devamithran.

* * *

Reif, Judge:  Before the court are the motions for judgment on the agency record by plaintiffs Evolutions Flooring, Inc. and Struxtur, Inc. (collectively, "Evolutions" or "plaintiff") and numerous other consolidated plaintiffs.

Plaintiffs invoke this Court's subject matter jurisdiction under 28 U.S.C. § 1581(c) and seek review of the final results of the eighth administrative review by the U.S. Department of Commerce ("Commerce") of the countervailing duty ("CVD") order on multilayered wood flooring ("MLWF" or "subject merchandise") from the People's Republic of China ("China"), published as *Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Recission of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 59,362 (Dep't of Commerce Oct. 27, 2021) ("*Final Results*"), PR 402.

Plaintiffs maintain that Commerce's Final Results were not supported by substantial evidence on the record and were otherwise not in accordance with law with respect to Commerce's: (1) calculation of the benchmark price for plywood; (2) inclusion of respondent's backboard purchases in the veneers for less than adequate remuneration ("LTAR") program; (3) VAT rate calculation; (4) finding based on adverse facts available ("AFA") of use of the Export Buyers Credit Program ("EBCP"); and (5) benefit calculation under the backboard veneers LTAR program.

For the reasons discussed below, the court sustains in part and remands in part Commerce's Final Results.

## BACKGROUND

On December 8, 2011, Commerce issued a CVD order on MLWF from China, *Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Order,* 76 Fed. Reg. 76,693 (Dep't of Commerce Dec. 8, 2011), amended by *Multilayered Wood Flooring from the People's Republic of China: Amended*

*Antidumping and Countervailing Duty Orders,* 77 Fed. Reg. 5,484 (Dep't of Commerce Feb. 3, 2012) ("CVD Order" or "Order").[1]

On December 6, 2019, Commerce issued a notice that interested parties could request an administrative review of the Order.  Department of Commerce Preliminary Decision Memorandum (Apr. 23, 2021) ("PDM") at 1, PR 340.  On February 6, 2020, Commerce published a notice initiating the review.  PDM at 2.  The period of review extended from January 1, 2018, to December 31, 2018.  PDM at 4.

Commerce selected Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Senmao") and Riverside Plywood Corp. ("Riverside") as mandatory respondents ("Mandatory Respondents") because the two companies accounted for the largest volume of subject merchandise exports during the period of review based on an analysis of Customs and Border Protection data.  Department of Commerce Memorandum regarding Respondent Selection (Apr. 22, 2020) at 1, 5, CR 8, PR 74.

On April 23, 2021, Commerce published its preliminary results in which it assigned countervailable subsidy rates of 9.36 percent for Riverside and its cross-owned affiliates, 5.19 percent for Senmao and 8.12 percent to the non-selected companies under review.  *Multilayered Wood Flooring from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Intent to Rescind Review, in Part; 2018,* 86 Fed. Reg. 21,693 (Dep't of Commerce Apr. 23, 2021), PR 351.

---

[1] The amendment consisted of "remov[ing] an incorrect Harmonized Tariff Schedule of the United States ["HTS"] number from the scope of the orders."  *Multilayered Wood Flooring from the People's Republic of China: Amended Antidumping and Countervailing Duty Orders,* 77 Fed. Reg. 5,484 (Dep't of Commerce Feb. 3, 2012).

On October 27, 2021, Commerce published its Final Results in which it calculated a final subsidy rate of 9.18 percent for Riverside and its cross-owned affiliates, 5.81 percent for Senmao and 8.17 percent for the non-selected companies. *Final Results* at 59,363.  The Issues and Decision Memorandum for the Final Results of the 2018 Countervailing Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China was dated concurrently with and adopted by the same notice.  *Id.* at 59,362 n.2; *see* Department of Commerce Issues and Decisions Memorandum (Oct. 27, 2021) ("IDM"), PR 393.

On December 1, 2021, Commerce published its amended Final Results in which it corrected certain ministerial errors.  *Multilayered Wood Flooring from the People's Republic of China: Notice of Amended Final Results of Countervailing Duty Administrative Review; 2018,* 86 Fed. Reg. 68,219 (Dep't of Commerce Dec. 1, 2021).

On November 23, 2021, and on December 20, 2021, Evolutions, an importer of record of subject merchandise, filed the summons and complaint, respectively, before the Court seeking judicial review of certain aspects of the Final Results.  Summons, ECF No. 1; Complaint at 1, ECF No. 13.  On February 14, 2022, the court granted defendant's motion to consolidate Evolutions' action with four other actions involving the same administrative review.[2]  Order Def.'s Mot. to Consol., ECF No. 30.  On June 24,

---

[2] These actions were filed by: (1) Dunhua City Jisen Wood Industry Co., Ltd. and Dalian Shumaike Floor Manufacturing Co., Ltd., (collectively "Dunhua and Dalian"), exporters of subject merchandise (Court No. 21-00599); (2) Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation (collectively "Baroque"), foreign producers/exporters of subject merchandise from the People's Republic of China (Court No. 21-00600); (3) Fine Furniture (Shanghai) Limited and Double F Limited (collectively "Fine Furniture"), manufacturers/exporters of the subject

2022, plaintiff and consolidated plaintiffs filed seven motions for judgment on the agency

record.  Mots. for J. on the Agency R., ECF Nos. 43-45, 48-51.[3]

Plaintiffs maintain that Commerce's Final Results were not supported by

substantial evidence on the record and were otherwise not in accordance with law with

respect to Commerce's: (1) calculation of the benchmark price for plywood; (2) inclusion

of respondent's backboard purchases in the veneers for LTAR program; (3) VAT rate

calculation; (4) finding based on AFA of use of the EBCP; and (5) benefit calculation

under the backboard veneers LTAR program.  *See, e.g.,* Baroque Mot. for J. on the

Agency R. ("Baroque Br."), ECF No. 51.  On November 9, 2023, the court heard oral

argument.  *See* Oral Arg., ECF No. 83; *see also* Oral Arg. Tr., ECF No. 84.

