C-570-971<br>
Remand<br>
Slip Op. 25-33<br>
POR: 01/01/2018 – 12/31/2018<br>
**Public Document**<br>
E&C/OVIII: LJS

*Evolutions Flooring, Inc. et al. v. United States*
**Court No. 21-000591, Slip Op. 25-33 (CIT March 27, 2025)**
**Multilayered Wood Flooring from the People's Republic of China**

FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND

**I.   SUMMARY**

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the opinion and remand order of the U.S. Court of International Trade (the Court) in *Evolutions Flooring, Inc. et al. v. United States*, Consol. Court No. 21-000591, Slip Op. 25-33 (March 27, 2025) (*Remand Opinion and Order*).  These final results of redetermination concern the final results of the 2018 administrative review of the countervailing duty (CVD) order on multilayered wood flooring from the People's Republic of China (China).[1]

In the *Remand Opinion and Order*, the Court granted Commerce's request for a voluntary remand to further evaluate its use of adverse facts available (AFA) to find that Jiangsu Senmao Bamboo Wood Industry Co., Ltd. (Senmao) used the Export Buyers Credit Program (EBCP) and correct an error in the benefit calculation of the provision of veneers for less than adequate remuneration (LTAR) program, with respect to backboard veneer purchases reported by Baroque Timber Industries (Zhongshan) Co., Ltd. (Baroque Timber), a cross-owned affiliate of Riverside Plywood Corporation (Riverside Plywood).[2]  On June 12, 2025, we released our Draft Remand

---

[1] *See Multilayered Wood Flooring from the People's Republic of China:  Final Results and Partial Recission of Countervailing Duty Administrative Review; 2018*, 86 FR 59362 (October 27, 2021) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See Remand Opinion and Order*.

to interested parties.[3] On June 18, 2025, we received comments from Fine Furniture (Shanghai) Limited and Double F Limited (collectively, Fine Furniture).[4] No other interested party filed comments.

As discussed below, pursuant to the Court's *Remand Opinion and Order*, Commerce has addressed the party's comments regarding Commerce's finding that Senmao did not use the EBCP during the period of review (POR), in addition to Commerce's correction of an error in the benefit calculation for Baroque Timber, a cross-owned affiliate of Riverside Plywood, under the provision of veneers for LTAR program.[5]

## II.    BACKGROUND

On February 6, 2020, Commerce initiated an administrative review of the CVD order on multilayered wood flooring from the People's Republic of China (China) for 166 producers and exporters of subject merchandise for the POR January 1, 2018, through December 31, 2018.[6] On April 22, 2020, Commerce selected Riverside Plywood, including its cross-owned affiliate Baroque Timber, and Senmao as mandatory respondents.[7] On May 14, 2020, Commerce issued its initial questionnaire to the Government of China (GOC),[8] and on May 28 and June 4, 2020, Senmao and Riverside Plywood timely filed their affiliation questionnaire responses.[9] Between July 6 and 16, 2020, Senmao, Riverside Plywood, and the GOC timely filed initial questionnaire

---

[3] *See* Draft Results of Remand Redetermination, *Evolutions Flooring, Inc. et al. v. United States*, Consol. Court No. 21-000591, Slip Op. 25-33 (CIT 2025), dated June 12, 2025 (Draft Remand).
[4] *See* Fine Furniture's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated June 18, 2025 (Fine Furniture Draft Remand Comments).
[5] *Id.*
[6] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 FR 6896 (February 6, 2020).
[7] *See* Memorandum, "Respondent Selection," dated April 22, 2020.
[8] *See* Commerce's Letter, "Countervailing Duty Questionnaire," dated May 14, 2020 (Initial Questionnaire).
[9] *See* Senmao's Letter, "Affiliation Questionnaire Response," dated May 28, 2020; *see also* Riverside's Letter, "Riverside Plywood Affiliation Response," dated June 4, 2020.