## JURISDICTION AND STANDARD OF REVIEW

The Court exercises jurisdiction pursuant to 28 U.S.C. §1581(c).  Section 516A of

the Tariff Act of 1930 provides also that the court will hold unlawful any determination,

---

merchandise (Court No. 21-00601); and (4) Zhejiang Dadongwu GreenHome Wood Co.
Ltd. ("GreenHome"), foreign producer and exporter of subject merchandise (Court No.
21-00602).

[3] These motions were filed by: (1) Senmao, ECF. No. 43; (2) GreenHome, ECF No. 44;
(3) Fine Furniture, ECF No. 45; (4) Evolutions, ECF No. 48; (5) consolidated plaintiffs
Yihua Lifestyle Technology Co., Ltd.; Dalian Shengyu Science and Technology
Development Co., Ltd.; Dongtai Fuan Universal Dynamics, LLC; Huzhou Sunergy World
Trade Co., Ltd.; Jiangsu Guyu International Trading Co., Ltd.; Jiangsu Simba Flooring
Co., Ltd.; Kemian Wood Industry (Kunshan) Co., Ltd.; Kingman Floors Co., Ltd.; Lumber
Liquidators Services, LLC; and Zhejiang Fuerjia Wooden Co., Ltd. (collectively "Lumber
Liquidators"), ECF No. 49; (6) Dunhua and Dalian, ECF No. 50; and (7) Baroque, ECF
No. 51.

finding or conclusion found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i)[4]

Substantial evidence constitutes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," but it requires "more than a mere scintilla."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  For a reviewing court to "fulfill [its] obligation" to determine whether a determination of Commerce is supported by substantial evidence and in accordance with law, Commerce is required to "examine the record and articulate a satisfactory explanation for its action."  *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) (quoting *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)).

Further, Commerce's determination will be sustained if it is "supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion."  *Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 837, 159 F. Supp. 2d 714, 718 (2001) (citing *Heveafil Sdn. Bhd. v. United States*, 25 CIT 147, 149 (2001)), *aff'd sub nom. Shandong Huarong Gen. Grp. Corp. v. United States*, 60 F. App'x 797 (Fed. Cir. 2003).  "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  *Universal Camera Corp.,* 340 U.S. at 488.

---

[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code, and refences to the U.S. Code are to the 2018 edition.

"To be in accordance with law, the agency's decision must be authorized by the statute, and consistent with the agency's regulations." *Yama Ribbons & Bows Co. v. United States,* 36 CIT 1250, 1253, 865 F. Supp. 2d 1294, 1297 (2012).

"It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50 (1983) (citations omitted). A reviewing court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 43 (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

"[W]hen a statute grants an agency power to administer fact-intensive inquires, the agency's conclusion should be reversed only if the record is 'so compelling that no reasonable factfinder' could reach the same conclusion." *Cooper (Kunshan) Tire Co. v. United States,* 45 CIT __, __, 539 F. Supp. 3d 1316, 1325 (2021) (quoting *INS v. Elias-Zacarias,* 502 U.S. 478, 484 (1992)).

## DISCUSSION

**I.    Whether Commerce's calculation of the benchmark price for plywood is supported by substantial evidence and otherwise in accordance with law**

The court addresses first Baroque's challenge to Commerce's calculation of the plywood benchmark.

### A.    Additional Background

In the Final Results, Commerce calculated plywood benchmark prices by weight-averaging the UN Comtrade data and the International Tropical Timber Organization ("ITTO") data placed on the record. *See* IDM at cmt. 6.

The UN Comtrade dataset consists of data covering multiple HTS categories of plywood for plywood transactions from more than 100 countries during the period of review. *See* Wiley Rein Letter regarding Administrative Case Brief (June 1, 2021) at 11-14, CR 142, PR 372. The ITTO dataset contains plywood export prices during the period of review from the European Union and Peru specific to C/CC grade plywood. *See* GDLSK Letter regarding Riverside and Baroque's Benchmark Submission (Dec. 7, 2020) at Ex. 1, CR 124, PR 196-200.

**B.    Legal framework**

Under 19 U.S.C. § 1677(5), a countervailable subsidy exists when a foreign government provides a specific financial contribution to a party, and that party *benefits* therefrom. *See* 19 U.S.C. § 1677(5) (emphasis supplied). The countervailing duty statute establishes that a *benefit* is conferred where "goods . . . are provided . . . for less than adequate remuneration," which "[is] determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review." *Id.* § 1677(5)(E)(iv). Prevailing market conditions include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.*

To determine whether goods were provided for less than adequate remuneration, "Commerce must determine the proper benchmark price." *Essar Steel Ltd. v. United States,* 678 F.3d 1268, 1273 (Fed. Cir. 2012) (quoting 19 C.F.R. § 351.511).