responses.¹⁰  On August 19 and 21, 2020, Commerce issued supplemental questionnaires to Senmao, Riverside Plywood, and the GOC, and, on September 8, 2020, all three parties timely filed responses to Commerce's supplemental questionnaire.¹¹

A. Senmao's Claimed Non-Use of the EBCP

In their initial questionnaire responses, Senmao and Riverside Plywood reported that neither company nor any of their U.S. customers used or benefited from the EBCP during the POR.¹²  To support its response, Senmao provided declarations of non-use from all of its U.S. customers during the POR.¹³  Riverside Plywood provided non-use declarations from only a subset of its U.S. customers.¹⁴  In the GOC's IQR, the GOC also reported that neither Senmao, Riverside Plywood, nor their U.S. customers, had used or benefited from the EBCP during the POR.¹⁵  The GOC provided the *Administrative Measures of Export Buyer's Credit of the Export-Import Bank of China* (*Administrative Measures*) and the *Detailed Implementation Rules Governing Export Buyer's Credit of the Export-Import Bank of China* (*Implementing Rules*).¹⁶  These documents provide internal guidelines for the China Export-Import Bank on the operations of the EBCP.  However, the GOC failed to provide other information requested by Commerce, including:  (1) the 2013 revisions to the *Administrative Measures* (2013 Revisions); (2) a list of

---

¹⁰ *See* Senmao's Letter, "Section III Questionnaire Response," dated July 6, 2020 (Senmao IQR); *see also* Riverside's Letter, "Riverside Plywood Initial Questionnaire Response," dated July 13, 2020 (Riverside IQR); and the GOC's Letter, "GOC Section II Questionnaire Response," dated July 16, 2020 (GOC IQR).
¹¹ *See* Commerce's Letter, "Affiliated Companies and Section III Initial Questionnaire Responses," dated August 19, 2020; *see also* Riverside's Letter, "Riverside Plywood Response to Supplemental Questionnaire," dated September 8, 2020 (Riverside SQR); Commerce's Letter, "2018 Countervailing Duty Administrative Review Section II Supplemental Questionnaire," dated August 21, 2020 (GOC supplemental questionnaire); the GOC's Letter, "GOC Supplemental Questionnaire Response," dated September 8, 2020 (GOC SQR); Commerce's Letter, "2018 Countervailing Duty Administrative Review Section III Supplemental Questionnaire," dated August 21, 2020; and Senmao's Letter, "Section III Supplemental Questionnaire Response," dated September 8, 2020.
¹² *See* Senmao IQR at Exhibits 7 and 8; *see also* Riverside IQR at Exhibits 11A, 11B and 11C.
¹³ *See* Senmao IQR at Exhibit 8.
¹⁴ *See* Riverside IQR at Exhibit 11C.
¹⁵ *See* GOC IQR at 8-9.
¹⁶ *Id.* at 8-9 and Exhibits Export-2 and Export-3.

3

all partner/correspondent banks involved in the disbursement of funds under the EBCP; and (3) documentation of direct or indirect export credits from the China Export Import Bank (*e.g.*, applications, correspondents, or underlying loan documentation), as routinely requested in Commerce's initial questionnaire. In a supplemental questionnaire, Commerce again asked the GOC to provide the requested information pertaining to the EBCP.[17] In response, the GOC again failed to provide the information requested stating, "{t}he GOC has confirmed that none of the respondents or its cross-owned affiliates has applied or received benefits under this program. Thus, the GOC believes this question is not applicable."[18]