Commerce regulations establish a hierarchy of three tiers — Tier One, Tier Two and Tier Three — that Commerce follows "in order of preference" to identify the appropriate benchmark that it uses to determine whether the goods or services were

provided for less than adequate remuneration, as discussed below. *Beijing Tianhai Indus. Co. v. United States,* 39 CIT __, __, 52 F. Supp. 3d 1351, 1356 n.9 (2015); 19 C.F.R. § 351.511(a)(2)(i)-(iii).

When a Tier 1 benchmark is unavailable — because Commerce cannot "compar[e] the government price to a market-determined price for the good . . . resulting from actual transactions in the country in question," 19 C.F.R. § 351.511(a)(2)(i) — Commerce uses a Tier 2 benchmark. *See Beijing Tianhai Indus. Co.,* 39 CIT at __, 52 F. Supp. 3d at 1356 n.9.

Using a Tier 2 benchmark, Commerce measures the adequacy of remuneration through a world market price that would be available to purchasers in the country in question. 19 C.F.R. § 351.511(a)(2)(ii). When the record presents more than one commercially available world market price, Commerce regulations require that it "average such prices to the extent practicable, making due allowance for factors affecting comparability." *Id.* "These factors ensure that the composite benchmark reflects prevailing market conditions in the home country. The[] [factors] include 'price, quality, availability, marketability, transportation, and other conditions of purchase or sale.'" *RZBC Grp. Shareholding Co. v. United States,* 39 CIT __, __, 100 F. Supp. 3d 1288, 1305 (2015) (quoting 19 U.S.C. § 1677(5)(E)).

### C.    Analysis

Baroque argues that Commerce should use only the ITTO C/CC grade data in Commerce's plywood benchmark calculation because Baroque's plywood purchases are only of lower-grade plywood. Baroque Br. at 1-2. For the reasons discussed below,

the court concludes that Commerce's determination is reasonable and supported by substantial evidence.

In the Final Results, Commerce weight-averaged data from the ITTO and UN Comtrade datasets to calculate a benchmark price for the provision of plywood for LTAR. *See* IDM at cmt. 6. In the IDM, Commerce explained that when the record presents more than one commercially available world market price, Commerce regulations require that it "average such prices to the extent practicable." IDM at cmt. 6 (citing 19 C.F.R. § 351.511(a)(2)(ii)).

Commerce explained further that using only the ITTO data would be inappropriate because Baroque "did not provide any official company documentation to demonstrate that its plywood input was limited to a particular grade." *Id.* Commerce noted that while Baroque provided witness statements that "may be reflective of the industry as a whole," those statements did not "represent dispositive evidence of the type of input used by" Baroque and did not "tie to any of [Baroque's] documentation in this review." *Id.* Last, Commerce asserted that "nothing on the record . . . demonstrates that different grades of plywood cannot be used to produce [the] subject merchandise." *Id.*

Baroque argues that Commerce "failed to provide a reasoned explanation based on substantial evidence for including UN Comtrade data in the Tier 2 plywood benchmark (1) that are not grade specific, (2) where indisputable evidence exists that different plywood grades have *significantly* different prices, and (3) where there is no record evidence that the UN Comtrade data include comparable grades of plywood to that used by Baroque." Consol. Pls. Baroque Timber and Riverside Plywood's Reply

Br. ("Baroque Reply Br.") at 1, ECF No. 71.  Specifically, Baroque asserts that

Commerce failed to address adequately record information demonstrating that

Baroque's "plywood input is limited to lower grade purchases," such as purchase

documentation and expert witness statements.  Baroque Br. at 18-19.

The court concludes that Commerce addressed adequately record information

regarding Baroque's plywood purchases and that substantial evidence supports

Commerce's inclusion of the UN Comtrade data in the plywood benchmark.

In the IDM, Commerce explained that it included the UN Comtrade data because

Baroque failed to provide sufficient documentation in support of its assertion that its

plywood purchases consisted of only grade C/D plywood.  IDM at cmt. 6.  Commerce

added that Baroque's witness statements "may be reflective of the industry as a whole,"

but "do not tie to any of [Baroque's] documentation."  *Id.*  Therefore, Commerce stated

that it had no reason to calculate the plywood benchmark using only ITTO C/CC grade

data. *Id.*

The court concludes that Commerce determined reasonably that Baroque failed

to demonstrate that its plywood purchases were limited to grade C/D plywood.  In its

response to Commerce's Third Supplemental Questionnaire, Baroque submitted as

documentation of its plywood purchases various purchase orders, monthly purchase

summaries and warehouse-in slips.  *See* GDLSK Letter regarding Riverside and

Baroque's Third Supplemental Response (Mar. 9, 2021) at Exs. TS-2 to TS-4, CR 126,

PR 332-334.

None of the documentation submitted by Baroque demonstrates that Baroque

purchased exclusively grade C/D plywood.  Exhibits TS-2 and TS-3, while documenting

Baroque's plywood purchases, do not contain any reference to the specific grade of plywood purchased. *Id.* at Exs. TS-2, TS-3. Further, although Exhibit TS-4 does specify the grade of plywood purchased, the grades listed are not consistent with Baroque's assertion that its plywood purchases were limited to C/D grade. *Id.* at Ex. TS-4. Additionally, Baroque's counsel admitted at oral argument that "none of Baroque's actual purchase documents specify what grade the different plywood should be." Oral Arg. Tr. at 8:1-3.

Accordingly, the court concludes that Commerce's decision to average the UN Comtrade and ITTO data in calculating the plywood benchmark is supported by substantial evidence.