In the *Preliminary Results*, Commerce found that these failures to provide the requested information regarding the EBCP described above created gaps in the record and significantly impeded the proceeding within the meaning of sections 776(a)(1), (2)(A), and (C) of the Act and that the GOC had failed to cooperate by not acting to the best of its ability.[19] As a result of the GOC's failure to cooperate, Commerce preliminarily concluded that the application of AFA was warranted, pursuant to section 776(b) of the Act, to find that the EBCP constitutes a financial contribution and is specific within the meaning of sections 771(5)(D) and 771(5A) of the Act, respectively.[20] Commerce also found that "the GOC's failure to provide the requested information further undermines Commerce's ability to verify Jiangsu Senmao's and Riverside Plywood's (and its cross-owned affiliate Baroque Timber) claims of non-use."[21] As explained in the *Preliminary Results*, Commerce found that, in order to verify claims of non-usage, the 2013 Revisions and a list of all EBCP partner/correspondent banks involved in the disbursement of

---

[17] *See* GOC Supplemental Questionnaire at 4-5.
[18] *See* GOC SQR at 4-5.
[19] *See Multilayered Wood Flooring from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Intent To Rescind Review, in Part; 2018*, 86 FR 21693 (April 23, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum at 22.
[20] *Id.* at 20.
[21] *Id.* at 21.

4

funds under the EBCP were necessary to understand how the program operates. Therefore, on the grounds of the GOC's non-cooperation, Commerce preliminarily determined that Senmao and Riverside Plywood (including its cross-owned affiliated Baroque Timber), used and benefited from the EBCP, despite their claims that their respective U.S. customers did not receive export buyer's credits under this program during the POR.[22]

In their case briefs, Riverside Plywood, Senmao, and the GOC objected to the application of AFA to find that Riverside Plywood and Senmao had used the EBCP, arguing that the record contained sufficient information to conclude that neither Riverside Plywood (including its cross-owned affiliate, Baroque Timber), nor Senmao had used or benefited from the EBCP during the POR, and that the gaps in the record cited by Commerce did not create a gap in the record with respect to the respondents' reported usage of the program.[23]

Commerce continued to find, consistent with the *Preliminary Results*, that the GOC's non-cooperation merited the application of AFA to find that Senmao and Riverside Plywood (including its cross-owned affiliate, Baroque Timber), had used and benefited from the EBCP. Commerce explained that without the 2013 Revisions and the list of correspondent banks, verifying the respondents' claims of non-use would not be feasible because Commerce would be unable to differentiate between loans made under the EBCP and unrelated financing. Commerce also stated that the record evidence in support of Senmao and Riverside Plywood's (including its cross-owned affiliate, Baroque Timber), claims of non-use (*i.e.*, declarations from U.S. customers) were unverifiable in light of the GOC's non-cooperation.[24] Thus, for the *Final*

---

[22] *Id*.
[23] *See* Senmao's Letter, "Case Brief," dated June 1, 2021, at 2-4; *see also* Riverside's Letter, "Administrative Case Brief," dated June 21, 2021 (Riverside's Case Brief), at 31-38; and GOC's Letter, "Case Brief of Government of the People's Republic of China," dated June 1, 2021, at 2-7.
[24] *See Final Results* IDM at 29.

5

*Results*, Commerce continued to conclude that the application of AFA was warranted to find that Senmao and Riverside Plywood (including its cross-owned affiliate, Baroque Timber), had used and benefited from the EBCP.[25]

In the *Remand Opinion and Order*, the Court upheld Commerce's application of AFA with respect to Riverside Plywood's (including its cross-owned affiliate, Baroque Timber), usage of the EBCP, and granted Commerce's request to reevaluate its application of AFA with respect to Senmao, specifically "to further evaluate whether there is sufficient information available or that could be requested that may be sufficient to fill the gap of missing record information to verify claims of non-use on behalf of Senmao."[26]

B. Riverside Plywood's Reported Backboard Veneer Purchases

In its initial questionnaire response, Riverside Plywood reported that Baroque Timber, its cross-owned affiliate, purchased backboard, a type of veneer Commerce has found to be included in the provision of veneers for LTAR program.[27] The company also reported purchasing other kinds of veneer and fiberboard, additional inputs covered by LTAR programs under examination in the administrative review.[28] At Commerce's request, Baroque Timber also provided "warehouse-in slips"[29] to demonstrate the wood species and dimensions of its reported purchases of backboard, fiberboard, and face veneer.[30] This information is necessary to convert the purchase quantities to kilograms (kg) in order to calculate the average unit values (AUV) of