## II.    Whether Commerce's inclusion of respondents' backboard purchases in the veneers for LTAR program was supported by substantial evidence and otherwise in accordance with law

The court turns next to Fine Furniture's challenge to Commerce's inclusion of backboards within the veneers for LTAR program.

### A.    Legal framework

"[Commerce] determines [whether] the government of a country or any public entity . . . is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of . . . merchandise" that has entered the United States. 19 U.S.C. § 1671(a)(1).

At the conclusion of an investigation leading to such a determination, Commerce publishes a countervailing duty order that imposes duties on imported merchandise covered by the order, which "includes a description of the subject merchandise, in such detail as the administering authority deems necessary." *Id.* § 1671e(a), (e)(a)(2).

Subject merchandise is "the class or kind of merchandise that is within the scope of . . .

an order." *Id.* § 1677(25).

To determine whether merchandise is within the scope of a CVD order,

"Commerce's inquiry must begin with the order's scope to determine whether it contains

an ambiguity and, thus, is susceptible to interpretation.  If the scope is unambiguous, it

governs." *Meridian Prods., LLC v. United States,* 851 F.3d 1375, 1381-82 (Fed. Cir.

2017) (internal quotation marks and citations omitted).  Because of Commerce's

expertise concerning the meaning and scope of orders, "Commerce [receives]

substantial deference with regard to its interpretation of its own antidumping duty and

countervailing duty orders."  *Id.* (internal quotation marks and citations omitted).

"[W]hen reviewing scope determinations by the Commerce Department," the

Court looks to "whether substantial evidence supports Commerce's determination and

whether that determination accords with law."  *Novosteel SA v. United States*, 284 F.3d

1261, 1269 (Fed. Cir. 2002).

**B.    Analysis**

For the reasons discussed below, the court concludes that Commerce's inclusion

of backboards in the veneers for LTAR program is supported by substantial evidence.

In the Final Results, Commerce determined that backboards "are a type of

veneer used in the production of subject merchandise subject to the *Order* of this

review."  IDM at cmt. 9.  Therefore, Commerce "included backboard purchases . . . in

the provision of veneers for LTAR benefit calculation."  *Id.*  In the IDM, Commerce

explained that "Baroque Timber's backboard purchases during the POR are veneers,

based on the plain language of the scope."  *Id.*  Commerce highlighted the language of

the scope of the CVD Order, which provides that back plies[5] are included within the

scope:

> All multilayered wood flooring is included within the definition of subject
> merchandise, without regard to: dimension (overall thickness, thickness of
> face ply, *thickness of back ply*, thickness of core, and thickness of inner
> plies; width; and length); wood species used for the face, *back* and inner
> veneers; core composition; and face grade.

*Id.* (quoting CVD Order at 76,694) (emphases supplied).

Commerce added that the scope of the Order states that MLWF "is composed of

an assembly of *two or more layers or plies of wood veneer(s)* in combination with a

core," and that "a 'veneer' is a thin slice of wood, rotary cut, sliced or sawed from a log,

bolt or flitch. . . .  [and] *is referred to as a ply when assembled*."  *Id.* (quoting CVD Order

at 76,694) (emphases supplied).

Commerce asserted that Baroque did not provide "any information which would

indicate that its backboards do not meet the definition of a veneer" in the scope of the

Order.  *Id.*  Commerce noted that although Baroque argued "that its backboard input

has 'different unit values, different physical characteristics, different definitions, and

different end-uses,' [Baroque] also describe[d] its backboard used in the production of

wood flooring as 'one solid piece of wood, which is generally used as the bottom layer.'"

*Id.* (quoting GDLSK Letter regarding Riverside's Second Supplemental Response (Oct.

2, 2020) at 1, CR 92, PR 173).  Commerce explained that, therefore, "in accordance

with the clear language of the scope, Commerce has consistently treated all layers of

wood used in the manufacture of subject merchandise as plies/veneers, regardless of

---

[5] The court refers to back plies and backboards interchangeably.

where they are placed in the assembly (*e.g.*, face veneers, center or 'core' plies, or backboards)." *Id.*

Fine Furniture argues that Commerce's determination is unsupported by substantial evidence because Commerce "ignored abundant evidence that is contrary to its decision to equate backboards as veneers." Mem. Supp. Rule 56.2 Mot. J. on Agency R. of Fine Furniture ("Fine Furniture Br."), at 7, ECF No. 47.

Commerce explained adequately that the plain language of the Order's scope defines backboard as a type of veneer. Commerce noted that the scope of the Order defines MLWF as an assembly of multiple layers of veneer around a core and, contrary to Fine Furniture's argument, does not limit the definition of veneer to only the top layer of MLWF. IDM at cmt. 9. Commerce added that the language of the Order's scope specifically mentions "back ply" and that assembled veneer is referred to as "ply." *Id.*

Accordingly, the court concludes that Commerce's determination that backboards are included within the scope of the CVD Order is supported by substantial evidence.

## III. Whether Commerce's VAT calculation is supported by substantial evidence and otherwise in accordance with law

The court turns next to Baroque's challenge of Commerce's determination to add a 17 percent VAT rate to the benchmarks for veneers, plywood, fiberboard, glue and paint. Baroque argues that Commerce should have instead applied a 16 percent VAT rate for the portion of the POR beginning in May 2018. Baroque Br. at 33.

For the reasons discussed below, the court concludes that Commerce's determination was supported by substantial evidence because Commerce articulated a satisfactory explanation for its action. *See CS Wind Vietnam Co.*, 832 F.3d at 1376.