---

[25] *Id*. at 32-33.
[26] *See Remand Opinion and Order* at 21-28.
[27] *Id*. at 14-16.
[28] *See* Riverside IQR at 23-24 and Exhibit 12.
[29] As described by Riverside Plywood in the underlying review, a warehouse-in slip is a type of inventory documentation that records the wood species of the input product when it is received by Riverside Plywood's and Baroque Timber's warehouses. Here, Riverside Plywood is specifically referencing the warehouse-in slips it utilizes to record receipt of veneer inputs to subject merchandise, which tie to its purchases of such inputs with respect to the total value and quantity of the purchase in cubic meters. *See* Riverside SQR at 2-3.
[30] *See* Riverside SQR at 1 and Exhibits SS-1 and SD-12; *see also* Riverside IQR at Exhibits 12 and 21a.

these purchases to compare such purchases to the benchmark prices, which are on a per-kg basis. However, Baroque Timber's reported warehouse-in slips were not tied one-to-one with its reported invoices for fiberboard and veneer. Instead, the purchases of numerous invoices are reflected in one or more warehouse-in slips. As the warehouse-in slips did not indicate the value of the purchases inputs and the invoice quantities were not convertible without the dimensions recorded only on the warehouse-in slip, it was necessary to use both documents in calculating the AUV of Baroque Timber's purchases. Therefore, in the *Preliminary Results*, Commerce calculated the AUV of Baroque Timber's purchases of fiberboard and veneer (including backboard) on a batch basis by summing the values of one or more invoices and dividing by the quantity of a corresponding batch of one or more warehouse-in slips.[31]

In its administrative case brief, Riverside Plywood argued, *inter alia*, that in the *Preliminary Results* Commerce had incorrectly calculated the AUVs for Baroque Timber's purchases of backboard, veneer, and fiberboard, resulting in an inaccurate benefit amount and subsidy rate.[32] Specifically, Riverside Plywood stated that, in calculating the AUVs of fiberboard and veneer on a batch basis, as described above, Commerce had wrongly excluded certain invoice values that were part of the same batch, which led to the batch's AUVs being lower than the correct amount.[33] Riverside Plywood also noted that calculating AUVs on a batch basis was unnecessary for Baroque Timber's backboard because it was possible to calculate the AUV on an invoice-specific basis using the warehouse-in slips only to identify the wood species of the reported backboard purchases.[34] This was because the invoiced quantity is reported in cubic meters, thus only required a density conversion factor to convert to kilograms (*i.e.,* the unit

---

[31] *See Final Results* IDM at 79.
[32] *See* Riverside's Case Brief.
[33] *Id*. at 14-18.
[34] *Id*. at 18.

of the benchmark prices).[35]  In its rebuttal brief, the American Manufacturers of Multilayered Wood Flooring (the petitioner) argued that Commerce should not revise Baroque Timber's veneer benefit calculation, as such calculation is based on the volume and value information reported by Riverside Plywood.[36]

As explained in the *Final Results*, Commerce agreed with Riverside Plywood's argument and found that the errors in the AUV calculation of Baroque Timber's purchases of fiberboard and face veneer resulted in "abnormal" AUVs for these purchases and consequently distorted the calculated benefit amount.[37]  For the final results, Commerce re-calculated the AUV for Baroque Timber's purchases of fiberboard and face veneer on a batch basis by dividing the total weight as indicated on one or more warehouse-in slips by one or more corresponding commercial invoices.[38]  However, Commerce inadvertently did not address Riverside Plywood's comments on the calculation of the AUV for Baroque Timber's purchases of backboard and made no changes with respect to its calculation methodology.[39]  In its ECF No. 51-1 brief, Baroque Timber argued that Commerce's calculation of the benefit calculation for its backboard veneer purchases continued to be incorrect.[40]  Upon reexamination of the record, we agree, and correct this calculation as explained below.