In the IDM, Commerce explained that although Baroque "reported paying 16 percent VAT on the purchases of inputs for LTAR after May 1, 2018, and submitted sample VAT invoices with 16 percent VAT, the GOC reported that 17 percent VAT was applicable to purchases of veneers, plywood, fiberboard, glue and paint during 2018." IDM at cmt. 13.

Baroque argues that Commerce's determination is unsupported by substantial evidence and not in accordance with law because: (1) Commerce ignored "uncontroverted record evidence demonstrating that as of May 2018, [Baroque] paid only 16 percent" VAT; and (2) Commerce "never alerted Baroque to any potential deficiency in its response with respect to the VAT rate that was reported, pursuant to 19 U.S.C. § 1677m(d)." Baroque Br. at 34.

As to Baroque's first argument, Commerce explained adequately its determination to apply the VAT rate reported by the GOC instead of the VAT rate reported by Baroque. IDM at cmt. 13. Commerce explained that the authority responsible for setting the VAT was the GOC, which certified in multiple responses that the applicable VAT for 2018 was 17 percent. *Id.*

In addition, Commerce acknowledged that Baroque "reported paying 16 percent VAT" and "submitted sample VAT invoices with 16 percent VAT," but explained nevertheless that Baroque failed to offer an explanation "as to why [Baroque's reported] VAT rate . . . differed from the VAT rate provided in the GOC's response." *Id.* Commerce, therefore, addressed Baroque's argument and its explanation was reasonable.

As to Baroque's second argument, the court concludes that Commerce's determination did not violate its obligations under § 1677m(d). Section 1677m(d) requires that if Commerce "*determines that a response to a request for information does not comply* with the request," Commerce "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency." (emphasis supplied). In other words, Commerce's obligations under § 1677m(d) are triggered only when Commerce determines first that a respondent failed to comply with Commerce's request for information. *See, e.g.*, *Saha Thai Steel Pipe Pub. Co. v. United States*, 46 CIT __, __, 605 F. Supp. 3d 1348, 1361, 1365-66 (2022) ("Having identified . . . deficiencies, Commerce was immediately confronted with its statutory obligation under [§ 1677m(d)] to provide [respondent with] notice and an opportunity to cure.").

In the IDM, Commerce did not conclude that Baroque's submissions were deficient within the meaning of § 1677m(d). *See* IDM at cmt. 13. Instead, Commerce concluded that another respondent, the GOC, provided more reliable information as to the VAT rate during the POR. *Id.* Therefore, Commerce's determination was not made in violation of § 1677m(d).

For the foregoing reasons, the court concludes that Commerce's application of a 17 percent VAT rate to the benchmarks for veneers, plywood, fiberboard, glue and paint is supported by substantial evidence and in accordance with law.

**IV.     Whether Commerce's application of AFA to find use of the EBCP is supported by substantial evidence and otherwise in accordance with law**

The court turns next to Baroque's challenge to Commerce's application of an adverse inference to find that respondents benefited from the EBCP.[6]

**A.     Legal framework**

In its calculation of a countervailing duty, Commerce uses facts otherwise available "[i]f . . . necessary information is not available on the record," 19 U.S.C. § 1677e(a)(1), or if an interested party or any other person: (1) withholds information requested by Commerce; (2) fails to submit the information on time or in the form and manner requested by Commerce; (3) significantly impedes the proceedings; or (4) provides information that cannot be verified by Commerce.  19 U.S.C. § 1677e(a)(2)(A) — (D); *see* 19 C.F.R. § 351.308(a).

In selecting from facts otherwise available, Commerce may use an inference that is adverse to the interests of a party "if [that] party has failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b)(1)(A); *see* 19 C.F.R. § 351.308(a).

When Commerce uses an inference that is adverse to an interested party, Commerce may rely on information derived from: (1) the petition; (2) a final

---

[6] The EBCP is a program of the Export-Import Bank of the People's Republic of China ("China Export-Import Bank").  *Cooper (Kunshan) Tire Co. Ltd. v. United States*, 45 CIT __, __, 539 F. Supp. 3d 1316, 1322 (2021).  The program "provides loans at preferential rates for the purchase of exported goods from China."  *Id.* (quoting *Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Countervailing Duty Administrative Review, Correction of Notification of Rescission, in Part, 2017*, 84 Fed. Reg. 58,685 (Dep't of Commerce Nov. 1, 2019) and accompanying PDM (Dep't of Commerce Oct. 10, 2019) at 25).

determination; (3) any previous review; or (4) any information placed on the record.  19 U.S.C. § 1677e(b)(2)(A)-(D).

The Court has repeatedly held that in an EBCP case, Commerce may apply AFA to a cooperative respondent only if Commerce does all the following: (1) defines the gap in the record by explaining exactly what information is missing from the record necessary to verify non-use; (2) establishes how the withheld information creates this gap by explaining the reason that the information the GOC refused to give was necessary to verify claims of non-use; and (3) shows that only the withheld information can fill the gap by explaining the reason that other information, on the record or accessible by respondents, is insufficient or impossible to verify.  *Guizhou Tyre Co. v. United States*, 45 CIT __, __, 523 F. Supp. 3d 1312, 1361 (2021) (citing *Jiangsu Zhongji Lamination Materials Co. v. United States*, 43 CIT __, __, 405 F. Supp. 3d 1317, 1333 (2019)).

**B.    Analysis**

The court addresses: (1) whether Commerce's use of AFA regarding Baroque's use of the EBCP is supported by substantial evidence and in accordance with law; and (2) whether the court should grant Commerce's remand request to evaluate further its use of AFA regarding Senmao's use of the EBCP.