### III.   ANALYSIS

In the *Remand Opinion and Order*, the Court granted Commerce's voluntary remand request with respect to two issues.  Our analysis of these two issues is set forth in the sections below.

---

[35] *Id*.
[36] *See* Petitioner's Letter, "Rebuttal Brief," dated June 15, 2021, at 11-13.
[37] *Id.*; *see also Final Results* IDM at Comment 11.
[38] *See Final Results* IDM at Comment 11.
[39] *Id*; *see also* Memorandum, "Final Results Calculations for Riverside Plywood Corporation," dated October 20, 2021 (Riverside Final Calculations Memorandum), at Attachment 2, tab "Baroque Back Veneer."
[40] *See* Baroque 56.2 Brief at 31-33 (June 24, 2022) (ECF No. 51-1).

A.    **Senmao's Claimed Non-Use of the EBCP**

As noted above, Senmao provided declarations from all of its U.S. customers during the POR to support its claim that it did not use the EBCP.[41] However, in *Final Results*, we determined that the GOC's non-cooperation rendered Senmao and Riverside Plywood's (including its cross-owned affiliate, Baroque Timber), claims of non-use unverifiable. Moreover, the GOC's failure to fully cooperate resulted in gaps in the record, and thus, Commerce relied on AFA to find that Senmao and Riverside Plywood (including its cross-owned affiliate, Baroque Timber), had used and benefited from the EBCP during the POR, as explained above. In the *Remand Opinion and Order*, the Court upheld Commerce's application of AFA with respect to Riverside Plywood's (including its cross-owned affiliate, Baroque Timber), use of the EBCP, and granted Commerce's request for a voluntary remand to reconsider whether there is sufficient information available or that could be requested that may be sufficient to fill the gap of missing record information to verify Senmao's claims of non-use. After reconsideration of the record information concerning the EBCP, we find that Senmao's provision of non-use certificates for all its U.S. customers, taken together, represent sufficient record evidence that Senmao did not use or benefit from the EBCP for purposes of this remand proceeding.

As explained in the "Background" section above, we found it appropriate to apply AFA, pursuant to sections 776(a)(1) and 776(b) of the Act, with respect to the EBCP because the GOC failed to provide, after repeated requests, the 2013 Revisions and a list of all partner/correspondent banks involved in the disbursement of funds under the EBCP. Based on

---

[41] *See* Senmao IQR at Exhibit 8.

AFA, Commerce found the EBCP to be countervailable and to have conveyed a benefit to Senmao and Riverside in the *Final Results*.

Upon reconsideration of the record, we find the non-use certificates for all of Senmao's U.S. customers adequate to fill the gap created by the GOC's non-cooperation, for the purposes of this remand proceeding.[42] Pursuant to sections 776(a)(1) and (2)(D) of the Act, where necessary information is not available on the record or information is provided, but such information cannot be verified, pursuant to section 782(i) of the Act, Commerce shall, subject to section 782(d) of the Act, use the facts otherwise available in reaching its determination.

As noted above, Senmao provided declarations from all of its U.S. customers that they did not use or benefit from the EBCP during the POR.[43] We find that this information is sufficient to demonstrate that Senmao and its U.S. customers did not use or benefit from the EBCP for purposes of this remand proceeding. Therefore, we find that the information provided by Senmao is sufficient to support finding non-use of the program with regard to Senmao and its U.S. customers.