For the reasons discussed below, the court concludes that Commerce's use of AFA regarding Baroque Timber's use of the EBCP is supported by substantial evidence and in accordance with law.  Additionally, the court grants Commerce's voluntary remand request to evaluate further its use of AFA regarding Senmao's use of the EBCP.

1.    **Whether Commerce's use of AFA regarding Baroque's use of the EBCP is supported by substantial evidence and in accordance with law**

The court concludes that Commerce properly: (1) defined the gap in the record created by the GOC's withholding of information; (2) established the reason that the withheld information was necessary to verify non-use; and (3) showed that only the withheld information can fill the gap by explaining the reason that other information on the record is insufficient or impossible to verify.  *See Guizhou Tyre Co.*, 45 CIT at __, 523 F. Supp. 3d at 1361.

In the Final Results, Commerce found that necessary information regarding the EBCP was not on the record because the GOC withheld information that Commerce requested.  IDM at cmt. 1.  On this basis, Commerce drew an adverse inference to determine that Baroque benefited from the EBCP.  *Id.*

In the IDM, Commerce explained that a gap in the record existed because the GOC refused to provide: (1) "a list of partner/correspondent banks that are used to disperse funds through this program"; (2) "documents making up the 'paper trail' of a direct or indirect export credit from the China EX-IM Bank" such as "specific applications, correspondence" or other "underlying [loan] documentation;" and (3) "the 2013 revisions to the administrative measures, which provide internal guidelines for how [the EBCP] is administered by the China EX-IM Bank."  *Id.*

Commerce noted that it requested the 2013 Administrative Measures and the list of partner/correspondent banks in both the initial and supplemental questionnaires to the GOC and requested the documents making up the paper trail in the supplemental

questionnaire to the GOC.  *Id.*  Commerce asserted that both times, the GOC did not

provide the requested information.  *Id.*

Commerce added that the GOC stated in response to Commerce's initial

questionnaire "that Commerce should reevaluate the information required to establish

non-use of the [EBCP], citing recent rulings from the CIT that much of the information

Commerce requests regarding this program is not necessary to determine non-use."  *Id.*

Regarding the 2013 Administrative Measures, the GOC responded "that it does not

maintain the 2013 revisions to the Administrative Measures."  *Id.*  Regarding the list of

partner/correspondent banks, the GOC asserted that "the information Commerce

requested regarding all partner/correspondent banks involved in disbursement of funds

under th[e] EBCP is [] not applicable."  *Id.*

Commerce explained that the GOC's refusal to provide this information

"constitutes withholding necessary information and impeded Commerce's ability to

analyze the program's operation or *determine how the program could be properly

verified*."  *Id.* (emphasis supplied).

Regarding the list of partner/correspondent banks, Commerce elaborated that

"the available record evidence indicates that under the [EBCP], credits are not direct

transactions from the China EX-IM Bank to the U.S customers of the respondent

exporters."  *Id.*  Commerce stated that instead "there can be intermediary banks

involved, the identities of which the GOC has refused to provide to Commerce."  *Id.*

(footnote omitted).

Commerce stated further that "based on our more recent understanding of the

[EBCP], . . . performing the verification steps to make a determination of whether the

manufacture, production, or export of the company respondents' merchandise has been

subsidized would [] require knowing the names of the intermediary banks." *Id.* (internal

quotation marks omitted).  Commerce explained that it would be the names of the

partner/correspondent banks, "not the name 'China Ex-Im Bank,' that would appear in

the subledgers of the U.S. customers if they received the credits." *Id.*  Therefore,

absent a list of the correspondent banks, a "careful verification of the company

respondent's customers' non-use of [the EBCP] . . . would be extremely difficult, if not

impossible." *Id.*

> Commerce elaborated that:

> [b]ecause Commerce does not know the identities of these banks,
> Commerce's second step of its typical non-use verification procedures (*i.e.*,
> examining the company's subledgers for references to the party making the
> financial contribution) could not by itself demonstrate that the U.S.
> customers did not use the program (*i.e.*, by examining whether there were
> any correspondent banks in the subledger).  Nor could the second step be
> used to narrow down the company's lending to a subset of loans likely to be
> the export buyer's credits (*i.e.*, loans from the correspondent banks).  Thus,
> verifying non-use of the program without knowledge of the correspondent
> banks would require Commerce to view the underlying documentation for
> all entries from the subledger to attempt to confirm the origin of each loan
> — *i.e.*, whether the loan was provided from the China EX-IM Bank via an
> intermediary bank.  This would be an extremely onerous undertaking for
> any company that received more than a small number of loans.

*Id.*

> Regarding the missing "paper trail," Commerce explained that such documents

"would be necessary even if the GOC provided the list of correspondent banks." *Id.*

Commerce elaborated with the following example:

> For instance, assuming that one of the correspondent banks is HSBC,
> Commerce would need to know how to differentiate ordinary HSBC loans
> from loans originating from, facilitated by, or guaranteed by the China EX-
> IM Bank.  In order to do this, Commerce would need to know what
> underlying documentation to look for in order to determine whether

particular subledger entries for HSBC might actually be China EX-IM Bank
financing: specific applications, correspondence, abbreviations, account
numbers, or other indicia of China EX-IM Bank involvement.