**B.     Correction of an Inadvertent Error in the Veneers for LTAR Calculation**

In addition, we are correcting an inadvertent error with respect to the calculation of the benefit received by Riverside Plywood under the veneers for LTAR program from its cross-owned affiliate Baroque Timber's purchases of backboard veneer, as described above. Specifically, in the *Final Results*, we incorrectly calculated the AUV of Baroque Timber's

---

[42] This is consistent with prior CIT determinations.  *See*, *e.g.*, *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 255 F. Supp. 3d 1312, 1316-19 (CIT 2017).
[43] *See* Senmao IQR at Exhibit 8.

backboard veneer purchases by using the invoice value and the warehouse-in slip quantity, rather than the quantity and value as indicated on each invoice.

As described above, Baroque Timber provided warehouse-in slips to demonstrate the species and dimensions of its reported purchases of backboard veneer, as well as fiberboard and face veneer.[44] The warehouse-in slips contained information necessary to convert Baroque Timber's reported purchase quantities of fiberboard and face veneer to kilograms to compare the AUVs of its purchases to benchmark prices. However, upon a reexamination of the record, we find that it is possible to calculate the AUVs of Baroque Timber's reported backboard purchases using the invoice quantity and value, and relying on the corresponding warehouse-in slips for these purchases only to determine the wood species (which determines the density conversion factor used). This is consistent with Riverside Plywood's explanation in its case brief that it is unnecessary to calculate the AUVs of Baroque Timber's backboard purchases on a batch basis, as Commerce did for Baroque Timber's purchases of fiberboard and face veneer, because the cubic meter quantity is indicated on each invoice of Baroque Timber's reported backboard purchases.[45]

Therefore, we revised our calculations to calculate the AUV of Baroque Timber's backboard veneer purchases by using the quantity and value of each reported invoice, rather than by directly linking warehouse-in slips and invoices or on a batch basis as described above. It is Commerce's preference to calculate on an invoice-specific basis the AUV of reported purchases

---

[44] *See* Riverside SQR at 1 and Exhibits SS-1 and SD-12; *see also* Riverside IQR at Exhibits 12 and 21a.
[45] *See* Riverside's Case Brief at 18.

subject to an LTAR program (and the resulting benefit), as reflected in the Initial Questionnaire[46] and the calculations for Riverside Plywood's other LTAR programs.[47]

Correcting the subsidy rate attributable to Baroque Timber, as described above, results in a revised rate of 1.38 percent *ad valorem* for the provision of veneers for LTAR program for Riverside Plywood, and an overall countervailable subsidy rate for Riverside Plywood of 9.02 percent.[48]

## IV.    INTERESTED PARTY COMMENTS

We have addressed the comments received in the Fine Furniture Draft Remand Comments. As stated above and explained further below, Fine Furniture supports Commerce's findings that Senmao did not benefit from the EBCP, that Commerce's correction in its calculation of a benefit to Baroque Timber under the Provision of Veneers for LTAR program is supported by substantial evidence, and Commerce's recalculation of the non-selected companies subsidy rate.[49]

**Issue 1:    Whether Commerce's Redetermination that Senmao Did Not Benefit from the EBCP Is Supported by Substantial Evidence**

*Fine Furniture Draft Remand Comments:*

The following is a verbatim summary of argument submitted by Fine Furniture. For further details, *see* Fine Furniture Draft Remand Comments at 2.

> {Commerce} properly determined that {Senmao} did not benefit from the {EBCP} because Commerce properly found that Senmao has provided certificates from all of its customers confirming non-use of the EBCP and the certificates are able to fill a gap on the record created by the {GOC}.

---

[46] *See* Initial Questionnaire at III-10 to III-11.
[47] *See* Riverside Final Calculations Memorandum at Attachment 2, tabs "Baroque Plywood," "Riverside Plywood," "Baroque Glue," and "Baroque Paint."
[48] *See* Memorandum, "Calculations for Draft Results of Redetermination Pursuant to Court Remand," dated June 12, 2025, at Attachment 2.
[49] *See* Fine Furniture Draft Remand Comments at 2-4.