*Id.* In other words, Commerce asserted that it "would not be able to verify which

loans were normal loans versus [EBCP] loans due to its lack of understanding of

what underlying documentation to expect to review." *Id.*

Regarding the 2013 Administrative Measures, Commerce stated that such

information is required to verify non-usage because "without a thorough

understanding of the [EBCP], Commerce might not recognize indicia of [China

Export-Import Bank] involvement." *Id.* Commerce elaborated that:

> [b]ecause the [EBCP] changed in 2013 and the GOC has not provided
> details about these changes, Commerce has outstanding questions about
> how this program currently functions, *e.g.*, whether the China EX-IM Bank
> limits the provision of export buyer's credits to business contracts exceeding
> $2 million, and whether it uses third-party banks to disburse/settle export
> buyer's credits. Such information is critical to understanding how export
> buyer's credits flow to and from foreign buyers and the China EX-IM Bank
> and forms the basis of determining countervailability. Absent the requested
> information, and without a full understanding of the involvement of third-
> party banks, the mandatory respondents' (and their customers') claims of
> non-use are not verifiable.

*Id.*

Commerce summarized that, absent the requested information, it "simply do[es]

not know what to look for when [it] look[s] at a loan to determine whether the China Ex-

Im Bank was involved or whether a given loan was provided under the EBC program."

*Id.*

Baroque argues that the "missing" information identified by Commerce does not

create a gap in the record. Baroque Br. at 21-22. Baroque states that "[e]ven if this

information was [sic] critical to Commerce's 'understanding,' the information was only

[sic] critical to *understanding* the operation of the program and not *establishing usage* of this program." *Id.* at 29 (emphases supplied).  Baroque asserts that a gap in the record did not exist because "the record of this case contains overwhelming and consistent evidence demonstrating that Baroque's customers did not use the EBCP." *Id.* at 28.

This Court has previously held that "[i]t is within the discretion of Commerce to determine how to verify . . . and due deference will be given to the expertise of the agency." *Cooper (Kunshan) Tire Co. v. United States,* 46 CIT __, __, 610 F. Supp. 3d 1287, 1309 (2022) (alterations in original).  Notwithstanding the foregoing, "Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court." *Id.* (quoting *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009)).

The court concludes that Commerce explained adequately the reason that only the withheld information can fill the gap and that "no other information on the record is sufficient or possible to verify." *Id.* __, 610 F. Supp. 3d at 1311.

In the IDM, Commerce noted that Baroque provided non-use certifications from only a minority of its U.S. customers.  IDM at cmt. 1; *see also* GDLSK Letter regarding Riverside's Initial Questionnaire Response (July 13, 2020), Ex. 11a-c, CR 27-50, PR 106.  In its briefing, the government explained that "[i]n order for Commerce to determine use (or non-use) of the [EBCP], *all* of the respondent's U.S. customers must be willing to participate in the review because any benefit calculation for this program would need to take all reported U.S. customers into account."  Def.'s Resp. to Pls.' Mots. for J. on the Agency R. ("Def. Br.") at 36, ECF No. 59 (emphasis supplied).  The government argues that because "the majority of [Baroque's] U.S. customers did not

provide such certifications, Commerce reasonably determine[d] that any further

evaluation would be insufficient for purposes of verifying non-use." *Id.*

    This Court has upheld Commerce's determination to fill the gap of missing

information on the record when *all* of a respondent's U.S. customers have provided

EBCP non-use declarations and record evidence does not establish that any of these

customers used the EBCP. *See Changzhou Trina Solar Energy Co. v. United States,*

41 CIT __, __, 255 F. Supp. 3d 1312, 1317-18 (2017). Here, Baroque has not

submitted gap-filling non-use declarations for all its U.S. customers. Additionally, as

outlined above, Commerce explained the reason that the withheld information was

necessary to verify non-use of the EBCP.

    Accordingly, the court concludes that Commerce's decision to apply AFA to

Baroque's use of the EBCP is supported by substantial evidence and in accordance

with law.

### 2. Whether the court should grant Commerce's remand request to evaluate further its use of AFA regarding Senmao's use of the EBCP

    The court grants Commerce's voluntary remand request to evaluate

further Commerce's use of AFA regarding Senmao's use of the EBCP.

    As noted above, "[w]hen Commerce has access to information on the

record to fill in the gaps created by the lack of cooperation by the government, as

opposed to the exporter/producer . . . it is expected to consider such evidence."

*Cooper (Kunshan) Tire Co.*, 46 CIT at __, 610 F. Supp. 3d at 1312. In prior

proceedings, Commerce has found no gap in a record that "consisted of non-use

affidavits without any evidence contradicting non-use." *Guizhou Tyre Co. v.*

*United States,* 43 CIT __, __, 399 F. Supp. 3d 1346, 1352 (2019).

Here, Commerce requested that Senmao "report all types of financing provided by the China [EX-IM] Bank" and that Senmao reported that none of its customers used the EBCP.  PDM at 19.  Commerce explained that to support Senmao's claims of non-use, Senmao provided certifications from all its U.S. customers.  IDM at cmt. 1 (citing Letter from Husch Blackwell LLP regarding Senmao's Initial Questionnaire Response (July 6, 2020), Ex. 8).

An "agency may request a remand, without confessing error, to reconsider its previous position."  *SKF USA Inc. v. United States,* 254 F.3d 1022, 1028 (Fed. Cir. 2001).