12

**Commerce's Position:**

Fine Furniture agrees with Commerce's redetermination that finds non-use for the EBCP where respondent Senmao has provided certificates from all its customers confirming non-use of the EBCP.[50] No other interested party contested Commerce's finding; therefore, Commerce continues to find that Senmao did not use the EBCP during the POR.

**Issue 2: Whether Commerce's Correction for the Calculation of the Benefit Under the Veneers for LTAR Program for Baroque Timber is Supported by Substantial Evidence**

*Fine Furniture Draft Remand Comments:*

The following is a verbatim summary of argument submitted by Fine Furniture. For further details, *see* Fine Furniture Draft Remand Comments at 2-3.

> Commerce's recalculation of the benefit received by {Baroque Timber} under the veneers for {LTAR} program is supported by substantial evidence because it is in line with Commerce's practice in using the value and quantity of each reported invoice rather than linking warehouse-in slips and invoices or on a batch basis.

**Commerce's Position:**

Fine Furniture agrees with Commerce's correction of an inadvertent error in the AUV calculation of Baroque Timber's backboard veneer purchases under the veneers for LTAR program. No other interested party contested Commerce's finding; therefore, Commerce continues to find that the revised subsidy rate attributable to Baroque Timber under the provision of veneers for LTAR program is 1.38 percent *ad valorem*, resulting in an overall countervailable subsidy rate for Riverside Plywood of 9.02 percent *ad valorem* during the POR.

---

[50] *Id*.

**Issue 3: Whether Commerce's Revision to the Assigned Subsidy Rate for the Non-Selected Companies Is Supported by Substantial Evidence and In Accordance With Law**

*Fine Furniture Draft Remand Comments:*

The following is a verbatim summary of argument submitted by Fine Furniture. For further details, *see* Fine Furniture Draft Remand Comments at 3-4.

> Commerce properly recalculated the assigned subsidy rate to the non-selected companies that are parties to the litigation based on the revised rates assigned to Senmao and {Baroque Timber}.

**Commerce's Position:**

Fine Furniture agrees with Commerce's revised calculation and assignment of a consequently adjusted subsidy rate for the non-selected companies in the underlying administrative review. No other interested party contested Commerce's finding; therefore, Commerce continues to calculate a subsidy rate of 7.91 percent *ad valorem* for the non-selected companies under review based on the revised subsidy rates calculated for Senmao and Baroque Timber.

**V.    FINAL RESULTS OF REDETERMINATION**

Consistent with the *Remand Opinion and Order*, Commerce has reexamined Senmao's claim that it did not use the EBCP during the POR and has corrected an error in the benefit calculation for the provision of veneers for LTAR program, utilizing the revised subsidy rates for Senmao and Baroque Timber to find a revised subsidy rate attributable to the non-selected companies under review. For the purposes of these final results of remand redetermination, Commerce finds Senmao's provision of non-use declarations from all of its U.S. customers sufficient evidence to demonstrate that Senmao and its U.S. customers did not use or benefit from the EBCP for the purposes of this remand proceeding, and finds that the quantity and value of Baroque Timber's reported veneer purchase invoices are sufficient to calculate a benefit

received by the company under the provision of veneers for LTAR program. Therefore, the final, revised subsidy rates attributable to Senmao, Baroque Timber, and the non-selected companies under review for the period January 1, 2018, through December 31, 2018, are 5.29 percent, 9.02 percent, and 7.91 percent, respectively. If Commerce's final results of redetermination are sustained by the Court, Commerce intends to publish a *Timken*[51] notice with the amended final determination in the *Federal Register* and issue appropriate customs instructions to CBP, consistent with the discussion above.

7/8/2025

X _/s/ Chris Abbott_

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[51] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (Timken); s*ee also Diamond Sawblades Manufacturers Coalition v. United States*, 626 F.3d 1374 (Fed. Cir. 2010).