As noted above, this Court has upheld Commerce's determination to fill the gap of missing information on the record when *all* of a respondent's U.S. customers have provided EBCP non-use declarations and record evidence does not establish that any of these customers used EBCP.  *Trina Solar,* 41 CIT at __, 255 F. Supp. 3d at 1317-18.  This Court has instructed Commerce to reconsider its decision to apply AFA to the use of the EBCP by a respondent's U.S. customers when *all* of those customers submitted non-use declarations without record evidence contradicting non-use.  *See Risen Energy Co. v. United States,* 47 CIT __, __, 658 F. Supp. 3d 1364, 1371 (2023) (remanding "for Commerce to consider Risen's rejected filing with the other accepted response as complete non-use certifications"); *Guizhou Tyre Co.,* 43 CIT at __, 399 F. Supp. 3d at 1351.

Here, Commerce has requested that the court remand this case to Commerce "to further evaluate whether there is sufficient information available or

that could be requested that may be sufficient to fill the gap of missing record information to verify claims of non-use on behalf of Senmao."  Def. Br. at 36.  The court grants Commerce's remand request.[7]

## V.    Commerce's voluntary remand request to correct an inadvertent error in its calculations for backboard veneer

The court turns last to Commerce's request for a voluntary remand to allow Commerce to correct an inadvertent error in its calculation of average unit values ("AUVs") for Baroque's purchases of fiberboard and veneer.

### A.    Legal framework

"[T]he agency may request a remand because it believes that its original decision was incorrect on the merits and wishes to change the result. . . . Remand to an agency is generally appropriate to correct simple errors, such as clerical errors, transcription errors, or *erroneous calculations*."  *SKF USA Inc.,* 254 F.3d at 1028-29 (emphasis supplied).

---

[7]  The court notes that there is no opposition to Commerce's remand request.  Reply Br. of Consol. Pl. Senmao at 1, ECF No. 66 (supporting remand request); Reply Br. of Consol. Pl. GreenHome at 1, ECF No. 67 (supporting remand request); Reply Br. in Supp. of Rule 56.2 Mot. for J. Upon the Agency R. of Consol. Pls. and Pl.-Intervenors Fine Furniture at 11, ECF No. 69 (supporting remand request); Pls.' Reply Br. to Rule 56.2 Mot. for J. on the Agency R. at 1-2, ECF No. 70 (incorporating by reference the arguments and requests for relief presented in the replies of all other plaintiffs, plaintiff-intervenors and consolidated plaintiffs); *see* Baroque Reply Br. at 15; *see* Pl.-Intervenors' Reply Br. at 5, ECF No. 73 (incorporating by reference the arguments and requests for relief presented in the replies of all other plaintiffs and plaintiff-intervenors in their reply briefs); *see* Consol. Pls.' Reply Br. at 2, ECF No. 74 (incorporating by reference the arguments and requests for relief presented in the replies of all other plaintiffs or consolidated plaintiffs).

The Court has "considerable discretion" in deciding whether to grant a request for voluntary remand by Commerce. *Nucor Tubular Prods. Inc. v. United States*, 47 CIT __, __, 619 F. Supp. 3d 1279, 1286 (2023) (citing *Home Prods. Int'l, Inc. v. United States*, 633 F.3d 1369, 1378 (Fed. Cir. 2011)). "[I]f the agency's concern is substantial and legitimate, a remand is usually appropriate." *SKF USA Inc.*, 254 F.3d at 1029.

An agency's concerns are "substantial and legitimate" if: (1) the agency has provided compelling justification for its remand request; (2) the need for finality does not outweigh the justification for voluntary remand; and (3) the scope of the remand request is appropriate. *See, e.g.*, *Sea Shepherd N.Z. v. United States*, 44 CIT __, __, 469 F. Supp. 3d 1330, 1335-36 (2020) (quoting *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 29 CIT 1516, 1522-26, 412 F. Supp. 2d 1330, 1336-39 (2005)).

## B.    Analysis

For the reasons discussed below, the court concludes that Commerce's request for a voluntary remand to correct an inadvertent error in its calculations for backboard veneer is appropriate because Commerce's concerns are "substantial and legitimate." *SKF USA Inc.*, 254 F.3d at 1029. The government has provided sufficient justification for its remand request and the scope of its remand request is limited appropriately to correction of the identified inadvertent error. *See Sea Shepherd N.Z.*, 44 CIT at __, 469 F. Supp. 3d at 1335-36. Further, parties have not raised, and the court cannot identify, any reason that the government's justification for voluntary remand would be outweighed by the need for finality. *See id.*

## CONCLUSION

In conclusion, the court sustains in part and remands in part Commerce's Final Results.  For the foregoing reasons, it is hereby

**ORDERED** that Commerce's calculation of the plywood benchmark is sustained; it is further

**ORDERED** that Commerce's inclusion of backboards within the veneers for LTAR program is sustained; it is further

**ORDERED** that Commerce's VAT rate application to the benchmarks for veneers, plywood, fiberboard, glue and paint is sustained; it is further

**ORDERED** that Commerce's decision to apply AFA to Baroque's use of the EBCP is sustained; it is further

**ORDERED** that Commerce's voluntary remand request to evaluate further its use of AFA regarding Senmao's use of the EBCP is granted; it is further

**ORDERED** that Commerce's voluntary remand request to correct an inadvertent error in its calculations for backboard veneer is granted; it is further

**ORDERED** that Commerce shall file its remand results within 90 days following the date of this Order; it is further

**ORDERED** that within 14 days of the date of filing of Commerce's remand results, Commerce shall file an index and copies of any new administrative record documents; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the Court.

**SO ORDERED**.

/s/     Timothy M. Reif    
Timothy M. Reif, Judge

Dated:     March 27, 2025    
       New York, New York